IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LAZY S RANCH PROPERTIES, LLC, an Oklahoma limited liability company,<br><br>    Plaintiff,<br><br>v.<br><br>VALERO TERMINALING AND DISTRIBUTION COMPANY; VALERO PARTNERS OPERATING CO. LLC; and VALERO PARTNERS WYNNEWOOD, LLC,<br><br>    Defendants. | Case No. 19-cv-425-JWB |

**DEFENDANTS' FED. R. EVID. 702 MOTION TO EXCLUDE EXPERT OPINIONS OF J. BERTON FISHER**

Defendants (collectively referred to as "Valero") request an order prohibiting Plaintiff from offering the testimony and opinions of one of its expert witnesses, J. Berton Fisher.

**INTRODUCTION**

Plaintiff erroneously alleges its property, the Lazy S Ranch (the "Ranch"), is contaminated by trace hydrocarbons allegedly leaking from a pipeline owned and operated by Valero Partners Operating Co., LLC (the "Wynnewood Pipeline"). However, Plaintiff has not been able to identify a single leak on the Wynnewood Pipeline. In an attempt to establish the Wynnewood Pipeline as the source of the hydrocarbons, Plaintiff intends to offer the opinion testimony of Fisher. *See* Dkt. 131 (Fisher Report); Dkt. 200 (Fisher Rebuttal Report); Ex. 1 (Fisher Dep.).

Fisher claims that the Wynnewood Pipeline is the source of the trace hydrocarbon readings on the Ranch. But Fisher failed to adequately account for other potential hydrocarbon sources on the Ranch—either in his report or subsequently in his improper "rebuttal" report. For example, he failed to adequately account for another pipeline on the Ranch <u>between</u> the Wynnewood Pipeline and Tulip Springs, as well as several nearby underground storage tanks ("USTs"), including one

designated by the OCC as a LUST ("Leaking" UST). Moreover, his opinions regarding the presence of hydrocarbons are based on sampling data collected using novel and unreliable methods such as polypropylene cloths and Bio-Traps®. Fisher's proposed testimony and opinions are unreliable and inadmissible as explained below.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal courts. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). As the "gatekeeper," the Court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is scientifically valid and applicable to a particular set of facts." *Goebel v. Denver and Rio Grande W.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). Rule 702 provides a qualified witness may testify to their opinions if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590. "[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589-90. An "expert's conclusions are not immune from scrutiny: A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Hollander v. Sandoz Pharmaceuticals Corp.*, 289 F.3d 1193, 1205 (10th Cir. 2002) (citing *Gen. Elec Co. v. Joiner*, 522 U.S. 136, 147 (1997)). "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." *Gen. Elec.*, 522 U.S. at

146. "[A]ny step that renders the analysis unreliable renders the expert's testimony inadmissible." *Palmer v. Asarco Inc.*, 2007 WL 2381242, at *2 (N.D. Okla. Aug. 13, 2007).

Federal Rule of Evidence 702's burden rests on "the proponent of the expert proffer" to establish "admissibility by a preponderance of proof." *Daubert*, 509 U.S. at 592 n.10; *accord Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001).

## ANALYSIS

**I.    Fisher's Testimony that the Wynnewood Pipeline is the Source of Trace Hydrocarbons on the Ranch Should be Excluded as Unreliable.**

Fisher cannot identify a leak on the Wynnewood Pipeline, and certainly not on the Ranch. Ex. 1 (Fisher Dep.) at 45:5-9, 152:20-25; 195:4-7, 228:22-24, 252:14-23. Neither can anyone else. *See*, *e.g.*, Ex. 2 (Ede Dep.) at 79:9-10, 185:8-15; Ex. 3 (Macbeth Dep.) at 83:11-16; Ex. 4 (Miller Dep.) at 159:18-20, 161:24-162:5; Ex. 5 (Roos IV Dep.) at 79:2-7, 91:14-92:13.

Fisher has not determined the (non-existent) "pathway" the hydrocarbons allegedly take from the Wynnewood Pipeline to the soil and water on the Ranch, including at Tulip Springs on the far west side of the Ranch. Ex. 1 (Fisher Dep.) at 118:10-14. Fisher has not drilled monitoring wells to locate and identify the contours of the alleged hydrocarbon plume originating from the Wynnewood Pipeline, even though Plaintiff's experts agree this is the commonly accepted way to identify whether a plume exists and/or measure a plume. *See* Ex. 3 (Macbeth Dep.) at 19:15-21 (monitoring wells are a "customary way to try to figure out where [a] plume is"); Ex. 2 (Ede Dep.) at 172:9-13; *see also* Ex. 1 (Fisher Dep.) at 114:9-21 (discussing his own prior use of monitoring wells). Experts for both sides agree this is a basic and necessary first step to site investigation, but it was omitted from the process here entirely. And although Fisher attempted to perform an electro-resistivity analysis, presumably to try and identify a hydrocarbon pathway (if one existed), that analysis failed because Fisher admits he does not know the "pathway" from the Wynnewood

3

Pipeline to Tulip Springs. Ex. 1 (Fisher Dep.) at 118:10-14. This is unsurprising, as Fisher's electro-resistivity analysis suffered many flaws, including distorted data caused by the presence of metal pipelines. Ex. 6 (Petersen Dep.) at 115:8-116:7, 121:4-127:12.

Because Fisher cannot identify a leak or a hydrocarbon pathway, he is left to conclude the Wynnewood Pipeline is leaking solely because he does not "see any other viable sources" for the trace hydrocarbons he claims to have found at the Ranch. Ex. 1 (Fisher Dep.) at 49:12-13. Because Fisher has no other basis for his opinion that the Wynnewood Pipeline is the source of the hydrocarbons, if there is any other possible source, his method fails. *See Agee v. Purdue Pharms.*, 2004 WL 5352989, at *2 (W.D. Okla. Nov. 22, 2004) (in making reliability determinations, courts consider "whether the expert has adequately accounted for obvious alternative explanations"); *Claar v. Burlington N. R.R.*, 29 F.3d 499, 502 (9th Cir. 1994) (expert opinions were unreliable for failure "to rule out other possible causes for the injuries plaintiffs complain of"); *Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1995) (finding "case reports" unreliable because, among other things, they "do not isolate and exclude potentially alternative causes"); *Shell Oil v. Haunchild*, 223 P.2d 333, 337 (Okla. 1950) (when escape of contaminant from a wellsite "is posed as a possibility, it is in the realm of conjecture and not competent as evidence"). In an October 13, 2022, hearing, Magistrate Judge West preliminarily stated she intended to grant Valero's motion to exclude Fisher's untimely tests, took the matter under further advisement, and indicated a written ruling will follow. Ex. 14 (Hearing Tr.) 32:3-34:5; Dkt. 255 (Oct. 13, 2022, H'rg Minute Order) at 1. Because that order has not yet issued, and for purposes of this Motion, Valero considers Fisher's sampling data as still being in the case.

Fisher wholly failed to evaluate and exclude other potential hydrocarbon sources in his report. Not until *Valero's* experts set forth several obvious alternative sources did Fisher provide

4

*any* support for the notion that there are no other viable sources. Even if these new opinions are admitted, Fisher still fails to adequately account for other potential causes in a scientifically reliable way. Fisher's testimony regarding causation for parts-per-billion traces of hydrocarbons alleged to be at the Ranch must be excluded under F.R.E. 702 and related case law.

      A.      **Fisher's Opinions Are Unreliable Because He Did Not Adequately Account for Other Potential Causes.**

Federal Rule 26(a)(2) required Fisher to set forth in his report "the basis and reasons for" his opinion that the Wynnewood Pipeline was the source of the hydrocarbons as well as the "facts or data" he considered in coming to that conclusion. And, as discussed in the case law cited above, that includes his evaluation and exclusion of other possible sources of the hydrocarbons.

Fisher's report does not reflect any efforts to evaluate and exclude other potential causes. Fisher's report indicates:

> The only other active pipeline on the Lazy S Ranch is the Eagle System pipeline reported by PHMSA as operated by BKEP Pipeline, LLC. This pipeline carries only crude oil, and has not carried any petroleum products such as gasoline or diesel fuel. As a consequence, the only significant source of gasoline and/or diesel fuel within the boundaries of the Lazy S Ranch and atop the Arbuckle-Simpson Aquifer is the Valero pipeline.

Dkt. 131 (Fisher Report) at 8; *see also id.* at 6. First, it is simply not true that the BKEP Pipeline (the "Blue Knight Pipeline") "has not carried any petroleum products such as gasoline or diesel fuel." It carried refined petroleum products until 2008. Ex. 7 (Smith Dep.) at 200:6-9.

Other than the above reference, there is no indication that Fisher considered any other potential sources of the hydrocarbons. Instead, he improperly <u>assumed</u> the source had to be the Wynnewood Pipeline. There is not a single mention of other sources, including petroleum pipelines, underground storage tanks ("USTs"), radio towers, and roadways, all of which are either on the Ranch or border the Ranch in very close proximity, as shown in Fisher's own Exhibit 1 to his expert report. *See* Ex. 8 (Fisher Report Ex. 1) (demonstrating various other potential sources

5

that he flatly ignored in issuing his opinions). In fact, Fisher acknowledges that hydrocarbons in the background air sample "mostly likely originated from car and truck emissions on I-35 or US-77" but there is no evidence that he analyzed the roads as potential sources of the hydrocarbons in the water and soil on the Ranch. Dkt. 131 (Fisher Report) at 29. And Fisher does not address or sample for background (naturally occurring) levels of hydrocarbons in water and soil in the area *at all*. *See id.* Fisher's assumption that the Wynnewood Pipeline is the source of trace hydrocarbons on the Ranch is an untested, unreliable guess that lacks any scientific methodology.

> As a court explained in a very similar case in a different jurisdiction:
>
> At first blush, [the expert's] conclusions seem to be supported by common sense. That is why Daubert is so important in this case. The fact that Defendants work with pollutants that are to[o] similar in some ways to those found on Plaintiffs' land, coupled with possible vectors for the contaminates' movement from Defendants' to Plaintiffs' land, does not prove that Defendants probably contaminated Plaintiff's land.
>
> If, for example, A is struck by a stray rifle bullet, just because B was firing a rifle at the time, in A's direction and A was in range, that does not prove B probably shot A. B is a good suspect. But to prove the connection, A would have to produce more direct or circumstantial evidence, such as a bullet comparison. At least, A should show that no one else was firing a rifle in the vicinity or eliminate other suspects. Here, as explained, [the expert] does not attempt to eliminate other possible suspects, much less quantify the damages Defendants caused. His syllogism is simply: Plaintiffs have arsenic and lead on their land; Defendants are involved with those elements and they could move from Defendants' to Plaintiffs' property; therefore, Defendants are responsible for Plaintiffs' problems. [The expert's] opinions, however, are simply untested.

*Alderman*, 2007 WL 1334565, at *9. Fisher's untested opinions should meet the same fate.

    **B.**    **Fisher's Testimony Regarding Other Potential Sources is Untimely.**

After Fisher filed his expert report, Valero's experts submitted expert reports opining that there are numerous other potential causes of the hydrocarbons on the Ranch. Only then did Fisher submit a purported "rebuttal" report containing the information that should have been contained in his original report: the basis and reasons for his opinion that the Wynnewood Pipeline is the sole

6

source of refined petroleum on the Ranch and therefore must be the cause of the hydrocarbons. Dkt. 200 (Fisher Rebuttal Report) at 8-18.

Pursuant to Rule 26(a)(2)(D)(ii), the proper scope of a rebuttal report is "evidence … intended <u>solely</u> to contradict or rebut evidence on the same subject matter identified by another party"—<u>not</u> to remedy important gaps in an affirmative report. "The plaintiff . . . must put in his evidence on the issue as part of his case in chief. When plaintiffs ... seek to rebut defense theories which they knew about or reasonably could have anticipated, the district court is within its discretion in disallowing rebuttal testimony." *Smart v. City of Wichita*, 2020 WL 3618851, at \*2 (D. Kan. July 2, 2020). It was **Fisher's** burden to establish he had ruled out other possible causes.

The new opinion in his report is not intended "solely to contradict or rebut" any of Defendants' experts, but to remedy errors and omissions in his own original report. *Stanfield v. Dart*, 2013 WL 589222, at \*3 (N.D. Ill. Feb. 14, 2013) ("A party may not offer testimony under the guise of "rebuttal" only to provide additional support for his case in chief."). Notably, Fisher could not have <u>supplemented</u> his expert report to fix its shortcomings, either. "Rule 26(e) does not allow a party to submit an amended or rebuttal report not based on new information. Allowable 'new information' does not include a response to another expert's report in a supplemental report if the information was available when the original report was due." *Spirit Aerosystems, Inc. v. SPS Techs., LLC*, 2013 WL 6196314, at \*6 (D. Kan. Nov. 27, 2013). It therefore follows that he also cannot remedy errors in his report under the guise of a rebuttal.

Moreover, Fisher's failure to set forth this information in his opening report prejudiced Defendants because their experts were not entitled to further rebuttal reports under the scheduling order. Because Fisher's opening report did not set forth the basis and reasons for his opinion that

7

there are no other possible sources of hydrocarbons on the Ranch, his opinions regarding causation must be excluded. *Smart*, 2020 WL 3618851, at *2.

### C. Fisher's "Analysis" Regarding Other Potential Causes Remains Incomplete.

Even if the Court considers Fisher's untimely support for his causation opinions, his testimony should nonetheless be excluded because Fisher has not "adequately accounted for obvious alternative explanations," Fed. R. Evid. 702 advisory committee note (2000), including the Blue Knight Pipeline and USTs.

*i.    Fisher Did Not Account for the Blue Knight Pipeline As a Source.*

Fisher acknowledges that a second pipeline, the Blue Knight Pipeline, runs on the Lazy S Ranch between the Wynnewood Pipeline and Tulip Springs. *See* Ex. 8 (Fisher Report Ex. 1), Ex. 1 (Fisher Dep.) at 56:15-25 (map showing the proximity of the Blue Knight Pipeline to Tulip Springs); *see also* Smith Report, Dkt. 171, at 37-40. The Blue Knight Pipeline carried refined petroleum from 1947 until about 2008. Ex. 7 (Smith Dep.) at 200:6-9.[1] Yet, Fisher submits three reasons the Blue Knight Pipeline cannot be the source; each of which fails *Daubert*.

First, Fisher opines that the Blue Knight Pipeline cannot be the source because there is no evidence of lead or MTBE on the Ranch, suggesting the hydrocarbons on the Ranch are more recent. Ex. 1 (Fisher Dep.) at 49:6-11. But this opinion is not based on sufficient facts or data. The EPA issued regulations requiring the availability of at least one grade of unleaded gasoline beginning in 1974. Ex. 9 (38 FR 1254 (Jan. 10, 1973)). MTBE became unlawful nationwide in 2002, although many states eliminated it by 2002. Ex. 1 (Fisher Dep.) at 57:20-58:5. Prior to that,

---

[1] Fisher argues Smith did not identify specific records establishing this, so it is "not possible to confirm or reject" his assertion. Dkt. 200 (Fisher Rebuttal Report) at 14. But, as explained above, it was Fisher's burden to identify, evaluate, and eliminate potential sources because his opinion rests on the assumption that there are none. And apparently, Fisher never attempted to determine when the Blue Knight Pipeline last carried refined petroleum. Ex. 1 (Fisher Dep.) at 55:6-18.

8

MTBE was not used in all gasolines—critically, the Ardmore refinery never used MTBE for blending gasoline. Ex. 10 (Stout Dep.) at 238:4-241:13. In other words, the lack of evidence of lead or MTBE is not indicative of recent gasoline, and unleaded gasoline without MTBE could have flowed through the Blue Knight Pipeline on the Ranch for decades. Plaintiff (and Fisher) has no idea if it did because it did not properly investigate the Blue Knight Pipeline as a source and does not even know when it last carried refined petroleum. Ex. 1 (Fisher Dep.) at 55:6-18.

Second, Fisher opines that when a new pipeline was installed 20 to 30 feet away from the Blue Knight Pipeline, it was "in essence, a site-wide investigation" of the Blue Knight Pipeline right-of-way and "nobody reported a release." Ex. 1 (Fisher Dep.) at 47:24-48:15, 53:4-54:2. Therefore, there must not have been a leak—yet Fisher does not cite to a single document to support this unproven and untested theory, and there is no evidence that there was "in essence, a site-wide investigation."[2] Moreover, Fisher concedes the original Blue Knight Pipeline from the late-1940s was not excavated and was abandoned in place when the new pipeline was installed. *Id.* at 53:4-54:18. There is no evidence Fisher assessed the condition of that nearly 75-year old line that led to its abandonment or that any soil sampling around it was ever done. *Id.*

In any event, the purported lack of evidence a recorded release from the Blue Knight Pipeline is meaningless under Plaintiff's own theories. Indeed, although Plaintiff alleges there is a leak on the Wynnewood Pipeline, to this day, Plaintiff has failed to report any alleged contamination at the Ranch to regulators. Ex. 5 (Roos IV Dep.) at 187:1-13; Ex. 11 (Roos V Dep.) at 69:1-6. The absence of such a report relating to the Blue Knight Pipeline is hardly scientific support to exclude it. Given that Fisher's unsupported theory is that contamination passes through

---

[2] Fisher's understanding that there was no evidence of a leak on the Blue Knight Pipeline comes from two sources: (1) a conversation with Roos, who talked to the former owner of the Ranch (inadmissible double hearsay) and was unaware of a release; and (2) the lack of reports in "any environmental records" of any release. Ex. 1 (Fisher Dep.) at 47:24-48:15, 53:4-54:2.

the Blue Knight Pipeline on its way to Tulip Springs, it is inconceivable that Fisher did no testing up and down the Blue Knight Pipeline to determine whether it is the reason for the trace hydrocarbons Fisher claims to have found in his testing at the Ranch. *See, e.g.*, *Purdue Pharms.*, 2004 WL 5352989, at *2; *Claar*, 29 F.3d 499, 502.

Finally, Fisher opines that the Blue Knight Pipeline cannot be the source of hydrocarbons because, as set forth in Ede's report, the hydrocarbons were "weathered" as opposed to "fresh" and therefore must have a more recent source. Dkt. 200 (Fisher Rebuttal Report) at 14-15 (citing Ede's Report). As set forth more fully in Valero's Motion to Exclude Ede, this opinion is untimely and not the product of reliable principles and methods. Macbeth, Stout, and even Ede himself all recognize the possibility that historic releases can appear "fresh" and not weathered when present under certain conditions. Ex. 3 (Macbeth Dep.) at 118:21-120:11; Ex. 10 (Stout Dep.) at 159:13-161:18, 167:18-168:7; Ex. 2 (Ede Dep.) at 83:16-85:11. Yet nothing was done to investigate this phenomenon at the Ranch. The inattentiveness makes Fisher's analysis inadmissible speculation.

    ii.  *Fisher Failed to Account for USTs As a Hydrocarbon Source.*

Smith also identified seven radio relay towers within a mile and a half of Tulip Springs that likely had generators powered by gasoline or diesel fuel stored in USTs. Ex. 7 (Smith Dep.) at 134:21-136:3; Dkt. 171 (Smith Report) at 35-37. OCC records of one such UST categorize it as a "Leaking UST" and contain a notation that the site was "Dirty." *See* Dkt. No. 175-4 (Smith Report Ex. J (OCC Records)) at 3, 11; Ex. 7 (Smith Dep.) at 101:18-106:16. OCC records of another UST indicates that sampling at the time of removal reflected a TPH concentration of 32 in one out of three soil samples—higher than any concentration found in a sample from the Ranch. Dkt. No. 175-4 (Smith Report Ex. J (OCC Records)) at 46; Ex. 7 (Smith Dep.) at 120:16-133:10; Ex. 12 (excerpt of Fisher Summary Ex. A).

In his rebuttal, Fisher did not explain why these USTs were not capable of producing the trace hydrocarbons on the Ranch. Instead, he criticized Smith for the lack of documentary evidence establishing them as the source. For example, Fisher attacked evidence of the "Dirty" UST site as "limited and equivocal" and therefore concludes there is "no evidence that this site released refined petroleum hydrocarbons." Dkt. 200 (Fisher Rebuttal Report) at 12-13. Fisher also argues there is no evidence the second UST was leaking because no leaks were detected during sampling during its removal. These arguments fail for two reasons.

First, the second UST site was considered "clean" <u>notwithstanding</u> that one of three soil samples had a ***higher TPH concentration than any concentration*** found in a sample from the Ranch. If Fisher believes that even lower TPH levels indicate a leak from the Wynnewood Pipeline, presumably, they also indicate a leak from this UST. At minimum those sampling "hits" warrant further investigation, but Fisher ignored this point entirely. And second, it is not Valero's burden to find documentary evidence conclusively establishing the source of the hydrocarbons on the Ranch. It was <u>Fisher's</u> burden to investigate and eliminate other potential sources, such as by ruling out the "leaking" UST as a source using accepted methodology, like groundwater samples or establishing background levels of TPH. Fisher failed to consider the USTs at all.

**II.     Fisher's Testimony Regarding Water Sample Gas Chromatographs Rests on Unreliable and Untested Environmental Sampling Methods.**

Fisher's opinions are based, in large part, on samples collected using polypropylene cloths and Bio-Traps®. His opinions must be excluded because neither method has been tested or subjected to peer review and publication and neither method is generally accepted in the scientific community. *See Daubert*, 509 U.S. at 593-94. Moreover, commonly accepted sampling standards were not applied. Finally, the results reflect that both the polypropylene cloth and Bio-Trap® beads were already contaminated prior to deployment and thus the results are inherently unreliable.

### A. The Polypropylene Cloth Sampling Method Is Unreliable.

Fisher determined that there could be "sheen" or "colloidal suspension of free product materials" in Tulip Springs that he "might miss… taking a dipper sample." Ex. 1 (Fisher Dep.) at 24:5-25. Fisher previously used polypropylene cloth to "capture sheen" when he worked for Amoco (at least *25 years ago*), so he asked his friend Bruce Torkelson, a former colleague who owned a laboratory, whether Torkelson would still endorse the methodology. *Id.* at 25:15-22; Fisher CV. Torkelson said he would, so Fisher deployed the polypropylene cloth in 2018. *Id.* at 25:18-22. Fisher then had Torkelson's lab test the samples.[3] *Id.* at 29:3-30:4.

There are no peer reviewed articles using these types of cloths for hydrocarbon testing, and this is an untested, unscientific method. Dkt. 179 (Stout Report) at 4-5. Convention within the oil spill industry dictates "traditional polypropylene adsorbent pads should not be used, as organic compounds in such material may interfere with the subsequent analytical processes in the laboratory." *Id.* Rather, standard practice and ASTM protocol call for the use of a chemically-inert material that traps free phase petroleum but does not interfere with any subsequent chemical analyses, such as fine nets of Teflon or Flurotex. *Id.* at 5. Defendant's expert Bert Smith has "never heard of" any remediation required based on "experimental test methods" like polypropylene cloths in his 42 years of relevant work experience. Dkt. 171 (Smith Report) at 57.

Additional factors make these samples even more unreliable. First, the cloths remained in place for at least *fourteen* days without anyone present to monitor them within the boundaries of the Lazy S Ranch. Ex. 1 (Fisher Dep.) at 51:3-18. This creates a significant chain of custody problem where no one associated with Fisher was monitoring any possible interference with the

---

[3] It appears that a subsequent sample was taken using polypropylene cloth in around February 22, 2022, but the circumstances are unclear: Fisher says Ede took this particular sample, but Ede did not mention taking such a sample, and in fact, said it had been "many, many years" since he took one. Ex. 1 (Fisher Dep.) at 25:23-26:21, 27:9-28:16, 39:3-20; Ex. 2 (Ede Dep.) at 196:10-198:6, 195:22-25. This sample had no evident petroleum.

12

two-week long polypropylene cloth method. Additionally, although a scientist would typically use an Oklahoma state accredited laboratory when taking standard environmental samples, Fisher sent the samples to Torkelson's lab, which has no such accreditation. Dkt. 171 (Smith Report) at 57.

The results in this case confirm the unreliability of the polypropylene cloth method. Upon receiving the samples, Torkelson isolated "a 1 square inch piece of the more heavily stained portion" of each cloth, analyzed them, and saw "unusual peaks on the GCs and suspecting they may be coming from the adsorbent pad extracted a clean area of the TS pad sample and analyzed (it)." Dkt. 179 (Stout Report) at 25. "All four of the Tulip Springs samples' chemical fingerprints are heavily influenced by chemicals derived from the polypropylene cloths. This is a well-known problem and precisely why polypropylene cloth is not conventionally used in sampling petroleum for chemical analysis." *Id.* at 25 (citation omitted); *see also* Dkt. 171 (Smith Report) at 57. Although this issue was raised in Stout's report, Fisher did not address it in his rebuttal report.

### B. The Bio-Trap® Sampling Method Is Unreliable.

Fisher also relies on water samples collected using Bio-Trap® samplers—another untested, unaccepted method. Bio-Trap® samplers (which contain Bio-Sep® beads) are another form of passive sampler placed into water for some period of time to concentrate chemicals dissolved in the water through sorption onto an organic polymer. Dkt. 179 (Stout Report) at 5. Microbial Insights Inc., the only commercial provider of Bio-Trap® samplers, states on its website that Bio-Trip® samplers are to be used in <u>monitoring wells</u>. *See* Ex. 13 (Bio-Trap® Samplers ER, https://microbe.com/bio-trap-samplers/). They are not designed for sampling for chemical fingerprinting. Ex. 10 (Stout Dep.) at 235:1-13. Valero's expert chemist, Scott Stout, is unaware of any published literature discussing the use of Bio-Traps® in spring water flowing from a surface spring during a high rain event, which is how Fisher used them here. Dkt. 179 (Stout Report) at 5.

Again, additional factors make these samples even more unreliable, as the Bio-Traps® appear to have remained in place for long periods of time unsupervised, and samples were again performed by Torkelson's unaccredited lab. *See id.* at 36 (summarizing Plaintiff's sample data). Moreover, it is unclear who oversaw the testing with the Bio-Trap beads. Fisher says another of Plaintiff's experts, Kenneth Ede, oversaw the testing. Ex. 1 (Fisher Dep.) at 41:5-42:18. But in his deposition, Ede did not mention overseeing any testing, instead testifying that "[all] I have done is looked at the data," "I did not collect the samples," and it had been "many, many years" since he took a sample. Ex. 2 (Ede Dep.) at 196:10-198:6, 195:22-25. Not knowing who selected and oversaw this sampling method renders it even more difficult to verify the reliability of the data, and it creates fatal chain of custody issues that require exclusion of Fisher's opinions.

Again, the results confirm this unproven and untested use of Bio-Traps® was "a complete failure." Ex. 10 (Stout Dep.) at 235:16-236:20. The fingerprints acquired from Bio-Traps® that were never deployed exhibited the same fingerprints as the field-deployed samples. *Id.* at 236:2-14. The samplers "contained chemicals right from the start before they ever went to the field, before they ever went into a spring, before they ever went into a drillhole that indicated these beads themselves are pre-contaminated." *Id.* at 236:15-20; *see also* Dkt. 179 (Stout Report) at 18. In other words, the sampler beads "do not contain petroleum of any sort, … they contain residual chemicals on the beads that were provided to [Fisher] by the manufacturer." Ex. 10 (Stout Dep.) at 229:22-230:6. This reflects an unequivocal and fatal technical failure of the sampler. Neither Fisher nor Ede appears to have evaluated this issue, including in rebuttal to Mr. Stout's report.  Because the samples taken using polypropylene cloths and Bio-Traps® are not reliable, those samples and Fisher's opinions (which are based on those samples) should be excluded.

**III.     Fisher's Testimony Should be Excluded Because it Contradicts Ede's Testimony.**

Tellingly, Fisher's theory of the alleged pipeline leak is inconsistent with Ede's. Even though the trace hydrocarbons are the only basis for Plaintiff's belief that a leak exists, Plaintiff's own experts do not agree on where the hydrocarbons are—or how they got there.

For example, Fisher opines that there is a hydrocarbon plume underneath the Ranch. Ex. 1 (Fisher Dep.) at 58:24-59:3. All he knows about its location is that "[i]t's going to have origin at the Valero pipeline" and "part of that material exits Tulip Springs and some other springs during high rainfall events." *Id.* at 58:24-59:20. In the interim, the water "pass[es] through a really complicated set of conduits," but he does not know where the groundwater sheds are. *Id.* at 59:7-63:14. Fisher then purports to model the size of the plume, Dkt. 131 (Fisher Report) at 35-44, and Plaintiff's Expert Tamzen Macbeth relies on Fisher's opinions to estimate it would cost $11 million to clean up the plume. Ex. 3 (Macbeth Dep.) at 97:6-98:24. However, Ede (another of Plaintiff's experts) adamantly disputes that there is a hydrocarbon plume on the Ranch. *See* Ex. 2 (Ede Dep.) at 172:9-172:18; *see also id.* at 171:23-24 ("This is a contamination of the cave. It's not a plume."); *see also id.* at 181:5-19.[4] Plaintiff's own experts do not share the same opinion regarding how and where the Wynnewood Pipeline is actually leaking, making their conclusions inherently unreliable and they cannot be presented to a jury under F.R.E. 702 and *Daubert*.

## CONCLUSION

For the reasons stated herein, Fisher's testimony and his opinions should be barred by this Court pursuant to F.R.E. 702 and applicable case law.

---

[4] Instead, Ede believes refined product is coming out of the Wynnewood Pipeline and "dripping down" into the Tulip Springs Cave (which is approximately 1,200 feet away), where it pools until some or all of the hydrocarbons are eventually flushed out during high rain events. *Id.* at 184:23-185:11, 171:20-172:1

Dated: October 21, 2022                     Respectfully Submitted,

By: */s/ Matthew E. Johnson*

James F. Bennett, MO Bar # 46826
Megan S. Heinsz, MO Bar # 56377
Matthew E. Johnson, CO Bar # 40984
Philip A. Cantwell, MO Bar # 65505
DOWD BENNETT LLP
7733 Forsyth Blvd., Suite 1900
St. Louis, MO 63105
(314) 889-7300 Telephone
(314) 863-2111 Facsimile
jbennett@dowdbennett.com
mheinsz@dowdbennett.com
mjohnson@dowdbennet.com
pcantwell@dowdbennett.com

Stephen L. Jantzen, OBA # 16247
Phillip G. Whaley, OBA # 13371
Grant M. Lucky, OBA # 17398
RYAN WHALEY
400 N. Walnut Ave.
Oklahoma City, OK 73104
(405) 239-6040 Telephone
(405) 239-6766 Facsimile
sjantzen@ryanwhaley.com
pwhaley@ryanwhaley.com
glucky@ryanwhaley.com

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

    I hereby certify that on October 21, 2022, a true and accurate copy of the foregoing was electronically transmitted to the Clerk of Court using the ECF System for filing and transmitting to the following ECF registrants:

David P. Page
Jessica C. Ridenour
Thomas E. Rogers
David Mitchell Garrett, Jr.
Christopher L. Camp
Krystina E. Phillips
Charles E. Geister, III
William A. Johnson
Elizabeth A. Price

By: /s/ *Matthew E. Johnson*