**Exhibit 1**

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF OKLAHOMA

RANCH PROPERTIES, LLC, AN      )
OKLAHOMA LIMITED LIABILITY     )
COMPANY,                       )
                               )
        Plaintiff,             )
                               )
        vs.                    ) CASE NO. 19-cv-425-JWB
                               )
VALERO TERMINALING AND         )
DISTRIBUTION COMPANY; VALERO   )
PARTNERS OPERATING CO., LLC,   )
AND VALERO PARTNERS            )
WYNNEWOOD, LLC,                )
                               )
        Defendants.            )
```

\* \* \* \* \*

VIDEO DEPOSITION OF BERT SMITH

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON OCTOBER 7, 2022

COMMENCING AT 9:30 A.M.

\* \* \* \* \*

WORD FOR WORD REPORTING, L.L.C.
620 NORTH ROBINSON
SUITE 202
OKLAHOMA CITY, OKLAHOMA  73102
(405)232-9673

REPORTED BY DEBRA GARVER, CSR, RPR

Page 66

1  the resistivity work done by Dr. Fisher, correct?
2      A.   I'm not sure if I have an opinion on that in
3  here.  I'll have to look.  I may have -- have issued an
4  opinion on it.
5      Q.   Okay.  Well, we'll -- we'll check on that.
6           And -- and what was your master's thesis?
7      A.   It was called Geophysical Investigations of the
8  Moscow-Troy area of Idaho, North Idaho.
9      Q.   Could you spell that area in Idaho for us,
10 please?
11     A.   Moscow -- just like Moscow, Russia,
12 M-O-S-C-O-W -- dash, Troy is another small town out in --
13 T-R-O-Y -- Idaho.
14     Q.   And you did some electrical work on that?
15     A.   I did some deep -- I did a lot of deep earth
16 resistivity.  I did several other types of geophysical
17 work.
18     Q.   Is what Dr. Fisher did in this case -- I guess
19 you at least looked at it -- what you would characterize
20 as deep earth resistivity?
21     A.   It -- it's more shallow.
22     Q.   After you got your minor -- excuse me -- your
23 master's in engineering, you had a thesis concerning this
24 area of -- I'll call it the Moscow area for simplicity.
25          Have you done any electrical resistivity work

Page 67

1  in your career?
2      A.   I've had a couple projects over the years that
3  I've been a part of.  And so, typically, I would hire --
4  we hired companies to do that work.
5      Q.   Okay.  I assume you've never issued an expert
6  opinion to testify at trial on electrical resistivity
7  survey work, correct?
8      A.   That's correct.  I think this might be because
9  it's the first time it's really come up.
10     Q.   Right.  Did you review Mr. Peterson's expert
11 report concerning electrical resistivity as part of your
12 work in this case?
13     A.   Yes.
14     Q.   Okay.  Did you provide any comments on it?
15     A.   I had some discussions with Mr. Peterson early
16 on.
17     Q.   Okay.  Was counsel present for those
18 discussions?
19     A.   I believe so, yes.
20     Q.   Who initiated the discussions?
21     A.   I'm not sure who initiated it.
22     Q.   Okay.  When you say "early on," when -- what
23 time period are you talking about?
24     A.   About the time Mr. Peterson was hired on to
25 look at the resistivity information that was provided by

Page 68

1  Dr. Fisher.
2      Q.   Had you already reviewed that information as --
3      A.   I looked at it.
4      Q.   -- part of your work?
5      A.   I'm sorry, I'm sorry.  Yes, I looked at it.
6      Q.   Did you form any opinions concerning the
7  resistivity work that you looked at at the time you -- at
8  any time working on this case?
9      A.   Yeah, my -- I had some initial thoughts on the
10 resistivity when I first looked at it.
11     Q.   Are those set forth in your report?
12     A.   Yes.
13          I might also add that I was -- I was -- my
14 graduate teaching, I taught geophysics, field -- field
15 applications of geophysics at Washington State through
16 the civil and environmental engineering department.
17     Q.   Okay.  And did you teach electrical resistivity
18 in that project?
19     A.   Yes.  I did.
20     Q.   Did you ever -- have you ever been involved
21 with an -- in any fashion -- electrical resistivity
22 analysis of a karst formation?
23     A.   Well, my electrical resistivity was Columbia
24 River basalt, which has a lot of karst features -- like
25 features.

Page 69

1      Q.   Karst-like features?
2      A.   Karst-like features, yeah.  There's very
3  similar type of features in the Columbia River basalts as
4  we have.  Different type of rock, but you have the same
5  sort of features.
6      Q.   Same sort of features as what?
7      A.   As -- as a karst topography you might find in
8  dolomitic limestone, for example.
9      Q.   Okay.  Are you testifying, sir, that the study
10 you did -- these basalt-type features for your thesis are
11 similar geological features as we find of the fractured
12 karst at the Lazy S Ranch?
13     A.   We have fractured karst features in basalts
14 that are analogous in some instances to the types of
15 karst features you might have at the ranch.
16     Q.   Okay.  And have you ever worked with karst --
17 well, do you know what steeply dipping karst is?
18     A.   Yes.
19     Q.   What is that?
20     A.   Karst would be -- karst features developed on
21 steeply dipping or inclined beds.
22     Q.   Okay.  And is -- does that describe the karst
23 beds that are found on the Lazy S Ranch?
24     A.   Yes.
25     Q.   Okay.  Have you ever worked, before the time

Page 70

1  you worked on this particular project, with a karst
2  formation similar to the Lazy S Ranch in that it's
3  steeply dipping in that fashion?
4       A.   I've worked on many karst facilities, large
5  projects, that were dipping.  I'm not sure they were
6  quite as steeply dipping, but certainly we -- as the
7  topography, we had similar type topography present.
8       Q.   Okay.  Can you give me an example?
9       A.   Sure.  I was a manager of a Superfund project
10 that covered the Meremec Caverns in Missouri.
11      Q.   Okay.
12      A.   So I've worked on that for a couple years.  It
13 was a Superfund project administered by the -- by the
14 Missouri Environmental Agency.  I can't remember what it
15 is now.
16      Q.   Who were you working for in that case?
17      A.   State of Missouri.
18      Q.   State of Missouri?  They hired you as a
19 consultant?
20      A.   Yeah, they hired us -- hired me as a consultant
21 to manage a investigation -- Superfund investigation for
22 that particular Superfund site.
23      Q.   And what's the site's name again?
24      A.   Oak Grove Village Superfund.
25      Q.   Oak Grove?

Page 71

1       A.   Village.
2       Q.   And where is it located in Missouri?
3       A.   It's near Sullivan, Missouri, Meremec Caverns.
4       Q.   And did you produce any work product as part of
5  that work?
6       A.   I'm sure I did, yes.
7       Q.   Okay.  Was that incorporated into -- well, what
8  kind of work did you do with regard to the Meremec
9  Caverns?
10      A.   Well, we did a geological review.  We did a
11 source review, potential source areas that could have
12 contributed to the types of chemicals that were of
13 interest at that site.
14           We did monitoring well installation.  We did
15 sampling pump test analysis, you know, correlate --
16 geochemical correlations, things of that nature.
17      Q.   And who did you work for?
18      A.   State of Missouri.
19      Q.   I mean, you were employed by the State of
20 Missouri?
21      A.   No, I was as a consultant.  Our firm had been
22 selected to do the Superfund evaluation at that site.
23      Q.   Well, what portion of the Superfund evaluation?
24      A.   Just what I mentioned.  I just talked to you --
25 it was -- it would have been a groundwater investigation

Page 72

1  portion of -- of the Superfund.  We were trying to
2  identify potential responsible parties --
3       Q.   Okay.
4       A.   -- and tie back to -- to groundwater and soil
5  type of evaluations.
6       Q.   So were you working to identify the -- you were
7  working to identify potential sources of contamination
8  where?
9       A.   That -- the village of Oak Grove had -- had a
10 water well that became contaminated with trichlorosilane,
11 and we -- it was -- was -- met the criteria to be ranked
12 as a Superfund site.
13           So we were looking at potential source areas
14 for that TCAE.  We were looking at potential pathways,
15 how TCAE could have gotten into that well, the levels of
16 impacts to that well, subsurface pathways.
17           And in addition to that, we also evaluated
18 Meremec Caverns.  I went into the caverns, did soil --
19 not soil -- groundwater and air sampling.
20      Q.   Okay.  So let's -- let's talk about Oak Grove's
21 well.  Was it -- was it a well that was completed in a
22 karst formation?
23      A.   Yes.
24      Q.   Okay.  What was the depth?
25      A.   Oh, you'd ask me that.  It was a deeper well.

Page 73

1  My recollection was like 7- or 800 feet deep.
2       Q.   Seven- to 800 feet deep?
3       A.   Yeah.
4       Q.   Did it -- was it completed in the bedrock?
5       A.   Yes.
6       Q.   Okay.  So the -- the study involved the
7  contamination had reached the bedrock, and you were
8  evaluating potential sources of contamination in a pool
9  of groundwater lying on top of the bedrock upon which a
10 karst formation overlaid it, correct?
11      A.   No.  That's not correct.
12      Q.   Okay.  So where was the -- it was a 7- to
13 800-foot well.  It was completed in the bedrock.
14           Where was it screened?
15      A.   I -- I can't recall that particular, but we --
16 the bedrock, I think, went all the way to the surface,
17 the karst features, the bedrock.  So that would have been
18 the first groundwater horizon that was being evaluated.
19           And when we put our wells in, for example, we
20 had large karst features.  I would get sometimes 40 foot
21 of drop as we encountered these sub -- subsurface caverns
22 when we were putting our monitoring wells in.  At various
23 depths.  They would be at various depths, shallow to
24 deep, so.
25      Q.   Okay.  How many wells were installed?

Page 206

1  Q.  Are you a toxicologist?
2  A.  No, I'm not.
3  Q.  Are you a risk assessor?
4  A.  I'm not a risk assessor.
5  Q.  Were you involved with the development of the
6  screening levels that are used by any agency in Oklahoma?
7  A.  The development of those, no.
8  Q.  Okay. And I think you testified earlier you're
9  not qualified to give a legal opinion as to the
10 applicability of those regulatory levels on contamination
11 at the Lazy S Ranch, correct?
12 A.  I don't think that was my testimony, no.
13 Q.  Okay. Well, do you believe that you can give
14 an opinion as to the applicability of a regulatory
15 cleanup matter on Lazy S Ranch?
16 A.  I can make the comparison to regulatory levels.
17 That's what I've done most of my career, you know, done
18 that thousands of times.
19 Q.  Right.
20 A.  You know --
21 Q.  Is this a regulatory case, sir?
22 A.  Pardon me?
23 Q.  Is this a regulatory case?
24 A.  At this point it is not a -- it hasn't been
25 under the purview of any regulatory agency, but these are

Page 207

1  typically -- you know, you make your comparison to
2  regulatory standards that -- typically to apply to issues
3  like this.
4  Q.  Because you're typically representing
5  contaminators or polluters that are being -- have
6  enforcement actions by regulatory agencies, correct?
7      MR. CANTWELL:  Objection.
8  Q.  (By Mr. Page)  I mean, your -- your career has
9  been primarily representing oil companies or other
10 companies that cause pollution and you're helping these
11 companies avoid cleanup at contaminated sites, correct?
12     MR. CANTWELL:  Objection.  Argumentative.
13 Misstates testimony.
14     THE WITNESS:  No, that's not correct.
15 Q.  (By Mr. Page)  It's not correct.
16     So earlier when I asked if you primarily
17 represented companies, did I misunderstand you when you
18 said you primarily do represent companies throughout your
19 career?
20 A.  I primarily represent industry.
21 Q.  Industry.
22 A.  Yeah.
23 Q.  And they are primarily, in the paradigm we're
24 talking about here, the people that cause contamination
25 of air, soil, and water, correct?

Page 208

1      MR. CANTWELL:  Objection.
2      THE WITNESS:  There are instances where
3  they've contaminated or caused impacts to air, soil, and
4  water.
5  Q.  (By Mr. Page)  And in those instances where
6  you've said you -- thousand of times you've applied
7  regulatory standards, those were all circumstances where
8  the regulatory agency was focusing on a cleanup of
9  contamination caused by your clients, correct?
10 A.  Well, those regulations were in -- put in place
11 as a guideline on when cleanup was needed.
12 Q.  By regulatory agencies, correct?
13 A.  By regulatory agencies.
14 Q.  Right.  Is this a regulatory action that we're
15 involved with here?
16 A.  The DEQ or the OCC at this point in time have
17 not been involved, so --
18 Q.  No?
19 A.  -- no.
20 Q.  Is it your understanding that the
21 Arbuckle-Simpson aquifer is a sole-source aquifer?
22 A.  Yes.
23 Q.  What's a sole-source aquifer in your
24 understanding?
25 A.  Well, there's a definition and I'd have to

Page 209

1  reference it, but it's an EPA designation of a aquifer
2  that's of very good quality and of -- just, a lot
3  generally, there's no other source of water in that area.
4  Q.  Okay.  So it's a -- it's sole source because
5  it's a sole drinking water source for that -- the people
6  that live in that area, correct?
7  A.  Yeah.  And there's a -- there's a definition
8  that I would default to that's the EPA actually has.
9  Q.  But is that generally the gist of it?
10 A.  That's generally what I mentioned, yes.
11 Q.  Is the Arbuckle-Simpson aquifer a sole-source
12 aquifer in your understanding?
13 A.  In what?
14 Q.  I'm sorry.
15     Is the Arbuckle-Simpson aquifer a sole-source
16 aquifer?
17 A.  Yeah, I just answered that, yes.
18 Q.  Yes.  Okay.
19     And what is your understanding of Oklahoma
20 policy to prevent contamination of sole-source aquifers
21 in Oklahoma?
22 A.  That there are regulatory programs that they
23 have to meet.  Yeah, I mean, those -- those parameters
24 are -- still fall under the purview of regulatory
25 agencies.

Page 266

1  A PID reading, I think you testified earlier
2  today, you use to investigate sites?
3  A.  Yeah.
4  Q.  And it does, in fact, take a sample of the
5  ambient air, does it not?
6  A.  It does --
7  Q.  And provides --
8  A.  -- so it's a measurement, yes.
9  Q.  -- an analysis?  Yes?
10 A.  It can kind of go either way, but, yeah, it --
11 it samples the air.
12 Q.  Okay.  So let me ask you, did you ever request
13 the opportunity to take any samples, whether or not it's
14 PID or otherwise, on the Lazy S Ranch?
15 A.  I don't recall doing so, no.
16 Q.  Now, you -- you did provide some more detail.
17 And I think you've now said that you walked 1 mile of the
18 3 miles along the Valero pipeline.  Is that probably more
19 accurate?
20 A.  One -- one -- oh, yeah, we didn't walk the
21 entire property.
22 Q.  It's -- it's pretty much impossible to walk the
23 whole pipeline, is it not?
24 A.  Yes.  We walked just a portion that was mainly
25 due -- due east of Tulip Springs, maybe a little bit

Page 267

1  southeast and then up to the northeast, so.
2  Q.  And now that you've had a chance to think about
3  it and talk to counsel and, I guess, review this, do you
4  recall now seeing the piles of rocks along the Valero
5  pipeline that you saw, similar to the piles of rocks
6  along the Blue Knight pipeline?
7  A.  I don't remember that.  When I was talking
8  about the piles of rock, I was talking about the Blue
9  Knight pipeline.  I still don't have a memory of piles of
10 rocks.
11 Q.  When you reviewed aerial photos for your -- I
12 guess I can call it a virtual investigation of the site,
13 do you remember that the piles of rocks are clearly
14 visible in aerial photos and Google Maps of the
15 Lazy S Ranch, along the Valero pipeline?
16 A.  There -- there may -- may be.  And I -- when I
17 saw that, I would make notes.  So I may have made notes
18 in my report.  I just had forgotten that I saw them.
19 Q.  And now that you've thought about it a little
20 bit more today, do you realize that there were sinkholes
21 along the place that walked that day on the Lazy S Ranch
22 that were ten to a hundred times bigger than the
23 2-foot-diameter sinkhole you described earlier here
24 today?
25 A.  I didn't describe it as a 2-foot.

Page 268

1  Q.  Okay.
2  A.  I did not.  I said a few feet.
3  Q.  Okay.  A few feet, what does that mean to you?
4  A.  Probably 10 feet or less.
5  Q.  Did you see some sinkholes out there in the
6  karst terrain that was larger than 10 feet in diameter?
7  A.  They would have been in that same range.  There
8  could have been some that's slightly larger.
9  Q.  Did you see any on the aerial photos that you
10 reviewed, any sinkhole evidence larger than 10 feet in
11 diameter?
12 A.  I don't -- there may have been.  I just don't
13 recall.
14 Q.  Thank you, sir.
15 A.  Thank you.
16    MR. CANTWELL:  I'm good.  Thank you.
17    THE WITNESS:  Thanks.
18    MR. PAGE:  We're off the record.
19       (End of Deposition at 6:26 p.m.)

Page 269

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF OKLAHOMA
2
  RANCH PROPERTIES, LLC, AN      )
3 OKLAHOMA LIMITED LIABILITY     )
  COMPANY,                       )
4       Plaintiff,               )
          vs.                    ) CASE NO. 19-cv-425-JWB
5 VALERO TERMINALING AND         )
  DISTRIBUTION COMPANY; VALERO   )
6 PARTNERS OPERATING CO., LLC,   )
  AND VALERO PARTNERS            )
7 WYNNEWOOD, LLC,                )
          Defendants.            )
8
9              C E R T I F I C A T E
10    I, DEBRA GARVER, a certified shorthand reporter
11 within and for the State of Oklahoma, certify that the
12 witness, BERT SMITH, located in Oklahoma City, Oklahoma,
13 was by me duly sworn to testify the truth; that the
14 deposition of October 7, 2022, was taken by me in
15 stenotype and simultaneously transcribed by computer, and
16 the foregoing is a true and correct transcript of the
17 testimony of the witness; and that I am not an attorney
18 for or a relative of any party, or otherwise interested
19 in this action.
20    IN WITNESS WHEREOF, I have hereunto set my hand
21 and seal this 10th day of October, 2022.
22                _____
23                DEBRA GARVER, CSR, RPR
                  State of Oklahoma CSR# 1370
24                Certificate exp. 12/31/2022
25

Page 270

```
 1                J U R A T
 2
 3        I, BERT SMITH, do hereby state under oath that
 4   I have read the above and foregoing deposition in its
 5   entirety and that the same is a full, true and correct
 6   transcription of my testimony so given at said time and
 7   place.
 8
        _____ With corrections       _____ No corrections
 9
10
11                   _____
                           BERT SMITH
12
13
14        Subscribed and sworn to before me, a Notary
15   Public in and for the State of Oklahoma by said witness,
16   BERT SMITH, on this, the ___ day of _____ 2022.
17
18                   _____
                          Notary Public
19
20   My Commission Expires: _____
21   My commission number is: _____
22
23   Reported by Debra Garver, CSR, RPR
24
25
```

Page 271

```
 1              E R R A T A  S H E E T
 2       WITNESS:  BERT SMITH
 3       DATE:  OCTOBER 7, 2022
 4       CASE:  RANCH PROPERTIES vs. VALERO TERMINALING
 5   PAGE   LINE     CORRECTION
 6   ____   _____    _____
 7   ____   _____    _____
 8   ____   _____    _____
 9   ____   _____    _____
10   ____   _____    _____
11   ____   _____    _____
12   ____   _____    _____
13   ____   _____    _____
14   ____   _____    _____
15   ____   _____    _____
16   ____   _____    _____
17   ____   _____    _____
18   ____   _____    _____
19   ____   _____    _____
20   ____   _____    _____
21   ____   _____    _____
22   ____   _____    _____
23
24   REPORTER:  DEBRA GARVER, CSR, RPR
25
```