```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF OKLAHOMA
 2       -------------------------------
         LAZY S RANCH PROPERTIES,      :
 3       LLC, AN OKLAHOMA LIMITED      :
         LIABILITY COMPANY             :
 4       VS.                           :  CASE NUMBER:
                                       :  6:19-cv-00425-JWB
 5                                     :
         VALERO TERMINALING AND        :
 6       DISTRIBUTION COMPANY;         :
         VALERO PARTNERS OPERATING     :
 7       CO. LLC; AND VALERO PARTNERS  :
         WYNNEWOOD, LLC,               :
 8       -------------------------------
 9              ORAL AND VIDEOTAPED DEPOSITION OF
10                  SCOTT A. STOUT, PH.D., P.G.
11                      September 27, 2022
12       ORAL AND VIDEOTAPED DEPOSITION OF SCOTT A. STOUT,
13       PH.D., P.G., produced as a witness at the instance
14       of the Plaintiff, and duly sworn, was taken in the
15       above-styled and numbered cause on the 27th day of
16       September, 2022, from 9:59 a.m. to 4:57 p.m., before
17       FELICIA A. NEWLAND, CSR, in and for the State of the
18       District of Columbia, reported by stenograph, at
19       Veritext Legal Solutions, 1250 I Street, Northwest,
20       Suite 35, Washington, D.C., pursuant to the Federal
21       Rules of Civil Procedure and the provisions stated
22       on the record or attached hereto.
```

**Exhibit 2**

Page 1

```
 1      Q    What evaluation did you make specific
 2  to the Lazy S Ranch as to naturally occurring
 3  materials?
 4           I know you cite that there's some
 5  aspects of some of the soil samples in your report
 6  may be naturally occurring materials.  What
 7  investigation did you make of the existence of
 8  naturally occurring vegetative materials on the
 9  Lazy S Ranch?
10      A    I've seen photographs of the
11  landscape there that shows there's indeed
12  vegetation present.  Irrespective of that, the
13  chemistry of the soil samples told me there's
14  remnants of that vegetation present.
15      Q    Based on the GC aspect, correct?
16      A    Based upon the chromatogram, the
17  GC/FIDs.
18      Q    GC/FIDs.  Thank you, sir, for the
19  correction.
20           Did you do any testing of the organic
21  content of these soils near the pipelines?
22      A    No.  I -- I didn't analyze any soils.
                                              Page 202
```

```
 1  They were all collected by Dr. Fisher and analyzed
 2  at his laboratory.
 3      Q    Was any --
 4      A    I'm sorry, that's not true.  I mean,
 5  there were the three samples that -- from the --
 6      Q    Right.
 7      A    -- January 2022 excavation.
 8      Q    I was -- I was just going to ask you
 9  about that.  There were a couple of soil samples?
10      A    Yes.
11      Q    And those are found on Table 3,
12  correct?
13      A    Yes.  And their chromatograms, are
14  all found on Figure 3.
15      Q    Figure 3.
16           And just looking at Table 3, these
17  results show that there was some, what, that Alpha
18  Labs collected from the -- what would you call that
19  that was shown there that was present in the
20  conventional soil that was collected by the
21  defendant?
22      A    There are, you can see, four
                                              Page 203
```

```
 1  detections of individual volatile aromatic
 2  hydrocarbons.  All of those are J qualified --
 3  which you may want me to explain -- all in the
 4  range of, you know, .25 to .08 parts per billion in
 5  soil.  And then off to the far right there are 1.44
 6  to 3.68 part per million TPH DRO reported for those
 7  soils.
 8      Q    Okay.
 9      A    Also J qualified.
10      Q    And J qualified means there's a --
11  does J qualified mean that it's below the
12  laboratory detection limit, but it's estimated by
13  the lab, the concentration?
14      A    It -- no.
15      Q    Okay.  What does it mean?
16      A    It means the concentration was below
17  the laboratory sample-specific reporting limit --
18      Q    Reporting limit?
19      A    -- but above the method detection
20  limit.
21      Q    Thank you.
22           And on Figure 3, that you mentioned
                                              Page 204
```

```
 1  earlier, these are the GCs for those -- that
 2  sample?
 3      A    For each of those three samples, yes.
 4      Q    Okay.  And what -- what is your
 5  interpretation of these?
 6      A    They each contained predominantly
 7  biogenic chemicals, which is this naturally
 8  occurring organic matter we started this
 9  conversation about.
10      Q    Yes, sir.
11      A    And the basis for that is they
12  exhibit the characteristic, quote, classic
13  fingerprint of biogenic materials, well published.
14           Sample two --
15      Q    What does it mean that they're within
16  the range of diesel range biogenic chemicals?
17           What does it mean that they're -- I
18  mean, I see it on this Figure 3, you have, "Diesel
19  range biogenic chemicals," and then, "residual
20  range biogenics."  What's the distinction between
21  those two, if there is one?
22      A    It's only referring to chemicals that
                                              Page 205
```

|   |   |
|---|---|
| 1 boil below C28, the upper limit of DRO or above<br>2 that limit. And I explained this in the background<br>3 material in my report that, you know, TPH is a<br>4 manmade metric, and we divide that metric into<br>5 different carbon ranges that we refer to as<br>6 gasoline range or diesel range or residual range,<br>7 but there are other things, for example, natural<br>8 organic matter that can occur within each of those<br>9 ranges that has nothing to do with petroleum, but<br>10 it's falsely measured as petroleum when it occurs<br>11 in the diesel range or the residual range. And<br>12 that's what's happening here with this natural<br>13 organic matter.<br>14     Q    Okay. On the -- on the B sample,<br>15 there's a -- there's a reference to 20. What does<br>16 that refer to?<br>17     A    That refers to an alkane, again, a<br>18 straight chain hydrocarbon with 20 carbons in a<br>19 row.<br>20     Q    Is that part of the biogenic<br>21 naturally occurring materials or is it different<br>22 from that?<br>Page 206 | 1 based on what your report says here, on the<br>2 chemical fingerprint for B, it could be either<br>3 diesel range or the coating for the pipeline. Is<br>4 that your testimony?<br>5     A    No.<br>6     Q    What's your testimony?<br>7     A    It's not diesel fuel and possibly the<br>8 coating.<br>9     Q    And if it's not any of those, what is<br>10 it?<br>11     A    I don't know. And the reason I say<br>12 possibly the coating is because exactly, as your<br>13 question a few moments ago, I did not analyze it,<br>14 but its description by the manufacturer indicates<br>15 it contains waxes, which is what we see here.<br>16     Q    Did you ask Valero for a sample of<br>17 the coating materials so you could do an analysis?<br>18     A    I don't believe we did -- I did<br>19 suggest that. Again, this wasn't evident until<br>20 after these soils had been collected and the hole<br>21 closed up in January of 2020 -- 2022 rather. So no<br>22 additional work went back to expose the pipeline<br>Page 208 |
| 1     A    It's different. And it's, I think,<br>2 explained either on the bottom of the page or<br>3 certainly in the text.<br>4     Q    Would you explain for the jury here<br>5 today, sir?<br>6     A    I'm just reading the bottom of page<br>7 40 right now where I say, "The trace n-alkanes in B<br>8 within the DRO range are not accompanied by a UCM<br>9 which could indicate diesel fuel, but rather appear<br>10 to be waxes possibly attributable to the pipelines<br>11 coating material; see text." Because I know I've<br>12 got a longer explanation earlier in the report.<br>13     Q    Okay. The coating material, did you<br>14 do any analysis of Valero's coating material on<br>15 this pipeline?<br>16     A    No, I did no chemical analysis.<br>17     Q    That's what I mean.<br>18     A    Just a literature analysis.<br>19     Q    A literature analysis. You did no<br>20 chemical analysis?<br>21     A    That's right.<br>22     Q    So you're attributing -- so I guess<br>Page 207 | 1 and collect this.<br>2     Q    So the answer is you didn't ask for a<br>3 sample of the original pipeline coating, correct?<br>4     A    No. At the time when I got these<br>5 results and initiated my investigation as to what<br>6 it could be, the literature on the pipeline coating<br>7 material explained its potential source<br>8 satisfactorily to me.<br>9     Q    Did it have a -- an analysis similar<br>10 to what's on the -- these tables in your report or<br>11 your GC graph example that you could compare it to?<br>12     A    No. It didn't provide that level of<br>13 detail. The descriptions of these Polyken coating<br>14 material, the tapes that were used, is found in one<br>15 of my footnotes or in the text on pages 14 and 15.<br>16     Q    So the answer is, is that you didn't<br>17 have a similar detail for this commercial product<br>18 description, you didn't have either an analytical<br>19 result or GC/FID sample for this material, correct?<br>20     A    No, I didn't. As I said, the<br>21 literature descriptions of their chemical<br>22 compositions answered my question satisfactorily,<br>Page 209 |

53 (Pages 206 - 209)

```
 1    you, that this phenomena is known to occur in karst
 2    settings.
 3        Q    But we don't know if it's occurring
 4    in this particular setting or not, correct?
 5        A    There's no reason to believe that
 6    it's not given the long-term manifestation of the
 7    conditions.
 8        Q    It could be a long-term leaking
 9    pipeline, couldn't it, Doctor?
10             MR. JOHNSON:  Objection.  Form.
11             THE WITNESS:  There's no evidence for
12    a long-term leaking pipeline, particularly the
13    Valero pipeline, which has been investigated.
14    There's no data available.  The data collected at
15    15 excavations along the Valero pipeline show no
16    evidence of petroleum released.  If there had been,
17    it would be evident.
18    BY MR. PAGE:
19        Q    How much of the pipeline has not been
20    investigated?
21        A    I don't know.  Some fraction of it.
22        Q    And how much of the pipeline overlays
                                                  Page 222
```

```
 1    the karst terrane at the Lazy S Ranch?
 2        A    Of the entire pipeline or --
 3        Q    Of the pipeline that's on the Lazy S
 4    Ranch, how much of it covers karst?
 5             Did you investigate that?
 6        A    I was just looking at a figure that
 7    allowed me to, because it's my --
 8        Q    But I asked you prior to today, just
 9    right now, sitting in this deposition, did you
10    investigate that -- how much of the karst is -- how
11    much of the pipeline runs over the karst on the
12    Lazy S Ranch?
13             MR. JOHNSON:  Objection.  Form.
14             Go ahead.
15             THE WITNESS:  I didn't investigate
16    it, I had it available to me.
17    BY MR. PAGE:
18        Q    Okay.  Well, did you evaluate how
19    much of the pipeline overlays the karst?
20        A    I didn't see a reason to evaluate it.
21    I can look at it and see it's somewhere around
22    70 percent.
                                                  Page 223
```

```
 1        Q    Okay.  And it's about how much of the
 2    pipeline and how long of the pipeline traverses the
 3    ranch?
 4             Three miles sound right?
 5        A    I don't recall a number.  I do my --
 6    look at my scale on my diagram here and estimate it
 7    but --
 8        Q    Well, Doctor, you used the term, you
 9    said that the pipeline has been evaluated, but you
10    didn't see any -- any leaks or spills.  I'm just
11    trying to get you to quantify how much of this
12    pipeline over the karst has actually been evaluated
13    by Valero.
14             We've had 15 digs, you said.  How
15    much is actually exposed in each dig?  How many
16    feet?
17        A    Tens.
18        Q    Tens of feet.
19             And if we had two miles of pipeline,
20    do you think that's a reasonable representation of
21    the -- the -- the -- the pipeline's potential to
22    leak on the Lazy S Ranch?
                                                  Page 224
```

```
 1             MR. JOHNSON:  Objection.  Form.
 2             THE WITNESS:  Those excavations were
 3    conducted at areas where other data indicated
 4    certain anomalies existed, anomalies potentially
 5    associated with thinning of the walls and so forth.
 6    So it's, I think, common practice and due diligence
 7    to investigate those areas, which is what Valero
 8    did.  And the data collected in the soils around
 9    those are clean.
10    BY MR. PAGE:
11        Q    They're clean?
12        A    Oh, yes.
13        Q    What do you mean by clean?
14        A    It's explained in my report.
15        Q    There's no refined products in
16    that --
17        A    That's correct.
18        Q    -- in that soil?
19        A    There's naturally occurring organic
20    matter that's falsely measured as TPH DRO.  There's
21    laboratory contamination from Accurate Laboratories
22    falsely measured as TPH DRO, but there's no
                                                  Page 225
```

**Page 226**

1  petroleum present.
2      I'm sorry, I wanted to add the third
3  one. In the samples that were analyzed by me at
4  Alpha, there's also evidence, what I believe, is
5  possibly attributable to the Polyken coating
6  material on the pipeline, only visible in the more
7  higher resolution results obtained at Alpha.
8      Q    So you've done some pipeline
9  engineering work in the past?
10     A    No. I've been involved in pipeline
11 investigations in the past.
12     Q    Have you ever found one that's
13 leaked?
14     A    Oh, yeah. That -- I'm glad you asked
15 that. Because pipelines aren't investigated by
16 someone like me unless there's been a leak, in
17 which case, we see thousands or tens of thousands
18 or even hundreds of thousands of parts per million
19 petroleum in soils around those leaks.
20     Q    And you've investigated a leak in a
21 karst environment --
22     A    I have --

**Page 227**

1      Q    -- a pipeline leak?
2      A    I have not investigated a leak in a
3  karst environment. So while it's true there's 15
4  excavations that are clean, in your hypothesis, or
5  the plaintiff's hypothesis, or the plaintiff's
6  expert's hypothesis, "Well, it leaked somewhere
7  else." That's irrefutable.
8          I mean, of course, unless they dig up
9  the entire pipeline, you're going to point to that.
10 But as a scientist, I rely upon the data. The data
11 showed no releases. The data showed no impacts to
12 water between the pipeline and Tulip Springs, so
13 the scenario that's being proposed is just not
14 supported by data.
15     Q    Okay. Do you know whether or not
16 Valero's replaced the pipeline -- all of the
17 pipeline from the refinery to the southern border
18 of the Lazy S Ranch?
19     A    No, I do not know.
20     Q    Okay. If I told you that was true,
21 would that affect your analysis?
22          MR. JOHNSON: Objection. Form.

**Page 228**

1          Go ahead.
2          THE WITNESS: It doesn't change the
3  data that I have available to me.
4  BY MR. PAGE:
5      Q    And you didn't have all the data,
6  Doctor?
7          MR. JOHNSON: Objection. Form.
8  BY MR. PAGE:
9      Q    Did you --
10     A    Well, let's talk about --
11     Q    Did you --
12     A    -- the data --
13     Q    Did you --
14     A    I'm not going to evaluate pipeline
15 integrity data. That's not my area of expertise.
16 I'm evaluating chemical data of soils collected
17 along that pipeline, 48 soils collected along that
18 pipeline, 30 of which were completely clean with
19 non-detectable hydrocarbons, 18 of which contained
20 part per million -- tens a part per million, 15
21 part per million at most, concentrations of TPH DRO
22 that included natural organic matter, waxy

**Page 229**

1  contamination from the laboratory and possibly
2  coating material from the pipeline.
3      Q    But no diesel?
4      A    No diesel, no gasoline.
5      Q    Okay. And what about the -- the --
6  the samples that were taken from the wells that
7  were drilled, did you look at those?
8      A    Absolutely.
9      Q    And they didn't contain any refined
10 products?
11     A    No.
12     Q    Not at all?
13     A    No.
14          It's all explained in my report, and
15 I hope we -- if you want to talk about the water
16 samples that were collected from wells and other
17 springs on the property.
18     Q    That's all you -- that's all
19 naturally occurring, correct?
20     A    No.
21     Q    Or unconventional sampling methods?
22     A    The nonconventional samples,

**Page 242**

1  your analysis. Is that right?
2  A   I didn't list them in my list of soil
3  data available to me, no.
4  Q   What were the results -- I think you
5  testified about this this morning, but I want to
6  make sure it's clear. What were the results of
7  those tests?
8  A   I think I mentioned or testified
9  earlier, they were all NDs.
10  Q   "ND" meaning?
11  A   ND being non-detect for the BTEX and
12  TPH analysis they were analyzed for.
13  Q   If somebody were looking at whether
14  or not those kinds of tests met regulatory
15  thresholds, could they be useful in your view?
16       MR. PAGE: Object to the form. This
17  goes beyond the scope of anything I did on direct.
18       MR. JOHNSON: It's cross-examination
19  about his expert report, they're in his report.
20  You can move to exclude it.
21  BY MR. JOHNSON:
22  Q   Go ahead.

**Page 243**

1       MR. PAGE: Regulatory statements are
2  in his report?
3       MR. JOHNSON: I'm talking about the
4  tests that you asked him about.
5  BY MR. JOHNSON:
6  Q   But go ahead.
7  A   I think, you know, they weren't
8  useful to me because I was tasked in looking at
9  what contamination was present in the soils.
10  Because of the elevated detection limits, the
11  higher detection limits that Environmental Testing
12  Laboratory used versus those of Accurate
13  Environmental Lab, for which there were splits, the
14  results from the Accurate Lab were more useful to
15  me because they had lower detection limits, I could
16  see if anything was truly there.
17       The Environmental Testing dataset, on
18  the same set of samples, with the higher detection
19  limits were not useful to me because they didn't
20  inform on that. But your question about, might
21  they be useful to somebody? Sure. I don't know
22  about regulatory thresholds, so I didn't know if

**Page 244**

1  that was the reason about those detection limits
2  that were reported there.
3       So I think in that sense, if -- if
4  those are indeed regulatory thresholds and those
5  data showed entirely non-detect samples, then, of
6  course, they're useful in some regard in that none
7  of these soils exceeded regulatory threshold.
8  Q   I want to ask you now about the
9  testing results that did report back with
10  quantifiable amounts. Let's go to your Table 3.
11  There are -- let's look at the soil tests where the
12  DRO reports are.
13       Can you just give us an example, in
14  your experience as a chemist as to what sort of
15  volumes we're talking about?
16       I mean how do I picture the results
17  that we're seeing here?
18       MR. PAGE: Object to the form.
19       THE WITNESS: Well, these detectable
20  levels of TPH DRO, which looking at the range from
21  somewhere around 5 parts per million to 15 parts
22  per million in 18 of the 48 samples, the other 30

**Page 245**

1  being non-detects. So 5 to 15 PPM is an extremely
2  low concentration of something being measured as
3  TPH. It's certainly not a concentration I would
4  attribute to petroleum-impacted soil from a
5  pipeline release, which I think I mentioned a few
6  moments ago would be hundreds, thousands, tens of
7  thousands, even hundreds of thousands of PPM.
8  That's what I've seen at other pipeline
9  investigations that I've worked on.
10       These levels are just completely
11  consistent with what I've seen in them; namely
12  natural organic matter and waxy contamination
13  from the laboratory or possibly the pipeline
14  coating materials, but not petroleum.
15  BY MR. JOHNSON:
16  Q   Last question. If I told you that I
17  went from Wheeler, Trigg, O'Donnell to Dowd Benett
18  in 2018, would that impact your testimony at all
19  about me being at Dowd Bennett when we worked on
20  the 2012 or '13 Colorado UST case?
21  A   Yes, of course.
22  Q   Do you remember that at all or --

```
 1        CERTIFICATE OF NOTARY PUBLIC
 2    I, FELICIA A. NEWLAND, CSR, the officer before
 3  whom the foregoing videotaped deposition was taken,
 4  do hereby certify that the witness whose testimony
 5  appears in the foregoing deposition was duly sworn
 6  by me; that the testimony of said witness was taken
 7  by me in stenotype and thereafter reduced to
 8  typewriting under my direction; that said deposition
 9  is a true record of the testimony given by said
10  witness; that I am neither counsel for, related to,
11  nor employed by any of the parties to the action in
12  which this deposition was taken; and, further, that
13  I am not a relative or employee of any counsel or
14  attorney employed by the parties hereto, nor
15  financially or otherwise interested in the outcome
16  of this action.
17
18
19          [signature]
20         FELICIA A. NEWLAND, CSR
            Notary Public
21
    My commission expires:
22  September 15, 2024
```
Page 254

```
 1      A C K N O W L E D G E M E N T  O F
 2              D E P O N E N T
 3
 4   I, SCOTT A. STOUT, Ph.D., P.G., do hereby
 5   acknowledge I have read and examined the foregoing
 6   pages of testimony, and the same is a true, correct
 7   and complete transcription of the testimony given by
 8   me, and any changes or corrections, if any, appear
 9   in the attached errata sheet signed by me.
10
11
12
13
14
     _____        _____
15   Date                SCOTT A. STOUT, Ph.D.,
     P.G.
16
17
18
19
20
21
22
```
Page 255

```
 1  Lazy S Ranch Properties, LLC v. Valero Energy Corporation
 2  Scott A Stout , Ph.D., P.G. (#5352742)
 3          E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19
20  _____    _____
21  Scott A Stout , Ph.D., P.G.       Date
22
```
Page 256

```
 1  Matthew E. Johnson
 2  mjohnson@dowdbennett.com
 3           October 12, 2022
 4  RE: Lazy S Ranch Properties, LLC v. Valero Energy
        Corporation
 5  9/27/2022, Scott A Stout , Ph.D., P.G. (#5352742)
 6    The above-referenced transcript is available for
 7  review.
 8    Within the applicable timeframe, the witness should
 9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  errata-tx@veritext.com.
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
             Yours,
22           Veritext Legal Solutions
```
Page 257

65 (Pages 254 - 257)

Veritext Legal Solutions
346-293-7000

```
                        Oklahoma
                       Rule 12-3230
              Depositions Upon Oral Examination
```

F.   Review By Witness; Changes; Signing.

The deponent shall have the opportunity to review the transcript of the deposition unless such examination and reading are waived by the deponent and by the parties.  After being notified by the officer that the transcript is available, the deponent shall have thirty (30) days in which to review it and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them.  The officer shall indicate in the certificate prescribed by paragraph 1 of subsection G of this section whether any review was requested and, if so, shall append any changes made by the deponent during the period allowed.


DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.