```
          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF OKLAHOMA


LAZY S RANCH PROPERTIES,        )
LLC, an Oklahoma Limited        )
Liability Company,              )
                                )
          Plaintiff,            )
v.                              )
                                ) Case No. CIV-19-425-RAW
VALERO TERMINATING AND          )
DISTRIBUTION COMPANY;           )
VALERO PARTNERS OPERATING       )
CO. LLC; and VALERO             )
PARTNERS WYNNEWOOD, LLC,        )
                                )
          Defendants.           )
```

Exhibit 15

VIDEO DEPOSITION OF NANCY COLEMAN, PhD

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON AUGUST 24, 2022

REPORTED BY JILL TUCKER SHAW, CSR #1459

Page 58

1    A.  There were a few trace quantities of TPH DRO
2  found in the soil.
3    Q.  And you -- did you discuss that in your
4  report?
5    A.  Yes, I did.
6    Q.  Okay.  Because -- and what was your -- what
7  was your opinion about those diesel quantities found
8  in the soil?
9    A.  They were below the evaluative human health
10 criteria that I was using to evaluate the soil data,
11 and so therefore I did not consider them to be
12 significant.
13   Q.  But they weren't zero; correct?
14   A.  No.  There were some non zeroes, but I  also
15 -- it's possible, given the low number -- the low
16 concentrations that those may actually be a product
17 of naturally occurring carbon compounds which are in
18 the same range as C ranges.
19   Q.  Okay.  Doctor, are you an analytical
20 chemist?
21   A.  No, I am not.
22   Q.  Okay.  Did you -- do you know how to run a
23 mass spectrometer?
24   A.  No, I do not.
25   Q.  Okay.  Did you -- were you asked to evaluate

Page 59

1  any of these things as an analytical chemist?
2    A.  No, I was not.
3    Q.  And I believe you've already stated, and I
4  just want to make it clear, you didn't perform any of
5  the laboratory testing yourself on this; correct?
6    A.  No, I did not.
7    Q.  Okay.  So this could have been naturally
8  occurring diesel?
9    A.  No.  It could have been naturally occurring
10 compounds that occur in this -- that show up in a
11 total petroleum hydrocarbon DRO analysis, because
12 they are in the carbon range that that particular
13 analysis covers.
14   Q.  So --
15   A.  And depending on the method and the cleanup
16 that takes place in the lab -- and to do that, to
17 look at those issues, you'd need to look at the
18 chromatograms.  And I believe another expert looked
19 at the chromatograms.  That is not my area of
20 expertise.  I deal in concentration only.
21   Q.  Okay.  In all your review of data, did you
22 find any source of metals, toxic metals, that caused
23 you any concern?
24   A.  That -- in a few of the soil samples that
25 were actually analyzed for metals, there were a few

Page 60

1  what would be considered naturally-occurring metals
2  here in Oklahoma.  I looked at those in comparison to
3  what are the accepted median background soil levels
4  for metals in Oklahoma, and they were all below that.
5    Q.  Okay.  Let's just talk about one of them,
6  like barium by chance.
7         You find barium is naturally occurring in
8  most Oklahoma soil?
9    A.  Most all Oklahoma soils have measurable
10 levels of barium.
11   Q.  Do you find higher measurable levels of
12 barium where oil and gas production has occurred?
13   A.  That is not necessarily a true statement.
14   Q.  What about where oil and gas refining has
15 occurred?
16   A.  Again, not necessarily a true statement.
17   Q.  Where would you expect to find higher levels
18 of barium concentration?
19   A.  Depends on the geological formation of the
20 underlying soil.
21   Q.  What about the soil at the Lazy S Ranch with
22 a natural karst limestone formation with an aquifer
23 underneath it?  Would you expect to find natural
24 barium occurring there?
25   A.  I would -- I would expect to find

Page 61

1  naturally-occurring barium in all soils in Oklahoma.
2    Q.  So flip to No. G in your report, Doctor.  I
3  want to kind of run through some of your opinions on
4  page 23.
5         And, Doctor, I know we said earlier that
6  you'd ruled out that any of the chemicals or metals
7  you found came from the pipeline, correct, with
8  absolute certainty?
9    A.  I don't believe that's what I said.
10   Q.  Okay.  Put it in your words, not mine.
11   A.  I said that given the soil and water data as
12 analyzed, there was no compelling evidence that there
13 had been releases of petroleum hydrocarbons from the
14 pipeline.
15        (Plaintiff's Exhibit No. 43 was marked for
16 identification purposes.)
17   Q.  (BY MR. GARRETT) Doctor, I'm going to hand
18 you what's been marked as Plaintiff's Exhibit No. 43.
19 This is a document that was produced by Valero that
20 was part of an Excel spreadsheet that's marked
21 StanTech 00000224.  It has to do with the previous
22 release in the pipeline and some of the chemical
23 levels that were around the pipeline release.
24        Can you take a minute and take a look at
25 this document?

Page 74

1   A.  That is correct.
2   Q.  And I think -- if I misstate your testimony,
3   correct me, please.  And you found to -- it was
4   present -- some of these things were present, but not
5   at significant harmful levels.  Is that also correct?
6   A.  Not at levels which exceeded the established
7   health-based evaluative criteria that I was using.
8   Q.  Right.  But it was present?
9   A.  Yes.
10      MR. CANTWELL:  Objection.
11  Q.  (BY MR. GARRETT) Okay.  So in your judgment,
12  pollution on property owned by another person in
13  Oklahoma is okay as long as it's just a little bit?
14      MR. CANTWELL:  Objection.
15      THE WITNESS:  That's not what I'm saying.
16  Q.  (BY MR. GARRETT) Okay.  So is it okay to
17  pollute just a little bit?
18  A.  I didn't say that and I wouldn't say that.
19  Q.  Okay.  So you would agree that any pollution
20  is bad; correct?
21  A.  Within the definition of pollution which
22  takes into account quantities.
23  Q.  Okay.  Because that -- can that pollution
24  lead to contamination?
25      MR. CANTWELL:  Objection.

Page 75

1       THE WITNESS:  It depends on the conditions.
2   Q.  (BY MR. GARRETT) How would you define
3   contamination, Doctor?
4   A.  In my practice, typically, it has been
5   levels of contaminants which exceed a human health
6   evaluative criteria.
7       (Plaintiff's Exhibit No. 42 was marked for
8   identification purposes.)
9   Q.  (BY MR. GARRETT) Okay.  So, Doctor, I'm
10  going to hand you what's been previously marked
11  Plaintiff's 42.  And sometimes when I'm searching
12  through things, I just -- I like to just look at, you
13  know, how Merriam-Webster would define a word of
14  contaminate.  And I just looked at the first version
15  of that.  They define contaminate as soil, stain,
16  corrupt, or infect by contact or association or to
17  make inferior or impure by admixture.
18      Would you say either one of those terms
19  would be relevant here?  Definitions?
20  A.  No.  Because in risk assessment, we use the
21  concept of concern, and concern relates to exceeding
22  a health-based criterion.
23  Q.  So what you're -- what you're looking at is
24  more definition No. 2, to make unfit for use;
25  correct?

Page 76

1   A.  Correct.
2   Q.  But you would agree with me that there was
3   some contamination to the water and soil at Lazy S
4   Ranch?
5       MR. CANTWELL:  Objection.
6       THE WITNESS:  There was certain chemicals
7   found at low levels in water and soil.  Where they
8   came from or whether they were associated with
9   naturally-occurring sources of some of that material,
10  I cannot tell you.
11  Q.  (BY MR. GARRETT) Because that was not part
12  of your --
13  A.  That was not part of my review --
14  Q.  Got it.
15  A.  -- nor is the data suffi- -- the data
16  collected for the site sufficient to make that
17  statement.
18  Q.  The data that you were provided is not
19  sufficient to make that statement; correct?
20  A.  Correct.
21  Q.  Okay.  So let's -- we were looking at your
22  opinions and they were slightly different from the
23  ones at the beginning to the end.  So flip back to
24  page 4 in your opinion, second -- second bullet
25  point, where you say, "The soils, as analyzed, are

Page 77

1   acceptable for the most conservative exposure
2   scenarios."  Do you see that?
3   A.  Yes.
4   Q.  So basically, you're stating that the soils
5   and waters do not require remediation under Oklahoma
6   environmental regulatory agency policies, is that
7   correct, based on the data you were provided for your
8   analysis?
9   A.  Based on the data I was provided and my
10  analysis of that data, it was my opinion that the
11  levels were below evaluative human health criteria
12  and therefore there was no need to consider
13  remediation.
14  Q.  But when we looked at the statute 27A
15  2-6-105, the statute we looked at earlier, it says
16  it's unlawful for any person to cause pollution in
17  any waters in the state.
18      Is that what that statute says?
19  A.  That's what that statute says, but 20 -- the
20  definition of pollution in Title 27A indicates that
21  you can consider quantities and whether or not it
22  constitutes a nuisance or public health threat or
23  disrupts a beneficial use, which is also contained in
24  the definition you provided.  It just doesn't include
25  the word quantities.

### Page 110

```
 1  individuals running the testing --
 2       A.  Yes, I do.
 3       Q.  -- things of that nature?  Okay.
 4           But none of those were provided to you to
 5  review --
 6       A.  No.
 7       Q.  -- in this case?
 8       A.  No.
 9           MR. GARRETT:  Okay.  That's all the
10  questions I have, Doctor.  Thank you so much for your
11  time today.
12           THE WITNESS:  You're welcome.
13           MR. CANTWELL:  She'll read and sign.
14           (Signature required; witness excused;
15  deposition concluded at 12:26 p.m.)
```

### Page 111

```
                        J U R A T

STATE OF _____  )
                       ) SS:
COUNTY OF _____  )


         I, NANCY COLEMAN, do hereby state under oath
that I have read the above and foregoing deposition
in its entirety and that the same is a full, true and
correct transcription of my testimony so given at
said time and place, except for the corrections
noted.

{_}  CORRECTIONS ATTACHED

{_}  NO CORRECTIONS

                      _____
                             NANCY COLEMAN


         Subscribed and sworn to before me, a Notary

Public in and for the State of _____ by said

witness, NANCY COLEMAN, this_____ day of

_____,20__.


                      _____
                             Notary Public, State of _____
                             My Commission Expires: _____
```

### Page 112

```
 1  WITNESS NAME:      NANCY COLEMAN
    IN RE:             Lazy S Ranch v. Valero Companies
 2  DATE TAKEN:        8/24/2022
    REPORTER:          JTS
 3
    Reasons for making changes are:
 4
    (1)  To clarify the record;
 5  (2)  To conform to the facts; or
    (3)  To correct major transcription errors.
 6
 7  PAGE LINE   CHANGE FROM       CHANGE TO       REASON
 8  ____ ____ _____|_____ _____
 9  ____ ____ _____|_____ _____
10  ____ ____ _____|_____ _____
11  ____ ____ _____|_____ _____
12  ____ ____ _____|_____ _____
13  ____ ____ _____|_____ _____
14  ____ ____ _____|_____ _____
15  ____ ____ _____|_____ _____
16  ____ ____ _____|_____ _____
17  ____ ____ _____|_____ _____
18  ____ ____ _____|_____ _____
19  ____ ____ _____|_____ _____
20  ____ ____ _____|_____ _____
21  ____ ____ _____|_____ _____
22  ____ ____ _____|_____ _____
23  ____ ____ _____|_____ _____
24  ____ ____ _____|_____ _____
25  DATE: _____WITNESS SIGNATURE:_____
```

### Page 113

```
 1  PAGE LINE   CHANGE FROM       CHANGE TO       REASON
 2  ____ ____ _____|_____ _____
 3  ____ ____ _____|_____ _____
 4  ____ ____ _____|_____ _____
 5  ____ ____ _____|_____ _____
 6  ____ ____ _____|_____ _____
 7  ____ ____ _____|_____ _____
 8  ____ ____ _____|_____ _____
 9  ____ ____ _____|_____ _____
10  ____ ____ _____|_____ _____
11  ____ ____ _____|_____ _____
12  ____ ____ _____|_____ _____
13  ____ ____ _____|_____ _____
14  ____ ____ _____|_____ _____
15  ____ ____ _____|_____ _____
16  ____ ____ _____|_____ _____
17  ____ ____ _____|_____ _____
18  ____ ____ _____|_____ _____
19  ____ ____ _____|_____ _____
20  ____ ____ _____|_____ _____
21  ____ ____ _____|_____ _____
22  ____ ____ _____|_____ _____
23  ____ ____ _____|_____ _____
24  ____ ____ _____|_____ _____
25  DATE: _____WITNESS SIGNATURE:_____
```

Page 114

```
 1              C E R T I F I C A T E
 2   STATE OF OKLAHOMA    )
                          ) SS:
 3   COUNTY OF OKLAHOMA   )
 4           I, JILL TUCKER SHAW, C.S.R. for the State of
 5   Oklahoma, certify that NANCY COLEMAN was by me sworn
 6   to testify the truth; that the deposition was taken
 7   by me in stenotype and thereafter transcribed and is
 8   a true and correct transcript of the testimony of the
 9   witness; that the deposition was taken on August 24,
10   2022, in Oklahoma City, Oklahoma; that I am not an
11   attorney for or a relative of either party, or
12   otherwise interested in this action.
13           Witness my hand and seal of office on this,
14   the 8th day of September, 2022.
15                    Jill Tucker Shaw
16               JILL TUCKER SHAW, C.S.R.
                 Oklahoma Certified Shorthand Reporter
17               Certificate No. 01459
                 Expiration Date:  December 31, 2022
18
19
20
21
22
23
24
25
```

Page 115

```
 1                      MEMORANDUM
 2
     TO:         STEPHEN L. JANTZEN
 3               Attorney at Law
                 Ryan Whaley
 4               400 North Walnut
                 Oklahoma City, Oklahoma  73104
 5
     FROM:       WORD FOR WORD REPORTING
 6               620 NORTH ROBINSON, SUITE 202
                 OKLAHOMA CITY, OKLAHOMA  73102
 7
     DATE:       SEPTEMBER 9, 2022
 8
     STYLE:      LAZY S RANCH PROPERTIES, LLC v.
 9               VALERO TERMINALING AND DISTRIBUTION
                 COMPANY, ET AL.; NO. CIV-19-425-RAW
10
             Please have NANCY COLEMAN read the
11   deposition enclosed in the above-styled case and sign
     the jurat page before a notary public.  Also, please
12   have NANCY COLEMAN make any needed corrections on the
     enclosed errata sheet and not directly on the
13   transcript.
14           Please return the signed jurat page and
     errata sheet to my office within 30 days of the date
15   of receipt so that we can forward the original
     deposition transcript to the attorney who took the
16   deposition.  If we do not receive the signed jurat
     and errata sheet back by said date, we will file the
17   original deposition as-is with the attorney who took
     the deposition.
18
             Thank you for your attention and cooperation
19   in this matter.
20
     cc:   D. Mitchell Garrett
21
22
23
24
25
```