UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF OKLAHOMA

**Exhibit**

**16**

------------------------------

LAZY S RANCH PROPERTIES,          :

LLC, AN OKLAHOMA LIMITED          :

LIABILITY COMPANY                 :

VS.                               :  CASE NUMBER:

                                  :  6:19-cv-00425-JWB

                                  :

VALERO TERMINALING AND            :

DISTRIBUTION COMPANY;             :

VALERO PARTNERS OPERATING         :

CO. LLC; AND VALERO PARTNERS :

WYNNEWOOD, LLC,                   :

------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

SCOTT A. STOUT, PH.D., P.G.

September 27, 2022

ORAL AND VIDEOTAPED DEPOSITION OF SCOTT A. STOUT,

PH.D., P.G., produced as a witness at the instance

of the Plaintiff, and duly sworn, was taken in the

above-styled and numbered cause on the 27th day of

September, 2022, from 9:59 a.m. to 4:57 p.m., before

FELICIA A. NEWLAND, CSR, in and for the State of the

District of Columbia, reported by stenograph, at

Veritext Legal Solutions, 1250 I Street, Northwest,

Suite 35, Washington, D.C., pursuant to the Federal

Rules of Civil Procedure and the provisions stated

on the record or attached hereto.

1  Q    What evaluation did you make specific
2  to the Lazy S Ranch as to naturally occurring
3  materials?
4        I know you cite that there's some
5  aspects of some of the soil samples in your report
6  may be naturally occurring materials.  What
7  investigation did you make of the existence of
8  naturally occurring vegetative materials on the
9  Lazy S Ranch?
10  A    I've seen photographs of the
11  landscape there that shows there's indeed
12  vegetation present.  Irrespective of that, the
13  chemistry of the soil samples told me there's
14  remnants of that vegetation present.
15  Q    Based on the GC aspect, correct?
16  A    Based upon the chromatogram, the
17  GC/FIDs.
18  Q    GC/FIDs.  Thank you, sir, for the
19  correction.
20        Did you do any testing of the organic
21  content of these soils near the pipelines?
22  A    No.  I -- I didn't analyze any soils.

1  detections of individual volatile aromatic
2  hydrocarbons.  All of those are J qualified --
3  which you may want me to explain -- all in the
4  range of, you know, .25 to .08 parts per billion in
5  soil.  And then off to the far right there are 1.44
6  to 3.68 part per million TPH DRO reported for those
7  soils.
8  Q    Okay.
9  A    Also J qualified.
10  Q    And J qualified means there's a --
11  does J qualified mean that it's below the
12  laboratory detection limit, but it's estimated by
13  the lab, the concentration?
14  A    It -- no.
15  Q    Okay.  What does it mean?
16  A    It means the concentration was below
17  the laboratory sample-specific reporting limit --
18  Q    Reporting limit?
19  A    -- but above the method detection
20  limit.
21  Q    Thank you.
22        And on Figure 3, that you mentioned

1  They were all collected by Dr. Fisher and analyzed
2  at his laboratory.
3  Q    Was any --
4  A    I'm sorry, that's not true.  I mean,
5  there were the three samples that -- from the --
6  Q    Right.
7  A    -- January 2022 excavation.
8  Q    I was -- I was just going to ask you
9  about that.  There were a couple of soil samples?
10  A    Yes.
11  Q    And those are found on Table 3,
12  correct?
13  A    Yes.  And their chromatograms, are
14  all found on Figure 3.
15  Q    Figure 3.
16        And just looking at Table 3, these
17  results show that there was some, what, that Alpha
18  Labs collected from the -- what would you call that
19  that was shown there that was present in the
20  conventional soil that was collected by the
21  defendant?
22  A    There are, you can see, four

1  earlier, these are the GCs for those -- that
2  sample?
3  A    For each of those three samples, yes.
4  Q    Okay.  And what -- what is your
5  interpretation of these?
6  A    They each contained predominantly
7  biogenic chemicals, which is this naturally
8  occurring organic matter we started this
9  conversation about.
10  Q    Yes, sir.
11  A    And the basis for that is they
12  exhibit the characteristic, quote, classic
13  fingerprint of biogenic materials, well published.
14        Sample two --
15  Q    What does it mean that they're within
16  the range of diesel range biogenic chemicals?
17        What does it mean that they're -- I
18  mean, I see it on this Figure 3, you have, "Diesel
19  range biogenic chemicals," and then, "residual
20  range biogenics."  What's the distinction between
21  those two, if there is one?
22  A    It's only referring to chemicals that

1    boil below C28, the upper limit of DRO or above
2    that limit.  And I explained this in the background
3    material in my report that, you know, TPH is a
4    manmade metric, and we divide that metric into
5    different carbon ranges that we refer to as
6    gasoline range or diesel range or residual range,
7    but there are other things, for example, natural
8    organic matter that can occur within each of those
9    ranges that has nothing to do with petroleum, but
10   it's falsely measured as petroleum when it occurs
11   in the diesel range or the residual range.  And
12   that's what's happening here with this natural
13   organic matter.
14        Q    Okay.  On the -- on the B sample,
15   there's a -- there's a reference to 20.  What does
16   that refer to?
17        A    That refers to an alkane, again, a
18   straight chain hydrocarbon with 20 carbons in a
19   row.
20        Q    Is that part of the biogenic
21   naturally occurring materials or is it different
22   from that?

Page 206

1        A    It's different.  And it's, I think,
2    explained either on the bottom of the page or
3    certainly in the text.
4        Q    Would you explain for the jury here
5    today, sir?
6        A    I'm just reading the bottom of page
7    40 right now where I say, "The trace n-alkanes in B
8    within the DRO range are not accompanied by a UCM
9    which could indicate diesel fuel, but rather appear
10   to be waxes possibly attributable to the pipelines
11   coating material; see text."  Because I know I've
12   got a longer explanation earlier in the report.
13        Q    Okay.  The coating material, did you
14   do any analysis of Valero's coating material on
15   this pipeline?
16        A    No, I did no chemical analysis.
17        Q    That's what I mean.
18        A    Just a literature analysis.
19        Q    A literature analysis.  You did no
20   chemical analysis?
21        A    That's right.
22        Q    So you're attributing -- so I guess

Page 207

1    based on what your report says here, on the
2    chemical fingerprint for B, it could be either
3    diesel range or the coating for the pipeline.  Is
4    that your testimony?
5        A    No.
6        Q    What's your testimony?
7        A    It's not diesel fuel and possibly the
8    coating.
9        Q    And if it's not any of those, what is
10   it?
11        A    I don't know.  And the reason I say
12   possibly the coating is because exactly, as your
13   question a few moments ago, I did not analyze it,
14   but its description by the manufacturer indicates
15   it contains waxes, which is what we see here.
16        Q    Did you ask Valero for a sample of
17   the coating materials so you could do an analysis?
18        A    I don't believe we did -- I did
19   suggest that.  Again, this wasn't evident until
20   after these soils had been collected and the hole
21   closed up in January of 2020 -- 2022 rather.  So no
22   additional work went back to expose the pipeline

Page 208

1    and collect this.
2        Q    So the answer is you didn't ask for a
3    sample of the original pipeline coating, correct?
4        A    No.  At the time when I got these
5    results and initiated my investigation as to what
6    it could be, the literature on the pipeline coating
7    material explained its potential source
8    satisfactorily to me.
9        Q    Did it have a -- an analysis similar
10   to what's on the -- these tables in your report or
11   your GC graph example that you could compare it to?
12        A    No.  It didn't provide that level of
13   detail.  The descriptions of these Polyken coating
14   material, the tapes that were used, is found in one
15   of my footnotes or in the text on pages 14 and 15.
16        Q    So the answer is, is that you didn't
17   have a similar detail for this commercial product
18   description, you didn't have either an analytical
19   result or GC/FID sample for this material, correct?
20        A    No, I didn't.  As I said, the
21   literature descriptions of their chemical
22   compositions answered my question satisfactorily,

Page 209

53 (Pages 206 - 209)

1  you, that this phenomena is known to occur in karst
2  settings.
3      Q    But we don't know if it's occurring
4  in this particular setting or not, correct?
5      A    There's no reason to believe that
6  it's not given the long-term manifestation of the
7  conditions.
8      Q    It could be a long-term leaking
9  pipeline, couldn't it, Doctor?
10         MR. JOHNSON: Objection. Form.
11         THE WITNESS: There's no evidence for
12  a long-term leaking pipeline, particularly the
13  Valero pipeline, which has been investigated.
14  There's no data available. The data collected at
15  15 excavations along the Valero pipeline show no
16  evidence of petroleum released. If there had been,
17  it would be evident.
18  BY MR. PAGE:
19      Q    How much of the pipeline has not been
20  investigated?
21      A    I don't know. Some fraction of it.
22      Q    And how much of the pipeline overlays

1  the karst terrane at the Lazy S Ranch?
2      A    Of the entire pipeline or --
3      Q    Of the pipeline that's on the Lazy S
4  Ranch, how much of it covers karst?
5         Did you investigate that?
6      A    I was just looking at a figure that
7  allowed me to, because it's my --
8      Q    But I asked you prior to today, just
9  right now, sitting in this deposition, did you
10  investigate that -- how much of the karst is -- how
11  much of the pipeline runs over the karst on the
12  Lazy S Ranch?
13         MR. JOHNSON: Objection. Form.
14         Go ahead.
15         THE WITNESS: I didn't investigate
16  it, I had it available to me.
17  BY MR. PAGE:
18      Q    Okay. Well, did you evaluate how
19  much of the pipeline overlays the karst?
20      A    I didn't see a reason to evaluate it.
21  I can look at it and see it's somewhere around
22  70 percent.

1      Q    Okay. And it's about how much of the
2  pipeline and how long of the pipeline traverses the
3  ranch?
4         Three miles sound right?
5      A    I don't recall a number. I do my --
6  look at my scale on my diagram here and estimate it
7  but --
8      Q    Well, Doctor, you used the term, you
9  said that the pipeline has been evaluated, but you
10  didn't see any -- any leaks or spills. I'm just
11  trying to get you to quantify how much of this
12  pipeline over the karst has actually been evaluated
13  by Valero.
14         We've had 15 digs, you said. How
15  much is actually exposed in each dig? How many
16  feet?
17      A    Tens.
18      Q    Tens of feet.
19         And if we had two miles of pipeline,
20  do you think that's a reasonable representation of
21  the -- the -- the -- the pipeline's potential to
22  leak on the Lazy S Ranch?

1         MR. JOHNSON: Objection. Form.
2         THE WITNESS: Those excavations were
3  conducted at areas where other data indicated
4  certain anomalies existed, anomalies potentially
5  associated with thinning of the walls and so forth.
6  So it's, I think, common practice and due diligence
7  to investigate those areas, which is what Valero
8  did. And the data collected in the soils around
9  those are clean.
10  BY MR. PAGE:
11      Q    They're clean?
12      A    Oh, yes.
13      Q    What do you mean by clean?
14      A    It's explained in my report.
15      Q    There's no refined products in
16  that --
17      A    That's correct.
18      Q    -- in that soil?
19      A    There's naturally occurring organic
20  matter that's falsely measured as TPH DRO. There's
21  laboratory contamination from Accurate Laboratories
22  falsely measured as TPH DRO, but there's no

1  petroleum present.

2          I'm sorry, I wanted to add the third

3  one.  In the samples that were analyzed by me at

4  Alpha, there's also evidence, what I believe, is

5  possibly attributable to the Polyken coating

6  material on the pipeline, only visible in the more

7  higher resolution results obtained at Alpha.

8      Q     So you've done some pipeline

9  engineering work in the past?

10     A     No.  I've been involved in pipeline

11 investigations in the past.

12     Q     Have you ever found one that's

13 leaked?

14     A     Oh, yeah.  That -- I'm glad you asked

15 that.  Because pipelines aren't investigated by

16 someone like me unless there's been a leak, in

17 which case, we see thousands or tens of thousands

18 or even hundreds of thousands of parts per million

19 petroleum in soils around those leaks.

20     Q     And you've investigated a leak in a

21 karst environment --

22     A     I have --

Page 226

1      Q     -- a pipeline leak?

2      A     I have not investigated a leak in a

3  karst environment.  So while it's true there's 15

4  excavations that are clean, in your hypothesis, or

5  the plaintiff's hypothesis, or the plaintiff's

6  expert's hypothesis, "Well, it leaked somewhere

7  else."  That's irrefutable.

8          I mean, of course, unless they dig up

9  the entire pipeline, you're going to point to that.

10 But as a scientist, I rely upon the data.  The data

11 showed no releases.  The data showed no impacts to

12 water between the pipeline and Tulip Springs, so

13 the scenario that's being proposed is just not

14 supported by data.

15     Q     Okay.  Do you know whether or not

16 Valero's replaced the pipeline -- all of the

17 pipeline from the refinery to the southern border

18 of the Lazy S Ranch?

19     A     No, I do not know.

20     Q     Okay.  If I told you that was true,

21 would that affect your analysis?

22          MR. JOHNSON:  Objection.  Form.

Page 227

1          Go ahead.

2          THE WITNESS:  It doesn't change the

3  data that I have available to me.

4  BY MR. PAGE:

5      Q     And you didn't have all the data,

6  Doctor?

7          MR. JOHNSON:  Objection.  Form.

8  BY MR. PAGE:

9      Q     Did you --

10     A     Well, let's talk about --

11     Q     Did you --

12     A     -- the data --

13     Q     Did you --

14     A     I'm not going to evaluate pipeline

15 integrity data.  That's not my area of expertise.

16 I'm evaluating chemical data of soils collected

17 along that pipeline, 48 soils collected along that

18 pipeline, 30 of which were completely clean with

19 non-detectable hydrocarbons, 18 of which contained

20 part per million -- tens a part per million, 15

21 part per million at most, concentrations of TPH DRO

22 that included natural organic matter, waxy

Page 228

1  contamination from the laboratory and possibly

2  coating material from the pipeline.

3      Q     But no diesel?

4      A     No diesel, no gasoline.

5      Q     Okay.  And what about the -- the --

6  the samples that were taken from the wells that

7  were drilled, did you look at those?

8      A     Absolutely.

9      Q     And they didn't contain any refined

10 products?

11     A     No.

12     Q     Not at all?

13     A     No.

14          It's all explained in my report, and

15 I hope we -- if you want to talk about the water

16 samples that were collected from wells and other

17 springs on the property.

18     Q     That's all you -- that's all

19 naturally occurring, correct?

20     A     No.

21     Q     Or unconventional sampling methods?

22     A     The nonconventional samples,

Page 229

58 (Pages 226 - 229)

1    your analysis.  Is that right?
2        A    I didn't list them in my list of soil
3    data available to me, no.
4        Q    What were the results -- I think you
5    testified about this this morning, but I want to
6    make sure it's clear.  What were the results of
7    those tests?
8        A    I think I mentioned or testified
9    earlier, they were all NDs.
10       Q    "ND" meaning?
11       A    ND being non-detect for the BTEX and
12   TPH analysis they were analyzed for.
13       Q    If somebody were looking at whether
14   or not those kinds of tests met regulatory
15   thresholds, could they be useful in your view?
16           MR. PAGE:  Object to the form.  This
17   goes beyond the scope of anything I did on direct.
18           MR. JOHNSON:  It's cross-examination
19   about his expert report, they're in his report.
20   You can move to exclude it.
21   BY MR. JOHNSON:
22       Q    Go ahead.

Page 242

1            MR. PAGE:  Regulatory statements are
2    in his report?
3            MR. JOHNSON:  I'm talking about the
4    tests that you asked him about.
5    BY MR. JOHNSON:
6        Q    But go ahead.
7        A    I think, you know, they weren't
8    useful to me because I was tasked in looking at
9    what contamination was present in the soils.
10   Because of the elevated detection limits, the
11   higher detection limits that Environmental Testing
12   Laboratory used versus those of Accurate
13   Environmental Lab, for which there were splits, the
14   results from the Accurate Lab were more useful to
15   me because they had lower detection limits, I could
16   see if anything was truly there.
17           The Environmental Testing dataset, on
18   the same set of samples, with the higher detection
19   limits were not useful to me because they didn't
20   inform on that.  But your question about, might
21   they be useful to somebody?  Sure.  I don't know
22   about regulatory thresholds, so I didn't know if

Page 243

1    that was the reason about those detection limits
2    that were reported there.
3            So I think in that sense, if -- if
4    those are indeed regulatory thresholds and those
5    data showed entirely non-detect samples, then, of
6    course, they're useful in some regard in that none
7    of these soils exceeded regulatory threshold.
8        Q    I want to ask you now about the
9    testing results that did report back with
10   quantifiable amounts.  Let's go to your Table 3.
11   There are -- let's look at the soil tests where the
12   DRO reports are.
13           Can you just give us an example, in
14   your experience as a chemist as to what sort of
15   volumes we're talking about?
16           I mean how do I picture the results
17   that we're seeing here?
18           MR. PAGE:  Object to the form.
19           THE WITNESS:  Well, these detectable
20   levels of TPH DRO, which looking at the range from
21   somewhere around 5 parts per million to 15 parts
22   per million in 18 of the 48 samples, the other 30

Page 244

1    being non-detects.  So 5 to 15 PPM is an extremely
2    low concentration of something being measured as
3    TPH.  It's certainly not a concentration I would
4    attribute to petroleum-impacted soil from a
5    pipeline release, which I think I mentioned a few
6    moments ago would be hundreds, thousands, tens of
7    thousands, even hundreds of thousands of PPM.
8    That's what I've seen at other pipeline
9    investigations that I've worked on.
10           These levels are just completely
11   consistent with what I've seen in them; namely
12   natural organic matter and waxy contamination
13   from the laboratory or possibly the pipeline
14   coating materials, but not petroleum.
15   BY MR. JOHNSON:
16       Q    Last question.  If I told you that I
17   went from Wheeler, Trigg, O'Donnell to Dowd Benett
18   in 2018, would that impact your testimony at all
19   about me being at Dowd Bennett when we worked on
20   the 2012 or '13 Colorado UST case?
21       A    Yes, of course.
22       Q    Do you remember that at all or --

Page 245

62 (Pages 242 - 245)

CERTIFICATE OF NOTARY PUBLIC

1  
2      I, FELICIA A. NEWLAND, CSR, the officer before  
3  whom the foregoing videotaped deposition was taken,  
4  do hereby certify that the witness whose testimony  
5  appears in the foregoing deposition was duly sworn  
6  by me; that the testimony of said witness was taken  
7  by me in stenotype and thereafter reduced to  
8  typewriting under my direction; that said deposition  
9  is a true record of the testimony given by said  
10  witness; that I am neither counsel for, related to,  
11  nor employed by any of the parties to the action in  
12  which this deposition was taken; and, further, that  
13  I am not a relative or employee of any counsel or  
14  attorney employed by the parties hereto, nor  
15  financially or otherwise interested in the outcome  
16  of this action.  
17  
18  
19  
20      FELICIA A. NEWLAND, CSR  
         Notary Public  
21  
      My commission expires:  
22  September 15, 2024

Page 254

---

1  Lazy S Ranch Properties, LLC v. Valero Energy Corporation  
2  Scott A Stout , Ph.D., P.G. (#5352742)  
3      E R R A T A  S H E E T  
4  PAGE_____ LINE_____ CHANGE_____  
5  _____  
6  REASON_____  
7  PAGE_____ LINE_____ CHANGE_____  
8  _____  
9  REASON_____  
10  PAGE_____ LINE_____ CHANGE_____  
11  _____  
12  REASON_____  
13  PAGE_____ LINE_____ CHANGE_____  
14  _____  
15  REASON_____  
16  PAGE_____ LINE_____ CHANGE_____  
17  _____  
18  REASON_____  
19  
20  _____  _____  
21  Scott A Stout , Ph.D., P.G.        Date  
22  

Page 256

---

1      A C K N O W L E D G E M E N T  O F  
2      D E P O N E N T  
3  
4  I, SCOTT A. STOUT, Ph.D., P.G., do hereby  
5  acknowledge I have read and examined the foregoing  
6  pages of testimony, and the same is a true, correct  
7  and complete transcription of the testimony given by  
8  me, and any changes or corrections, if any, appear  
9  in the attached errata sheet signed by me.  
10  
11  
12  
13  
14  
     _____  _____  
15  Date               SCOTT A. STOUT, Ph.D.,  
     P.G.  
16  
17  
18  
19  
20  
21  
22  

Page 255

---

1  Matthew E. Johnson  
2  mjohnson@dowdbennett.com  
3      October 12, 2022  
4  RE: Lazy S Ranch Properties, LLC v. Valero Energy  
      Corporation  
5  9/27/2022, Scott A Stout , Ph.D., P.G. (#5352742)  
6  The above-referenced transcript is available for  
7  review.  
8      Within the applicable timeframe, the witness should  
9  read the testimony to verify its accuracy. If there are  
10  any changes, the witness should note those with the  
11  reason, on the attached Errata Sheet.  
12  The witness should sign the Acknowledgment of  
13  Deponent and Errata and return to the deposing attorney.  
14  Copies should be sent to all counsel, and to Veritext at  
15  errata-tx@veritext.com.  
16  
17  Return completed errata within 30 days from  
18  receipt of testimony.  
19  If the witness fails to do so within the time  
20  allotted, the transcript may be used as if signed.  
21  
      Yours,  
22      Veritext Legal Solutions  

Page 257

65 (Pages 254 - 257)

```
                    Oklahoma
                  Rule 12-3230
          Depositions Upon Oral Examination
```

F.  Review By Witness; Changes; Signing.


The deponent shall have the opportunity to review
the transcript of the deposition unless such
examination and reading are waived by the deponent
and by the parties.  After being notified by the
officer that the transcript is available, the
deponent shall have thirty (30) days in which to
review it and, if there are changes in form or
substance, to sign a statement reciting such
changes and the reasons given by the deponent for
making them.  The officer shall indicate in the
certificate prescribed by paragraph 1 of subsection
G of this section whether any review was requested
and, if so, shall append any changes made by the
deponent during the period allowed.


DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
                    VERITEXT LEGAL SOLUTIONS
         COMPANY CERTIFICATE AND DISCLOSURE STATEMENT
```

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.