IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LAZY S RANCH PROPERTIES, LLC, an OKLAHOMA LIMITED LIABILITY COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>VALERO TERMINALING AND DISTRIBUTION COMPANY, et al.,<br><br>Defendants. | Case No. 19-CV-425-JWB |

## MEMORANDUM AND ORDER

Presently before the court are a plethora of motions filed by both parties. The primary focus of this order are the two dispositive motions: a motion for summary judgment filed by Defendants Valero Terminaling and Distribution Company, Valero Partners Operating Co. LLC, and Valero Partners Wynnewood, LLC (collectively, "Defendants" or "Valero") (Doc. 267) and a motion for partial summary judgment filed by Plaintiff Lazy S Ranch Properties, LLC (Docs. 211, 212). Plaintiff has filed its response to Defendants' motion (Doc. 298), and Defendants filed a reply (Doc. 312). Defendants filed a response to Plaintiff's motion. (Doc. 266.) Plaintiff did not timely file a reply, but it is attached as an exhibit to Plaintiff's motion for leave to file reply. (Docs. 309, 309-1.) The court grants the motion and the reply was considered by the court in ruling on these motions. Accordingly, the dispositive motions are ripe and ready for judicial review.

Also pending before the court are fifteen *Daubert* motions (Docs. 133, 218, 219, 220, 223, 258, 259, 260, 261, 262, 263, 264, 265, 268, 272), two motions in limine (Docs. 221, 222), a motion to strike (Doc. 300), two discovery motions (Docs. 249, 293), Defendants' motion to strike three overlength opposition briefs (Doc. 300), and Plaintiff's motion for leave to appear (Doc. 314). For the reasons stated below, Plaintiff's motion for partial summary judgment is DENIED,

1

Defendants' motion for summary judgment is GRANTED, and the remaining motions are DENIED.

## I.     BACKGROUND

The court finds the following facts to be uncontroverted for purposes of summary judgment. Factual disputes about immaterial matters are excluded from the following statement, as are factual averments asserted by the parties that are not supported by the record citations provided.

Plaintiff owns and runs cattle operations on 6,150 acres of real property in Carter County, Oklahoma (the "Lazy S Ranch" or "ranch" or "property"). The Roos family bought the property for approximately $8.6 million in December 2017. The property includes a main house/ranch headquarters, a foreman's house, a ranch hand house, a mobile home, a barn, a former airplane hangar, an equipment shed, a garage/shop, a covered corral, and five pipe fence cattle corrals. (Doc. 127 at 26.) The property also has eight water wells. (*Id.*)

The Lazy S Ranch lies above a portion of the Arbuckle-Simpson Aquifer, which covers an area of over 500 square miles in south central Oklahoma. (Doc. 127 at 24; Doc. 131 at 6.) The aquifer feeds numerous freshwater springs and clear running streams in the region, and it supplies water to approximately 39,000 people. (Doc. 127 at 19.) "Water is discharged naturally from the aquifer by numerous springs and seeps; much of this discharge becomes the base flow of streams." U.S.G.S., *Karst Aquifers: Arbuckle-Simpson Aquifer* (July 20, 2021), https://www.usgs.gov/mission-areas/water-resources/science/karst-aquifers-arbuckle-simpson-aquifer. At least 9 springs are located on the ranch. (Doc. 131 at 34.) Most of the springs flow 80-90% of the year. (*Id.*) Buzzard Spring is an exception as it flows reliably year-round and serves as the drinking water supply for the ranch. (*Id.*)

Beneath the property lie several pipelines. Central to this case is a 12-inch petroleum (refined gasoline and diesel fuel) transportation pipeline operated by Valero (the "Wynnewood Pipeline"). The Wynnewood Pipeline begins at Valero's refinery in Ardmore and travels approximately 30 miles north to a product terminal in Wynnewood.[1] Approximately three miles of the Wynnewood Pipeline is located beneath the Lazy S Ranch. This section of the pipeline is oriented in a north-south/southeast direction and is about 0.5 miles east of a spring called Tulip Springs in the northwest corner of the property.[2] (Doc. 142-1 at 2.)

The other pipelines are located in the Blue Knight right of way, which is oriented in a north-south/southwest direction and is located west of the Wynnewood Pipeline and approximately 2,435 feet east of Tulip Springs. (Doc. 171 at 37.) The Blue Knight pipeline (also referred to as the Eagle System pipeline) is an 8-inch pipeline that was constructed in the 1940s. (*Id*. at 39.) Between 1948 and 2008, the Blue Knight pipeline carried refined petroleum products. (*Id*. at 37.) Between 2008-2013, it carried crude oil. (*Id*.) It appears that the 8-inch line was abandoned in place in 2013, when Blue Knight installed a 12-inch pipeline adjacent to the existing 8-inch pipeline. (*Id*. at 37-38.) The 12-inch pipeline is currently active and carries crude oil. And in 2017, Cool Creek Properties, LLC installed an 8-inch steel pipeline, used for fiber optic lines, telephone lines, power lines, and other related cabling in the right of way. (*Id*. at 38.)

---

[1] The Wynnewood Pipeline was constructed in 1975 by Vickers Pipeline Company and was acquired by Valero in 2009. It is subject to regulation by the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), an agency of the U.S. Department of Transportation. It is subject to inspections, monitoring, and regulatory oversight, routine PHMSA audits, aerial inspections and flyovers, on the ground inspections, in-line inspections using multi-tool "smart pigging" technology inside the Pipeline, pipeline integrity requirements, constant monitoring and metering of pipeline metrics, and other assessments and evaluations. It is inspected every three years, while most other PHMSA pipelines are inspected every five years. "Corrosion on the pipeline" was cited as the cause that necessitated a more frequent interval than other pipelines. (Doc. 212-1 at 67:1-12.)

[2] Portions of the Lazy S Ranch are designated by PHMSA as "high consequence areas" or "HCA" due to the aquifer. On the property, the Pipeline has both "direct" and "indirect" impacts with an HCA. A direct impact occurs when a pipeline directly crosses anHCA, and an indirect impact occurs when a spill analysis determines that a spill can reach an HCA, so that area is also treated as an HCA. Both are present at the Lazy S Ranch. (Doc. 212-1 at 102:4-103:11.)

In April 2018, there was a spill on the Wynnewood Pipeline of approximately 706 barrels, or 30,000 gallons of diesel and/or gasoline approximately six miles south of the Lazy S Ranch. After doing a "failure investigation," Valero determined the cause of the spill was "selective seam weld corrosion." (Doc. 212-1 at 82-92.)

In July 2018, Robert Charles "Cinco" Roos, a representative of Lazy S Ranch, claims to have smelled a diesel fuel odor emanating from Tulip Springs. (Doc. 267-11 at 3-4.) Mr. Roos testified that he was the first representative of Lazy S Ranch to discover something "amiss at Tulip Springs." (*Id*. at 3.) However, Plaintiff's expert Bert Fisher states that witnesses have reported "refined petroleum product hydrocarbon odors at Tulip Springs following high precipitation events as early as 2004." (Doc. 131 at 35.) Since July 2018, several other members of the Roos family, geologists, and experts have also reported gas fumes/odors near Tulip Springs.

Shortly after Mr. Roos reported the odor, Plaintiff retained multiple experts with experience in the fields of pipeline integrity and environmental contamination and began investigating. Trae Miller, a licensed professional engineer, traversed the entire portion of the Wynnewood Pipeline crossing the ranch and reviewed all of Valero's pipeline integrity data from 2009-present. (Doc. 128.) Fisher, a geologist and geochemist, began collecting samples of environmental media on the property. (Docs. 131, 142, 143, 144, 161, 162, 163, 269.) And Kenneth Ede, an environmental scientist and professor at Oklahoma State University, analyzed the numerous soil, water, and air samples that were taken. (Doc. 130.) Plaintiff's experts contend the Wynnewood Pipeline is leaking refined petroleum products into the soil, water, and air on the property.

Valero also retained multiple experts and began its own investigation. Valero ran pipeline integrity in-line inspections ("ILI") on the Wynnewood Pipeline looking for metal loss features

that could turn into small leaks. (Doc. 267-3 at 16, 144, 286.) Additionally, Valero performed approximately 13 "digs" around the pipeline to look for selective seam weld corrosion. (Doc. 267-4 at 81:17-85:13.) And Valero also collected and analyzed samples of environmental media. Valero's experts contend there is no evidence of environmental contamination on the property and there are no leaks or any other conditions that need to be repaired on the Wynnewood Pipeline.

The parties have collectively taken: 48 soil samples, 61 surface water, groundwater, and spring water samples, and 8 air samples. (Doc. 179 at 33.) These samples were taken from various locations on and around the Lazy S Ranch, but a high percentage were taken from the area between Tulip Springs and the Wynnewood Pipeline. Generally speaking, the samples were tested for the existence of refined petroleum product hydrocarbons. "Hydrocarbons are organic compounds and contain only carbon and hydrogen." (Doc. 131 at 27.) "Refined petroleum product hydrocarbons are those hydrocarbons that have been produced by the physical and chemical processes used in a refinery." (*Id.*) More specifically, the samples were tested for the existence of certain volatile organic compounds ("VOCs") known to be present in gasoline, including benzene, toluene, ethyl-benzene, and xylenes (collectively, "BTEX"). They were also tested for total petroleum hydrocarbons ("TPH"), diesel range organics ("DRO"), and gasoline range organics ("GRO"). (*Id.* at 28.)

First, the results for the soil samples are as follows. Forty-eight soil samples were collected along the Wynnewood Pipeline during 15 routine maintenance excavations in 2019, 2020, and 2022, or from a nearby cave in 2019. (Doc. 179 at 11.) Thirty of the 48 (62.5%)[3] soil samples did

---

[3] Plaintiff attempts to controvert this statement by arguing that Valero is essentially downplaying the significance of the 18 samples that *contained* hydrocarbon concentration levels above the practical quantitation limit. (*See* Doc. 298 at 16-17.) But this statement does not concern the 18 positive samples, it only concerns the 30 samples that *did not contain* a sufficient concentration of hydrocarbons for the laboratory to report.

not contain any hydrocarbons over the laboratory's practical quantitation limit (i.e., the minimum level at which a laboratory would feel comfortable reporting a quantitative value). (Doc. 179 at 34.) Eighteen of the 48 (37.5%) soil samples reported the existence of TPH-DRO. The concentration levels of TPH-DRO in these 18 samples ranged from 5.11 ppm to 15.3 ppm.[4] (*Id.*) One of the 48 soil samples contained 55 parts per billion ("ppb") of toluene and 66 ppb of m,p-xylene. The other 47 samples did not contain any toluene or xylene over the laboratory's practical quantitation limit. No soil sample contained TPH-GRO over the laboratory's practical quantitation limit. None of the samples exceeded the levels established by the Oklahoma Corporation Commission ("OCC"), the Oklahoma Department of Environmental Quality ("ODEQ"), or the U.S. Environmental Protection Agency ("EPA") for any hydrocarbon.

Second, the results for the water samples are as follows. Sixty-one surface water, groundwater, and spring water samples were taken from the ranch. The majority of the water samples were completely free of all hydrocarbons. (Doc. 179 at 35.) Other water samples taken in the same areas contained "very low" reported quantities of toluene, m,p-xylene, and TPH-DRO and TPH-GRO. (*Id.*) None of the water samples exceeded the levels established by the OCC, ODEQ, EPA, U.S. Food and Drug Administration ("FDA"), or the Oklahoma Water Resources Board ("OWRB") for any contaminant. And all the water samples satisfied the federal drinking water standards for public water supplies.

Third, the results for the air samples are as follows. Eight air samples were taken on the ranch at various locations, which were analyzed for various constituents. The majority of samples were taken from approximately two meters inside the entrance of Tulip Springs, while background

---

[4] The laboratory's practical quantitation limit for TPH-DRO is 5.00 parts per million ("ppm"). The parties dispute whether low-level detections of TPH-DRO in soil samples is common in the absence of pipeline leaks due to naturally occurring organic matter in soil.

samples were apparently taken from a location outside Tulip Springs and "upwind of the air discharging from Tulip Springs." (Doc. 131 at 29; Doc. 179 at 26.) One of the samples was positive for benzene, toluene, ethyl-benzene, m,p-xylene, o-xylene, and isooctane. (Doc. 179 at 37.) Three other samples were positive for three to four of these hydrocarbons. (*Id.*) The detected concentrations of hydrocarbons in the air samples were all less than the EPA Target Indoor Air Concentrations.[5]

In November 2021, Valero was cited by PHMSA with a Notice of Probable Violation regarding welding procedures, maintaining an effective procedural manual, valve maintenance, and the failure to monitor atmospheric corrosion control. (Doc. 266-2.) In February 2022, a Final Order was issued, which found Valero violated the following pipeline safety regulations:

> 49 C.F.R. § 195.214(a) (Item 1) — Respondent failed to qualify its welding procedures to ensure welding would be performed by a qualified welder or welding operator in accordance with welding procedures qualified under Section 5, Section 12, Appendix A, or Appendix B of API Standard 1104, or Section IX of the ASME Boiler and Pressure Vessel Code.

> 49 C.F.R. § 195.420(b) (Item 3) — Respondent failed to inspect each mainline valve at intervals not exceeding 7 1/2 months, but at least twice each calendar year, to determine that it is functioning properly.

> 49 C.F.R. § 195.583(b) (Item 4) — Respondent failed to give particular attention to pipe at soil-to-air interfaces, under thermal insulation, under disbanded coatings, at pipe supports, in splash zones, at deck penetrations, and in spans over water during atmospheric corrosion inspections.

(Doc. 266-2 at 2.) The citation and Final Order were in response to the April 2018 spill south of the Lazy S Ranch.

---

[5] To provide some context for these statistics, Valero provides three tables (uncontroverted by Plaintiff) in its brief. (Doc. 267 at 18, 20, 22.) These tables set forth the minimum concentration levels for hydrocarbons and TPH established by the OCC, ODEQ, EPA, FDA, and OWRB, as well as the maximum concentration levels found in any of the environmental samples taken at Lazy S Ranch. As can be seen, none of the soil, water, or air samples exceed the lowest levels established by the agencies as potentially harmful to health.

Plaintiff filed this lawsuit on December 18, 2019. (Doc. 1.) Plaintiff filed its amended complaint on April 30, 2020. (Doc. 42.) The Pretrial Order was entered on July 13, 2022, which supersedes the pleadings and now controls the course of litigation. (Doc. 230.)

Plaintiff brings 11 claims against Defendants: (1) negligence and res ipsa loquitur; (2) negligence per se; (3) trespass; (4) private nuisance; (5) public nuisance; (6) unjust enrichment; (7) constructive fraud; (8) indemnification; (9) alter ego; (10) amalgamation or single enterprise; and (11) punitive damages. (*Id.* at 9-10.) Plaintiff alleges it has suffered harm to the subsurface limestone and dolomite geologic strata and groundwater underlying its property. Plaintiff contends that Valero has violated both federal and state statutes and is negligent per se; since Valero controls the Pipeline exclusively, negligence can be inferred from the fact that the pipeline is leaking; the contents of the pipeline constitute a trespass onto Plaintiff's land and into the groundwater; the leaking creates a private and public nuisance; Valero has been unjustly enriched at the expense of Lazy S Ranch and the community who drinks from the Arbuckle Simpson aquifer; and Valero committed fraud on Lazy S Ranch by not fully disclosing the contamination and by acting as if there is no leak. (*Id.* at 5-6.)

## II.   LEGAL STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Sotunde v. Safeway, Inc.*, 716 F. App'x 758, 761 (10th Cir. 2017). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322-23 (1986)). If the movant carries the initial burden, the nonmovant must then assert that a material fact is genuinely disputed and must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored, information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; by "showing that the materials cited [in the movant's motion] do not establish the absence . . . of a genuine dispute"; or by "showing that an adverse party [i.e., the movant] cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Celotex Corp.*, 477 U.S. 317. The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III.  ANALYSIS

Both parties move for summary judgment. Plaintiff moves for partial summary judgment on the specific issue that refined petroleum pollution exists on the Lazy S Ranch, and that Plaintiff has, as a threshold matter, established the first element of its cause of action for nuisance. (Doc. 212 at 13.) Defendants move for summary judgment on all claims. (Doc. 267 at 8.) The court begins with Plaintiff's tort claims.

### A.  Defendants Are Entitled to Summary Judgment on Plaintiff's Tort Claims.

Plaintiff alleges that the Wynnewood Pipeline is leaking and has contaminated the soil, water, and air on the Lazy S Ranch. (*See* Doc. 230 at 5.) Plaintiff brings seven claims that sound in tort: (1) negligence and res ipsa loquitur; (2) negligence per se; (3) trespass; (4) private nuisance; (5) public nuisance; (6) unjust enrichment; (7) constructive fraud. (*Id*. at 9-11.)

Each of these claims requires proof of an injury that was proximately caused by the defendant's tortious conduct. *Baker v. Chevron USA, Inc.*, 2009 WL 3698419, at *3 (S.D. Ohio

2009) (stating that negligence, negligence per se, conspiracy and fraud, strict liability, trespass, private nuisance, conversion, and failure to warn claims all sound in tort and that the plaintiff must prove injury or damages proximately caused by the defendant's tortious conduct); *see also MBA Com. Const., Inc. v. Roy J. Hannaford*, 818 P.2d 469, 474 (Okla. 1991) ("[T]o maintain a negligence action . . . the litigant must allege injury or damages that are certain and not speculative."); *Barton v. Ovintiv Mid-Continent*, 2021 WL 1566451, at *2-3 (W.D. Okla. 2021) (stating that to succeed on trespass claim, plaintiff required to show "substantial damage to . . . property" where plaintiff alleges intangible intrusion such as fumes that are perceptible through smell); *Laubenstein v. Bode Tower*, 392 P.3d 706, 709 (Okla. 2016) ("An alleged nuisance must substantially interfere with the ordinary comforts of human existence."); *Taylor v. Del. Cnty. Solid Waste Tr. Auth.*, 503 P.3d 1216, 1221 (Okla. Ct. App. 2021) ("Private nuisance requires a substantial interference with the use and enjoyment of real property . . . ."); *Ponca Tribe of Indians of Okla. v. Cont'l Carbon*, 2008 WL 11338389, at *4 (W.D. Okla. 2008) (stating that claim for unjust enrichment requires showing of "resulting injustice"); *Howard v. Zimmer, Inc.*, 299 P.3d 463, 474 (Okla. 2013) ("[T]o prevail on a claim for negligence per se, the [plaintiff] must not only demonstrate violation of the regulation but also that the violation caused his injury along with the extent to which the injury may support an award of damages."); *Cambria Energy, LLC v. Higgins*, 2019 WL 13197711, at *3 (E.D. Okla. 2019) (stating that claim for constructive fraud requires the plaintiff to show he suffered damages as a result of the defendant's actions).

Defendants seek summary judgment as to these claims on the grounds that there is no evidence the Wynnewood Pipeline is leaking, and Plaintiff has failed to demonstrate an actual injury or damages.

**1.  To establish an actual injury, Plaintiff must show that the hydrocarbons exist in sufficient quantities to constitute a nuisance or to render the environment harmful, detrimental, or injurious.**

The court begins by addressing the issue at the center of this case: are the levels of hydrocarbons detected from samples at the Lazy S Ranch sufficient to establish a legal injury? Plaintiff's principal legal theory, underpinning each of its tort claims, is that under Oklahoma law, there is *no* minimum threshold for pollution.  (*See* Doc. 298 at 40-41; Doc. 212 at 9-13.)  Plaintiff contends that "Oklahoma was built on the idea that real and personal property owners enjoy natural rights," and that it is "contrary to public policy to allow a private company like Valero to pollute and contaminate those . . . rights utilizing the idea that *some* pollution is acceptable.  It is not." (Doc. 298 at 40-41; Doc. 212 at 9 (emphasis in original)).[6]  Thus, Plaintiff and its experts contend the mere *existence* of hydrocarbons is sufficient, and that the hydrocarbon *concentration* levels are irrelevant to proving its claims.  (*See, e.g.*, Doc. 130 at 17; Doc. 131 at 6.)

Defendants contend that this argument misrepresents Oklahoma law, and that de minimis exposure to hydrocarbons, without more, is not sufficient to prove any of Plaintiff's claims.  (Doc. 266 at 18; Doc. 267 at 36.)  According to Defendants, the ranch's soil, water, and air has been extensively tested and repeatedly found to be well under the levels requiring remediation under the applicable regulations from the OCC, ODEQ, OWRB, and EPA.  (Doc. 267 at 9.)  Defendants contend that "even the highest alleged sampling concentrations in this case fall orders of magnitude below any concentration levels that these agencies have set to protect human health and environment."  (*Id.*)

---

[6] *See also* Okla. Const. Art. 2, § 23 ("No private property shall be taken or damaged for private use, with or without compensation, unless by consent of the owner."); OAC § 165:10-7-5 ("All . . . pipeline companies . . . shall at all times conduct their operations in a manner that will not cause pollution."); Okla. St. tit. 27A § 2-6-105(A) ("It shall be unlawful for any person to cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any air, land, or waters of the state."); Okla. Stat. tit. 82 § 1084.2(1) (defining "Pollution")).

But Plaintiff counters that it should not be required to prove that pollution exceeds certain regulatory standards in order to prevail on its tort claims.[7] (*See* Doc. 298 at 36.) In support, Plaintiff cites a number of cases rejecting the argument that a plaintiff's legal injury must be predicated on regulatory standards. *See Smith v. Carbide & Chems. Corp.*, 226 S.W.3d 52, 56-57 (Ky. 2007) ("Property owners are not required to prove contamination that is an actual or verifiable *health* risk, nor are they required to wait until government action is taken."); *Alexander v. Halliburton*, 2015 WL 4067808 *3 (W.D. Okla. 2015) (rejecting the defendant's argument that "private parties . . . have no legally cognizable claim if the level of contamination is below the safe level set by [a] regulatory agency"); *Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (rejecting definition of "injury" predicated on regulatory standards); *see also* Restatement (2d) of Torts § 288C ("[C]ompliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions.").

Here, the court first notes that there is a split of authority on this issue. *See Alexander*, 2015 WL 4067808, at *3 (stating there is "no clear majority ruling that private parties, as opposed to public water suppliers, have no legally cognizable claim if the level of contamination is below the safe level set by the regulatory agency responsible"). But the court agrees with the rationale of the courts holding that a plaintiff is not required to prove that regulatory standards/guidance were exceeded to prevail on its claims.

However, this does not mean that even a single hydrocarbon molecule present in the ground, water, or air constitutes an actual injury under Oklahoma law as Plaintiff claims. Courts

---

[7] Plaintiff also challenges several of Defendants' experts for this same reason, i.e., that these experts disregard Oklahoma law regarding pollution and instead rely on irrelevant regulatory agency thresholds. (*See* Docs. 265, 268, 272.)

have consistently held in pollution cases that, while regulatory standards are not ultimately dispositive, the plaintiff must still establish a "real and substantial" injury or "actual harm." *See, e.g.*, *id.* at *1-4 (holding that EPA advisory level of 15 ppb for perchlorate contamination was not legally enforceable but denying summary judgment because the plaintiffs had presented evidence from their experts establishing that perchlorate levels detected in that case still posed health hazards); *Smith*, 226 S.W.3d at 56-57 (holding that while property owners are not required to prove contamination "is an actual or verifiable health risk," they must establish an "unreasonable interference" with the possessory use of their property to prevail on trespass claim); *Barton*, 2021 WL 1566451, at *3 ("Oklahoma law allows a trespass claim for an intangible intrusion if a plaintiff pleads 'substantial damage to the property.'"); *Little Hocking Water Ass'n, Inc. v. E.I. du Pont Nemours & Co.*, 91 F. Supp. 3d 940, 975 (S.D. Ohio 2015) ("A landowner may only recover damages for nuisance, however, for real, substantial, and material injury and not for trifling annoyances and unsubstantiated or unrealized fears." (internal alterations omitted)); *Mercer v. Rockwell Int'l Corp.*, 24 F. Supp. 2d 735, 741-42 (W.D. Ky. 1998) (noting that many courts "have allowed trespass claims for invisible particles, but . . . they circumscribe the reach of this rule by requiring actual damage to property"); *Baker*, 2009 WL 3698419, at *5 ("Plaintiffs may only recover damages to the extent that the plume actually interferes with their use of the subsurface."); *Borland v. Sanders Lead Co., Inc.*, 369 So. 2d 523, 529 (Ala. 1979) ("But we hasten to point out that there is a point where the entry is so lacking in substance that the law will refuse to recognize it, applying the maxim *De minimis non curat lex* the law does not concern itself with trifles.").

Plaintiff contends this approach is inconsistent with Oklahoma law because, according to Plaintiff, there is no minimum threshold for pollution in Oklahoma. (Doc. 298 at 40 (citing OAC § 165:10-7-5; Okla. St. tit. 27A § 2-6-105(A); Okla. Stat. tit. 82 § 1084.2(1)). The court disagrees

for several reasons.  First, section 165:10-7-5 states that "pipeline companies . . . shall at all times conduct their operations in a manner that will not cause pollution."  OAC § 165:10-7-5.  But this is just a general prohibition; it does not define what constitutes "pollution."  To the extent that the OCC regulations discuss pollution levels/standards at all, the court notes that the OCC adopts the OWRB's minimum standards for remediation when groundwater becomes polluted,[8] but Title 165 does not provide any guidance for soil or air pollution.

Second, the definition of "pollution" advocated by Plaintiff does not appear to be applicable to the facts of this case.  Plaintiff relies on the definition of "pollution" found in Okla. Stat. tit. 82 § 1084.2 (defining pollution as: "contamination or other alteration of the physical, chemical or biological properties of any natural waters of the State, or such discharge of any liquid, gaseous or solid substance into any waters of the State as will or is likely to create a nuisance or render such waters harmful, or detrimental or injurious to public health, safety or welfare . . . .").  But the Title where this definition is found governs OWRB administrative proceedings.  *See State ex rel. Fent v. State ex rel. Okla. Water Resources Bd.*, 66 P.3d 432, 437 n.10 (Okla. 2003); *see also* Okla. Stat. tit. 82 § 1084.1.  Plaintiff cites no authority, and the court is aware of none, showing that this definition of "pollution" should be used to establish liability outside of an OWRB proceeding—especially in cases alleging *soil and air* contamination.

Instead, Oklahoma courts in similar cases have applied the definition of "pollution" found in the Oklahoma Environmental Quality Code ("OEQC").  *See Bickerstaff v. Halliburton Energy*

---

[8] The section immediately preceding § 165:10-7-5 provides that the OCC "adopts the State water quality standards established and promulgated by" the OWRB.  OAC § 165:10-7-4.  The OWRB's regulations set forth the "minimum standards for remediation when groundwater becomes polluted by humans."  OAC § 785-45-7-1(b).  It is uncontroverted that the OWRB's minimum thresholds for benzene, toluene, and ethylbenzene are: 0.022 mg/L, 1.3 mg/L, and 0.53 mg/L, respectively.  The OWRB has not established minimum thresholds for xylenes, TPH-condensate, or TPH-crude oil.  *See* OAC § 785:45, tbl 2, *available at*: https://www.owrb.ok.gov/rules/pdf/current/Ch45.pdf.  And it is uncontroverted that the maximum levels detected in any of the Lazy S Ranch water samples were as follows: benzene (below laboratory's reporting limits); toluene (0.00203 mg/L); ethylbenzene (below laboratory's reporting limits).

*Servs., Inc.*, 2015 WL 4208702, at *3 (W.D. Okla. 2015) (stating that "Plaintiffs' claims for public nuisance arise under section 2-6-105(A) of the" OEQC and applying the OEQC's definition of the term "pollution"); *Alexander*, 2015 WL 4067808, at *4 (applying OEQC definition of "pollution" in groundwater contamination case to determine whether defendants were entitled to summary judgment on plaintiffs' negligence, nuisance, and trespass claims).

The OEQC defines "pollution" as:

> the presence in the environment of any substance, contaminant or pollutant, or any other alteration of the physical, chemical or biological properties of the environment or the release of any liquid, gaseous or solid substance into the environment *in quantities which are or will likely create a nuisance or which render or will likely render the environment harmful or detrimental or injurious* to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, or to property.

Okla. Stat. tit. 27A § 2-1-102(12) (emphasis added).[9]   The court finds this definition to be appropriate in this case.[10]

This provision does not broadly define "pollution" to encompass even a single molecule of contamination as Plaintiff claims.  Instead, the proper inquiry is whether a contaminant or pollutant exists "in *quantities* which [1] are or will likely create a nuisance or [2] which render or will likely render the environment harmful or detrimental or injurious to public health, safety or welfare." Okla. Stat. tit. 27A § 2-1-102(12); *see also Bickerstaff*, 2015 WL 4208702, at *3.

---

[9] This definition is substantially similar to the definition proposed by Plaintiff.  The only notable difference is that 82 § 1084.2 is narrower, as it is limited to the discharge of contaminants into the "waters of the State," while 27A § 2-1-102(12) applies more broadly to the release of contaminants "into the environment."

[10] The court notes that Plaintiff also relies on a provision of the OEQC to argue that all pollution is unlawful under Oklahoma law.  (*See* Doc. 298 at 39 (quoting Okla. St. tit. 27A § 2-6-105(A)).  *See also Oliver v. City of Tulsa*, 654 P.2d 607, 611 (Okla. 1982) ("Where a statute contains its own definition of a term used therein, the term may not be given the meaning in which it is employed in another statute . . . .").

Accordingly, the court finds that Plaintiff cannot rely on the mere presence of hydrocarbons to establish injury.[11] Rather, Plaintiff must establish that the alleged contaminants exist in sufficient quantities to constitute a nuisance or to render the environment harmful, detrimental, or injurious.

### 2. There are no facts by which a reasonable jury could conclude that Plaintiff has suffered a legal injury.

#### a. Plaintiff's *Daubert* Motions

Before discussing the evidence, the court addresses Plaintiff's *Daubert* motions. Plaintiff challenges four[12] of Defendants' experts, Kevin Garrity, Nancy Pees Coleman, Steven Larson, and Bert Smith. (Docs. 258, 265, 268, 272.) Plaintiff argues that these experts disregard Oklahoma law regarding pollution on private property and, instead, rely on irrelevant regulatory agency thresholds. Plaintiff contends that "this case does not turn on whether pollution reached specific state or federal regulatory agency guidance policy," because "Oklahoma law does not require a minimum threshold of pollutants for a jury to find that Valero acted unlawfully and is liable for pollution of the Lazy S Ranch." (Doc. 265 at 10; Doc. 268 at 10; Doc. 272 at 5.) Plaintiff also

---

[11] To accept Plaintiff's legal theory that even a single molecule of contamination is actionable would "open the proverbial floodgates of litigation." Landowners would be able to bring a nuisance claim seeking, as here, tens of millions of dollars for property devaluation and groundwater cleanup against any visitor whose vehicle dropped a single drop of gasoline or oil on their property. *See Rockwell Int'l Corp. v. Wilhite*, 143 S.W.3d 604, 621 (Ky. Ct. App. 2003) ("Were we to accept the landowners' argument that [the minimal presence of contaminants] is sufficient, the implication for future cases would be that in any negligent trespass case, the mere deposit of a potentially toxic substance on property in an amount not detectable by unassisted human senses would satisfy the element of actual injury to the property. Such a decision would open the proverbial floodgates of litigation, allowing a suit to proceed any time a landowner can show the presence, however minute, of a substance known to be harmful in greater concentrations.").

[12] Plaintiff originally challenged seven of Defendants' experts, Bert Smith, Nancy Pees Coleman, Scott Stout, Robert Grace, Kevin Garrity, Trevor Phillips, and Steven Larson. (Docs. 218, 219, 220). These motions were found to be moot in the Pretrial Order. (Doc. 230 at 21.) However, these motions were never formally denied and are still currently pending. Accordingly, these motions are denied as moot. The only remaining *Daubert* motions challenge Garrity (Doc. 258), Coleman (Doc. 265), Larson (Doc. 268), and Smith (Doc. 272).

argues that Garrity and Larson failed to disclose their cited "materials considered" forming their opinions as required by Fed. R. Civ. P. 26(a)(2)(B)(ii).  (Doc. 258 at 12; Doc. 268 at 23.)

Rule 702 requires an expert's testimony to be "based upon sufficient facts or data" and to be "the product of reliable principles and methods" which have been "applied . . . reliably to the facts of the case."  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  "It is within the discretion of the trial court to determine *how* to perform its gatekeeping function under *Daubert*."  *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (emphasis in original).  "The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated."  *Id*.

Here, the court can "satisfactorily assess the issues on the briefing and does not believe a *Daubert* hearing is necessary."  *United States v. Woods*, 2022 WL 989477, at *1 n.1 (N.D. Okla. 2022).  These motions are premised on the legal theory that Oklahoma law does not require a minimum threshold of pollutants for a jury to find that Valero acted unlawfully.  The court rejected this theory above.  While the court agrees that Plaintiff is not required to prove that regulatory thresholds were exceeded to prevail on its claims, these standards are still relevant in determining whether contaminants exist in sufficient quantities to constitute a nuisance or to render the environment harmful, detrimental, or injurious.  *See, e.g.*, *Alexander*, 2015 WL 4067808, at *4 (considering expert testimony regarding contamination levels in comparison to EPA Health Advisory guidance); *Rose v. Un. Oil Co of Cal.*, 1999 WL 51819, at *2-3 (N.D. Cal. 1999) (considering California guidelines for maximum levels of hydrocarbons in drinking water in determining whether the amounts of contamination detected on plaintiff's property were too low to constitute a "substantial endangerment").

Accordingly, to the extent Plaintiff seeks to exclude testimony on the basis that these experts have relied on regulatory thresholds, these motions are denied. And with regard to Plaintiff's Rule 26 challenges to Garrity and Larson, the motions are denied as moot for purposes of summary judgment. The court does not rely on Garrity or Larson's reports or testimony in reaching its findings or conclusions set forth in this order. *See Norton v. Maximuss Inc.*, 2016 WL 6211281, at *9 (D. Idaho 2016) (denying motion to exclude expert testimony as moot for purposes of summary judgment because the court did not rely on the expert's report or opinions in the order).

### b. The quantities of hydrocarbons do not exist in quantities that will render the environment harmful, detrimental, or injurious to public health, safety, or welfare.

Next, the court determines whether Plaintiff has evidence of a cognizable injury, i.e., whether a contaminant or pollutant exists "in *quantities* which [1] are or will likely create a nuisance or [2] which render or will likely render the environment harmful or detrimental or injurious to public health, safety or welfare." Okla. Stat. tit. 27A § 2-1-102(12) (emphasis added); *see also Bickerstaff*, 2015 WL 4208702, at *3.

Plaintiff contends that its injury is evidenced by its experts, who opine to the diminution in property value, loss of the ability to sell groundwater, and the cost to remedy the contamination. In support, Plaintiff cites the expert witness reports submitted by Macbeth (remediation costs), Isaacs (diminished property value) and Boyle (loss of use – water sales). (Docs. 127, 129, 132.)[13] Macbeth offers an opinion as to the "estimated cleanup cost" to remediate contamination of the

---

[13] Defendant has filed Rule 702 motions to exclude these experts. (Docs. 259, 260, 262.) Defendants argue that these experts uncritically accepted, and then relied upon, the erroneous opinions of Plaintiff's other experts that the Wynnewood Pipeline is leaking and has contaminated the property. As explained in Section III.C.2 *infra*, the court also concludes it is unnecessary to rule on the admissibility of Plaintiff's experts as a prerequisite to deciding the parties' motions for summary judgment.

Lazy S Ranch from "pollution from refined petroleum products on and beneath" its land. (Doc. 132 at 7-8.) Given the extent of the pollution, Macbeth opines the estimated remediation cost is $43,292,000. (*Id*. at 7.) Isaacs offered an opinion as to the "valuation of estimated damages" to the land and building improvements. Isaacs estimates the total purported damages to equal $13,050,000.00. (Doc. 127 at 44.) This opinion is based on the assumption that the property is "impaired" due to "reported soil and groundwater contamination." (*Id*. at 25.) And Boyle opines that a leaking pipeline contaminated the groundwater below the Lazy S Ranch, causing it to lose "the market value of the water," which he calculates to be $22,537,045.00. (Doc. 129 at 2, 10-12.)

But these experts "put the cart before the horse" by presuming that the mere presence of hydrocarbons constitutes an injury requiring extensive remediation. Boyle's report does state that "petroleum products have the greatest risk for human health when they are in drinking water." (Doc. 129 at 8-9). However, Boyle and Plaintiff's other damages experts fail to establish that the *quantities* detected at the Lazy S Ranch are harmful. *See Wilhite*, 143 S.W.3d at 621 ("There was scientific evidence presented by the landowners that PCBs present a health hazard at higher concentrations, but none demonstrating that a hazard is presented by PCBs in the concentrations found on the land in question."). Instead, they blindly rely on the opinions of Plaintiff's other experts that the entire property is contaminated. (*See* Doc. 132 at 8 (Macbeth stating she is "not offering opinions regarding the nature of the pipeline leaks, the quantities of material spilled, and the extent of contamination," and that those opinions will be provided by Plaintiff's experts Miller, Fisher, and Ede); Doc. 259-1 at 42, 160 (Isaacs stating he simply relied on the opinions of Plaintiff's other experts, without undertaking any efforts to independently corroborate the existence or extent of the contamination); Doc. 129 at 2, 8-9 (Boyle stating that his opinion as to damages is based on Plaintiff's other experts' conclusions that the pipeline has contaminated the

groundwater beneath the property)). Yet the experts they rely on also fail to establish that the quantities of hydrocarbons detected on the property are harmful. (See Doc. 128 at 2-3 (Miller opining that the Wynnewood Pipeline is leaking, but offering no opinion as to the danger posed by the quantities of hydrocarbons that have leaked into the environment); Doc. 131 at 4-5 (Fisher opining that the soil, water, and air on the property is contaminated, and that the environment can be remediated, but offering no opinion as to the necessity of remediation); Doc. 130 at 4 (Ede opining that "refined petroleum product hydrocarbons have contaminated the groundwater, soil, springs and air on and beneath the Lazy S Ranch" without discussing contamination levels)).

As such, Macbeth, Isaacs, and Boyle merely provide a method of *measuring* damages, which is only relevant *after* an actual injury has been found. *See, e.g.*, *Smith*, 226 S.W.3d at 57 ("Thus, the diminution in the property's value due to an intentional trespass is a recognized measure of damages after, or if, an actual injury has been found."); *Mercer*, 24 F. Supp. 2d at 743 ("Decreased fair market value is not harm to the property, it is only a means of measuring the harm."); *Mock v. Potlatch Corp.*, 786 F. Supp. 1545, 1551 (D. Idaho 1992) ("[T]he mere allegation of diminished property value is not sufficient to meet the requirement of showing actual and substantial damage to the property itself."); *Bradley v. Am. Smelting & Refining Co.*, 635 F. Supp. 1154, 1157 (W.D. Wash. 1986) (rejecting landowner's argument that the diminished fair market value constituted an injury to his property because such evidence "can serve only to quantify the magnitude of injury otherwise proven").

Plaintiff also contends that its injury is evidenced by the fact that Mr. Roos has foregone water sales and not allowed persons on the ranch to recreate. (Doc. 298 at 31.) However, Plaintiff provides no scientific basis for concluding that the water cannot be sold or that the property should not be used for recreational purposes. Plaintiff's "unsubstantiated phobia" is not evidence of an

actual injury. *See Wilhite*, 143 S.W.3d at 627 ("There is no scientific basis for concluding that these lands should not be used for their ordinary agrarian purposes. Any annoyance or interference sustained by the landowners here is the result of an irrational fear of PCBs. The law does not allow relief on the basis of an unsubstantiated phobia.").

Accordingly, Plaintiff has presented no evidence establishing that the hydrocarbons detected on the property exist "in *quantities* which [1] are or will likely create a nuisance or [2] which render or will likely render the environment harmful or detrimental or injurious to public health, safety or welfare." Okla. Stat. tit. 27A § 2-1-102(12). On the contrary, the evidence uniformly suggests that the levels detected are so low that they do not create a nuisance[14] or render the environment harmful to persons or animals.

Indeed, Defendants have provided a comparison of the soil, water, and air samples with OCC, ODEQ, EPA, FDA, and OWRB guidance, which sets forth the lowest levels at which these agencies believe adverse health effects may occur. Plaintiff concedes that even the samples with the highest concentration of hydrocarbons are significantly below (in some cases 500-1,000 times lower) the levels at which adverse health effects may occur according to this regulatory guidance. (*Compare* Doc. 267, SOF ¶¶ 42, 50, 60 *with* Doc. 298, Response to SOF ¶¶ 42, 50, 60).[15] The

---

[14] To constitute a nuisance, Oklahoma courts require evidence "of substantial interference with the use and enjoyment of property." *Laubenstein*, 392 P.3d at 710 (citing *Kenyon v. Edmundson*, 193 P. 739, 740 (Okla. 1920)). The defendant must have "created an environment so inhospitable as to cause substantial injury to comfort, health, or property. *Id*. at 709. "[A] mere trifling annoyance, inconvenience, or discomfort" should not be deemed a nuisance." *Id*.

[15] Plaintiff does attempt to controvert SOF ¶ 42, which establishes that the concentration of hydrocarbons detected in the soil samples are well below even the lowest levels at which adverse health effects may occur. Plaintiff contends that this statement of fact does not correctly consider that Oklahoma law prohibits all pollution. (Doc. 298 at 18.) However, the court has already rejected this argument and SOF ¶ 42 is thus uncontroverted. Plaintiff also contends that Defendant's expert Stout admits that "free-phase diesel fuel" (i.e., non-dissolved droplets of petroleum) was collected from Tulip Springs, implying that the test results are not representative of the extent of the contamination. (Doc. 298 at 16 (citing Stout's expert witness report)). However, Stout was merely discussing two "non-conventional" water samples allegedly collected by Plaintiff's expert Fisher, and explaining why Fisher's methodology was improper. (*See* Doc. 179 at 4 ("Dr. Fisher used the polypropylene cloth, however, to passively absorb 'free phase' petroleum in water. . . . convention within the oil spill industry dictates '*traditional polypropylene absorbent pads*

21

regulatory agencies' published thresholds, as well as the maximum levels detected in any of the samples taken from the Lazy S Ranch, are set forth below:

| | OCC Tier 1 Residential Surface Soil Levels | OCC Tier 1 Leaching to Groundwater Soil Levels | ODEQ Quality Cleanup Levels | EPA Regional Screening Levels | Maximum Concentration in Any Lazy S Sample |
|---|---|---|---|---|---|
| Benzene | 44 | 3 | N/A | 1.2 | *Below laboratory's reporting limits* |
| Toluene | 6700 | 6700 | N/A | 4900 | 0.055 |
| Ethyl-benzene | 5400 | 5400 | N/A | 5.8 | *Below laboratory's reporting limits* |
| Xylenes | 21000 | 2100 | N/A | 58 (total) | 0.068 |
| TPH | 4400 (condensate) 2600 (crude oil) | 3000 (condensate) 5000 (crude oil) | 50 (total) | N/A | 15.3 |

(Doc. 267 at 19) (comparing regulatory thresholds for soil).

*should not be used, as organic compounds in such material may interfere with the subsequent analytical process in the laboratory.*'"))·  Stout was not conceding that free-phase diesel fuel was present in the ranch's groundwater.  And while Fisher generally explains that "[a] layer of hydrocarbons floating on groundwater would be referred to as a layer of free phase hydrocarbons," he fails to establish that he observed or collected free-phase petroleum in the groundwater samples.  (Doc. 131 at 7.)

| | OCC Risk Based Screening Levels | ODEQ Tier 1 Cleanup Levels | EPA Primary Maximum Contaminant Levels | FDA Requirements for Bottled Water Quality | OWRB | Maximum Concentration in Any Lazy S Sample |
|---|---|---|---|---|---|---|
| Benzene | 0.005 | | 0.005 | 0.005 | 0.022 | *Below laboratory's reporting limits* |
| Toluene | 1 | | 1 | 1 | 1.3 | 0.00203 |
| Ethyl-benzene | 0.7 | | 0.7 | 0.7 | 0.530 | *Below laboratory's reporting limits* |
| Xylenes | 10 | | 10 | 10 | N/A | 0.00247 |
| TPH-condensate | 5 | 1 (total TPH) | N/A | N/A | N/A | 0.236 |
| TPH-crude oil | 5 | 1 (total TPH) | N/A | N/A | N/A | 0.236 |

(*Id*. at 20) (comparing regulatory thresholds for water).

| | EPA Target Indoor Air Concentrations | Maximum Concentration in Any Lazy S Sample |
|---|---|---|
| Benzene | 3.60 | 0.891 |
| Toluene | 5210 | 7.57 |
| Ethylbenzene | 11.2 | 1.74 |
| Xylenes (total) | 104 | 7.79 |

(*Id*. at 22) (comparing regulatory thresholds for air).

Coleman, an environmental toxicologist, explains that the samples are all below health-based evaluative criteria, and are acceptable for even the most conservative exposure scenario, i.e., residential use. (Doc. 178 at 4.) Coleman also opines that there is no data which can be used to support the need for further action or remediation. (*Id*.) Plaintiff offers no evidence to counter this. (*See* Doc. 298 at 19, Response to SOF ¶¶ 55-57). Plaintiff only argues that "Oklahoma statutory requirements are to prevent pollution," a theory which this court has already rejected.

(*See id.*)  And, as discussed earlier, Plaintiff's experts' fail to offer opinions that the levels in the samples are harmful.  Because Plaintiff presents no alternative, the only reasonable conclusion is that the soil, water, and air samples show that there is no health risk or need for remediation.

This conclusion is supported by Plaintiff's actions since discovering the existence of the alleged leak.  It is uncontroverted that Plaintiff has never notified any regulatory agency of any alleged contamination on the property.  (Doc. 267-7 at 187:1-13; Doc. 267-11 at 69:1-6.)  In relation to an October 2019 OWRB Permit Application, Plaintiff was asked to identify "all known or suspected contamination, both surface and subsurface," to which Plaintiff responded "None." (Doc. 267-32 at 4.)  It is also uncontroverted that persons who live and work on the Lazy S Ranch continue to drink the groundwater fed from a spring on the property (albeit with a filter).  (Doc. 267-7 at 27:7-9.)  Similarly, cattle continue to freely drink the water from Tulip Springs and elsewhere on the ranch, and continue to graze freely on "every foot" of the property.  (*Id.* at 142:19-24, 152:9-12.)  There have been periodic reports of a gasoline/diesel odor emanating from Tulip Springs, but this is insufficient to establish a nuisance, which requires a showing of a *substantial* injury to comfort, health, or property.[16]  *See, e.g.*, *Kenyon*, 193 P. at 741 ("[A] nuisance exists where the odors are a substantial annoyance or physical discomfort to an ordinary person, or an injury to his health or property."); *Baker*, 2009 WL 3698419, at *6 (rejecting plaintiff landowner's argument that periodic reports of smelling oil, gasoline, and diesel fuel odors was sufficient to establish a substantial injury because the incidents were "too insubstantial as a matter of law").

---

[16] Plaintiff also implies that it may have been injured by the fact that the Wynnewood Pipeline uses Drag Reducing Agents like Hexylene glycol, which are known to be hazardous in that they are combustible, harmful if swallowed, cause serious eye irritation, and are harmful to aquatic life.  (Doc. 212 at 6.)  While these chemicals may indeed be hazardous, there is no evidence that any levels of such chemicals were detected in the soil, water, or air on the property, or that they exist in sufficient quantities to be harmful.

Simply put, the evidence before the court indicates that the levels of hydrocarbons are so low that they have not rendered the environment harmful or dangerous. And they are too insignificant to constitute a substantial interference with the use and enjoyment of Plaintiff's property. Accordingly, the court finds there is no evidence by which a reasonable jury could find that Plaintiff has been injured. *See Rose*, 1999 WL 51819, at *6 (granting summary judgment on plaintiff landowners' nuisance claim when it was uncontroverted that no remediation would be required for the amount of petroleum contaminants detected, the landowners were not deprived of any uses of their property as a result of alleged contamination, and they continued to operate their businesses on the property without complaint); *Bradley*, 635 F. Supp. at 1157 (granting summary judgment on trespass claim even though soil samples showed arsenic and cadmium in quantities exceeding background concentrations because the plaintiffs failed to present any evidence showing that "an actual danger exists"); *Wilhite*, 143 S.W.3d at 627 ("In this case, there is no rational basis for a finding that the discharge of minute quantities of PCBs onto the landowners' properties resulted in any interference with their use and enjoyment of the properties. While it is true that the presence of PCBs on land may cause a reasonable person to stop using that land because of health risks PCBs pose, it is only the case when a significantly higher concentration of PCBs is present.").

## 2. Even if Plaintiff could establish an injury, Plaintiff fails to establish that it was caused by Defendants.

Plaintiff's tort claims are premised on the assumption that the Wynnewood Pipeline is the only plausible source of the hydrocarbons detected at the ranch, so Defendants must be responsible for the contamination. Defendants argue that Plaintiff has failed to identify a single leak on the Wynnewood Pipeline on the ranch despite at least three experts having spent years investigating it. Defendants also argue that they continuously monitor, investigate, and perform ILI inspections to look for metal loss features that could turn into very small leaks, but have discovered none.

The court agrees that Plaintiff has failed to provide a sufficient factual basis to conclude that Defendants were the proximate cause of the minimal hydrocarbons that were detected on the property. Plaintiff's only direct evidence of a leak in the Wynnewood Pipeline is from expert Trae Miller. (Doc. 128.) Miller claims that the pipeline is "visibly leaking." (*Id*. at 2.) However, this is in reference to a *small drip* from a mechanical union on above-ground relief valve piping at the Mt. Vica Dr. main line valve station, which is located on the southern border of the property. (*Id*. at 13.) This is more than two miles from Tulip Springs—the alleged epicenter of the contamination—which is in the northwest corner of the property. And this valve station does not lie on top of the Arbuckle-Simpson Aquifer either. Accordingly, this is not a plausible source of the alleged contamination.

Plaintiff alternatively contends that the existence of a leak can be inferred because the Wynnewood Pipeline is the only real and plausible source of refined petroleum products on the property, and it suffers from unmanaged corrosion and anomalies. (*See* Doc. 298 at 29; Doc. 230 at 4.) Plaintiff contends that "the anomalies are more highly concentrated—and the risk of leaks greater—throughout the Lazy S Ranch than they are throughout the remainder of the pipeline." (Doc. 230 at 4.) In other words, Plaintiff asserts that the doctrine of res ipsa loquitur should apply, which permits a jury to draw an inference of negligence, based on special circumstances where direct evidence is lacking. For res ipsa loquitur to apply, the plaintiff must establish that "the defendant exclusively controlled the instrumentality that caused the injury." *Burleson v. Wayne*, 948 P.2d 298, 303 (Okla. 1996). "The rule in Oklahoma is that res ipsa loquitur cannot be applied where, after proof of the occurrence, without more, the matter still rests on conjecture, or is reasonably attributable to some cause other than negligence." *Avard v. Leming*, 889 P.2d 262, 266 (Okla. 1994) (internal quotation omitted).

Here, Plaintiff's evidence of a leak in the Wynnewood Pipeline is too speculative for res ipsa loquitur to apply. For example, Miller, Plaintiff's expert in pipeline integrity, opines that the Wynnewood Pipeline is "47 years old and was fabricated with custom, thin wall pipe that leaves no room for corrosion over time," and that the Pipeline "has significant corrosion . . . that make[s] it a greater risk and more hazardous to the environment and surroundings." (Doc. 128 at 2.) Even assuming this to be true, this does not establish that the Wynnewood Pipeline is actually leaking. While Miller believes a leak exists somewhere, he admits that he "cannot tell you specifically where it is." (Doc. 267-14 at 159:18-20; *see also* Doc. 267-13 at 185:13-15 (Ede testifying: "I think that the pipeline on the Lazy S, I believe, is three miles long. If you were to ask me where are the leaks, I do not know where it's leaking.")) Miller proposes that: "If we want to find where the leak is, we squeeze it up. We pressurize the pipeline, hydrotest it." (Doc. 267-14 at 159:21-22.) However, there is no evidence to suggest that this has been done.

Plaintiff also cites a "pathway of hydrocarbon contamination from the Wynnewood Pipeline to Tulip Springs" as evidence of a leak. (Doc. 298 at 28.) Plaintiff's expert Fisher opines that the "nature of the geology of the Lazy S Ranch (through which the Valero Pipeline passes) provides multiple vertical and horizontal pathways for the movement of contaminants from refined petroleum product hydrocarbons leaking from the Valero Pipeline to groundwater." (Doc. 131 at 9.) But this testimony is also too speculative. Just because Fisher has identified a pathway by which contaminants *could* travel, it does not mean that any contaminants *have traveled* through this pathway to Tulip Springs. Indeed, Fisher confirmed in his deposition that "[w]e don't know the detailed pathway." (Doc. 266-3 at 118:14.)

And, as discussed above, the concentration of hydrocarbons that were detected in the soil and water samples were very low. The presence of trace amounts of hydrocarbons is not indicative

of a leak that, according to Fisher, may have been ongoing for over twenty years. (Doc. 267-10 at 215:3-1, 250:1-8.) The court also notes that it is uncontroverted that the Wynnewood Pipeline carries both diesel and gasoline, so it would be expected to see both TPH-DRO (diesel range organics) and TPH-GRO (gasoline range organics) in the soil samples if there was a leak. However, TPH-GRO is entirely absent in all of the samples taken from the property. (*See* Doc. 179 at 34.)

Additionally, the court finds that res ipsa loquitur is not appropriate because the presence of hydrocarbons can be "reasonably attributable to some cause other than [Defendants'] negligence." *Avard*, 889 P.2d at 266. First, there are several other potential hydrocarbon sources on the ranch. For example, three other pipelines cross the Ranch, including the original Blue Knight pipeline which carried refined petroleum products between 1948-2008. The Blue Knight pipeline is closer to Tulip Springs than the Wynnewood Pipeline is. In fact, it is in the same drainage basin as Tulip Springs, while the Wynnewood Pipeline is in a separate drainage basin. (*See* Doc. 142-1 at 16.) And one of Fisher's own exhibits even demonstrates that groundwater from the land above where the Wynnewood Pipeline is located would flow in an easterly direction *away* from Tulip Springs. (*Id.*) Specifically, this exhibit is a map showing the various pipelines on the ranch along with, among other things, arrows indicating the general direction of groundwater flow at various places across the ranch. Of particular note, this exhibit indicates that there is not a single place on the ranch where the direction of groundwater flow would carry contaminants from a leak on Valero's pipeline toward Tulip Springs. (*See id.*) But Fisher offers no explanation for how contaminants leaking from the Wynnewood Pipeline could defy groundwater flow directions to end up at Tulip Springs.[17] The only alternative would appear to be

---

[17] Fisher rules the Blue Knight pipeline out as a source of the contamination because it carries crude oil, not refined fuels. (Doc. 131 at 47.) However, Fisher only discusses the other *active* pipeline on the property, i.e., the 12-inch

that any leaks would have to migrate through the soil eastward from Valero's pipeline toward Tulip Springs and then descend into the groundwater; however, Plaintiff provides no evidence of any soil contamination consistent with a leak of that magnitude, nor do any of its experts offer anything beyond conjecture on how this might occur.

Second, there are many potential hydrocarbon sources near and around the ranch that Plaintiff fails to adequately address. For example, there are multiple radio relay tower sites within about a mile of the ranch with transformers and generators that use petroleum products. (Doc. 171 at 40.) Other possible sources nearby include windmills, asphalt roadways, and stockpiles of asphalt millings. (*Id*.) Fisher even admits the likely source of some air contamination at Tulip Springs is the nearby highways adjacent to the Lazy S Ranch. (*See* Doc. 131 at 29.)

Third, Plaintiff fails to adequately address the possibility that groundwater and soil contamination originates from some other location and has been transported via the Arbuckle-Simpson Aquifer. Plaintiff contends that Tulip Springs is the epicenter of the contamination, and that any such contamination must have come from the Wynnewood Pipeline as it is the only active pipeline on the property that transports refined fuel products. But Tulip Springs is not isolated. It is part of the Arbuckle-Simpson Aquifer, which spans more than 500-square miles. (*Id*. at 6.) Fisher states that there "is no evidence that the deeper portions of the Arbuckle-Simpson Aquifer are isolated from the shallow portions of the Arbuckle-Simpson Aquifer on the Lazy S Ranch." (*Id*. at 7-8.) Thus, Fisher contends that contaminated water from Tulip Springs will carry refined petroleum product hydrocarbon contaminants to the deeper portions of the aquifer. (*Id*. at 8.)

---

pipeline Blue Knight installed in 2013. Fisher does not discuss the original 8-inch pipeline installed in 1948, which did carry refined fuels. (*See* Doc. 171 at 37.) It is possible that the hydrocarbons on the ranch could have come from an old release or plume from the original 8-inch pipeline. *See Moore v. Texaco, Inc.*, 244 F.3d 1229, 1232 (10th Cir. 2001) (rejecting plaintiff's argument that defendant controlled the tank farm and therefore only defendant could be responsible for the pollution because the tank farm existed and operated on the property before defendant acquired it and there was no specific evidence that the spills occurred during the time defendant was operating).

However, Fisher fails to address the possibility that the inverse is true, i.e., contaminated water from the deeper portions of the aquifer has been carried to Tulip Springs. Fisher's report indicates that this is possible.[18] (*See id.* at 23 ("[E]xcess groundwater results in groundwater discharge to land surface in form of the springs that have been mapped near the karst aquifer/fractured rock aquifer transition."); *see also* Doc. 127 at 15 (Isaacs stating that south-central Oklahoma is characterized by "clear running streams fed by the Arbuckle Simpson aquifer"); Doc. 171 at 41 (Smith stating that Plaintiff's experts failed to evaluate highway surface-water runoff as a potential source of contamination, explaining that "[g]roundwater is vulnerable to contamination in karst areas where highway stormwater runoff may flow directly into karst aquifers with little or no natural attenuation and transport highway-derived contaminants rapidly from sinkholes to locations in the aquifer.")).

Plaintiff has not adequately eliminated or even investigated these other potential hydrocarbon sources, and therefore, Plaintiff cannot use res ipsa loquitur to establish the Wynnewood Pipeline as the source of hydrocarbons on the Lazy S Ranch. *See Moore*, 244 F.3d at 1232; *Williams v. Aviles*, 2022 WL 2643559, at *7 (D.D.C. 2022) ("Because the undisputed record evidence is that the loose pipe fitting can be attributed to a source other than Defendant, Plaintiff cannot establish that Defendant 'probably caused' the gas leak. She is therefore not entitled to go to the jury under a res ipsa loquitur theory.").

To the extent that Plaintiff is not relying on the doctrine of res ipsa loquitur to prove causation for any of its tort claims, the court finds that Plaintiff's theory of causation is far too

---

[18] Plaintiff also fails to controvert Defendants' SOF ¶ 48, which states that: "Plaintiff made no effort to determine background concentration levels of hydrocarbons in groundwater in the region." (Doc. 267 at 12, SOF ¶ 48.) Plaintiff contends that "samples collected *from the Lazy-S ranch* demonstrate that the local hydrocarbon background level in groundwater is 'non-Detect.'" (Doc. 298 at 18, Response to SOF ¶ 48. (emphasis added)). But this does not address Defendants' contention—no samples were taken from other locations to determine background concentration levels in the surrounding region.

speculative to present to a jury for the same reasons stated above. Accordingly, Defendants are entitled to summary judgment for the alternative reason that there is insufficient evidence for a reasonable jury to conclude that Defendants proximately caused Plaintiff's alleged injury. *See Harrell v. Dillard's Inc.*, 2012 WL 3061482, at *3 (N.D. Okla. 2012) ("When causation is too speculative to present to a jury, summary judgment is proper."); *Taber v. Allied Waste Sys., Inc.*, 2015 WL 1119750, at *10 (W.D. Okla. 2015) ("[B]ecause Plaintiffs support causation only with evidence speculative in nature, Defendant is entitled to judgment as a matter of law . . . .").

### 3. Conclusion

Accordingly, the court finds that Defendants are entitled to summary judgment on Plaintiff's tort claims. Each of these claims requires proof of an injury that was proximately caused by Defendants' tortious conduct. *Baker*, 2009 WL 3698419, at *3. Plaintiff has presented no evidence by which a reasonable jury could conclude that Plaintiff has been injured, or that its injury was proximately caused by Defendants. Plaintiff's motion for partial summary judgment is denied for the same reasons.

### B. Defendants are entitled to summary judgment on Plaintiff's non-tort claims.

Plaintiff has also asserted claims for indemnification, alter ego, and amalgamation or single enterprise. (Doc. 230 at 10-11.) Defendant moves for summary judgment on these claims as well. (Doc. 267 at 46-48.) Plaintiff does not address these claims in its response. Nevertheless, the court finds that Defendants are entitled to summary judgment on these claims.

First, the court finds Defendants are entitled to summary judgment on Plaintiff's indemnification claim. "The general rule of indemnity is that one without fault, who is forced to pay on behalf of another, is entitled to indemnification." *Nat'l Union Fire Ins. Co. v. A.A.R. Western Skyways, Inc.*, 784 P.2d 52, 54 (Okla. 1989). Thus, indemnity is available where the party

forced to pay was not at fault. The right to indemnity must be premised on a legal relationship between the parties, such as contractual or vicarious liability. *See id.* at 55; *see also Sinclair Oil Corp. v. Texaco, Inc.*, 94 F. App'x 760, 768 (10th Cir. 2004) (rejecting appellant's contention that Oklahoma law regarding equitable indemnity does not require a legal relationship between the parties). Here, Plaintiff has presented no evidence of a legal relationship to any of the Defendants, or any other equitable considerations that would entitle it to indemnification. Accordingly, the court finds Defendants are entitled to summary judgment.

Second, it appears that Plaintiff's alter ego and amalgamation/single enterprise claims have previously been dismissed. In the first amended complaint, Plaintiff sought to impose indirect or vicarious liability against three non-owner/operator defendants, Valero Energy Corporation, Valero Energy Partners LP, and Valero Energy Partners GP, LLC (collectively, the "Valero Energy Defendants"). (Doc. 42.) These defendants moved for dismissal on several grounds, including that the court lacked personal jurisdiction and that Oklahoma expressly prohibits an indirect action against such entities. (Doc. 49 at 10-11.) The court granted the motion, dismissing these three entities for lack of personal jurisdiction. While these claims were included in the Pretrial Order, it appears that this was an oversight. Plaintiff has not articulated its theory for imposing vicarious liability on any of the remaining defendants in either the Pretrial Order on in its response. To the extent these claims are still a part of the case, the court finds Defendants are entitled to summary judgment for the same reasons set forth in the court's order granting the Valero Energy Defendants' motion to dismiss. (Doc. 65 at 9-10.)

Accordingly, the court finds that Defendants are entitled to summary judgment on each of Plaintiff's claims.

## C.     Remaining Motions

### 1. Motions in limine

There are two pending motions in limine. First, Defendants move to exclude twelve categories of evidence for use at trial. (Doc. 222 at 4-6.) Because the court is granting Defendants' motion for summary judgment in its entirety, the court denies these motions as moot.

Second, Plaintiff moves to exclude all evidence concerning "Defendants' use of the wrong legal standard." (Doc. 221 at 1.) This includes references to the Safe Water Drinking Act as well as state and federal regulatory standards. The court has already addressed and rejected Plaintiff's legal argument. Accordingly, the court denies this motion for the reasons stated above.

### 2. Defendants' *Daubert* motions

Defendants have filed seven *Daubert* motions. (Docs. 223, 259, 260, 261, 262, 263, 264.) Defendants' omnibus motion challenges the testimony of Fisher, Boyle, Ede, Macbeth, Miller, and Isaacs. (Doc. 223.) The court found that this motion was moot in the Pretrial Order. (Doc. 230 at 21.) Accordingly, this motion is denied.

Defendants' remaining *Daubert* motions challenge the testimony of Isaacs (Doc. 259), Boyle (Doc. 260), Miller (Doc. 261), Macbeth (Doc. 262), Ede (Doc. 263), and Fisher (Doc. 264). The court finds that is unnecessary to rule on the admissibility of Plaintiff's experts' reports and opinions as a prerequisite to deciding Defendants' motion for summary judgment. "[T]he interplay between the summary judgment and *Daubert* standards does not require the Court to uncritically accept every one of [Plaintiff's experts' opinions], nor does it suggest that the Court should overlook any flaws, omissions, or inconsistences in [their] work." *Dyson, Inc. v. SharNinja Operating LLC*, 2018 WL 1906105, at *8 (N.D. Ill. 2018). The court considered all of Plaintiff's experts' reports and testimony in the light most favorable to Plaintiff. Even so, the court finds that this evidence is insufficient to support a jury verdict in Plaintiff's favor. *See id.*; *Hirsch v. CSX*

*Transp., Inc.*, 656 F.3d 359, 363 (6th Cir. 2011) ("Although juries are generally free to believe expert witnesses, a plaintiff cannot survive summary judgment with an expert's bare opinion on the ultimate issue."); *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997) (holding that district court properly found plaintiff's expert testimony insufficient to support a jury verdict in the plaintiff's favor when expert's opinion "was wholly conclusory and devoid of any analysis" regarding the dispositive legal issue). Accordingly, the court denies as moot Defendants' *Daubert* motions, as well as Defendants' motion to strike Plaintiff's briefs in opposition (Doc. 300.)

### 3. Discovery Motions

On October 6, 2022, Plaintiff filed a motion to compel (Doc. 249) the production of 106 records and documents listed in Defendants' Second Amended Privilege Log (Doc. 249-2)[19] relating to the April 2018 Wynnewood Pipeline spill that occurred approximately 6 miles south of the Lazy S Ranch. Defendants assert work-product and attorney-client privilege over 106 documents relating to the "2018 Ardmore Line Incident" and/or the "Wynnewood excavation." (Doc. 249 at 12-13 n.3-5.) After the spill, Defendants selected the Rosen Group to assist in an investigation led by Defendants' in-house counsel. This investigation ultimately resulted in a report (the "Rosen Report"). The Rosen Report (dated 9/27/2018) initially included a section on "Causal Analysis." (Doc. 128 at 31.) But the second version of the Rosen Report (dated 10/24/2018) omitted that section. The second version, devoid of the "Causal Analysis" section, was ultimately shared with PHMSA, a federal agency also investigating the 2018 incident. Carlos

---

[19] This motion was filed three days after the close of discovery, and two weeks before the dispositive motions deadline. (*See* Doc. 230 at 20, 24.) Plaintiff has known of the existence of these 106 documents since at least April 8, 2022, when Plaintiff received a copy of Defendants' First Amended Privilege Log. (*See* Doc. 249 at 11, SOF ¶ 2.)

Gauna, Defendants' 30(b)(6) designee, testified that Defendants decided to remove that section "[b]ecause it wasn't mandatory." (Doc. 249-19 at 293:17-296:25.)

Plaintiff now moves to compel the production of these documents and to compel Michael Rethman (Rosen's 30(b)(6) designee) and Nate Murphy (Defendants' in-house counsel) to answer questions posed by Plaintiff's counsel regarding Defendants' rationale for removing the "Causal Analysis" section of the Rosen Report. (*Id*. at 9-10.) Defendants argue that this discovery is not relevant to any party's claim or defense in this case. The court agrees.

Under the Federal Rules of Civil Procedure, the proper scope of discovery is "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The factors that bear upon proportionality are: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id*.

Plaintiff does not address relevance in its brief, but in a hearing in front of Magistrate Judge West, Plaintiff explained that the 2018 spill is relevant because "what happens in one area [of the pipeline] is clearly relevant from a pipeline engineering and maintenance issue for this case." (Doc. 257 at 50.) However, the cause of the 2018 leak, which occurred approximately six miles south of the Lazy S Ranch, is not relevant to Plaintiff's claims in this case. Here, Plaintiff is alleging the existence of a leak (or leaks) somewhere in the three-miles of pipeline that cross Plaintiff's property. Plaintiff claims that these leak(s) are the source of Plaintiff's injury. Plaintiff *is not* contending that any contamination from the 2018 incident has migrated onto the Lazy S Ranch. (*See* Fisher Dep., Doc. 276-5 at 184:15-19 (Q: "You would agree with me that you're not

saying that any contamination that may have occurred in 2018 has migrated onto the Lazy S Ranch; correct A: That is correct.")). Thus, the court finds that this evidence is irrelevant to Plaintiff's claims or defenses. *See Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders, LLC*, 2017 WL 1408226, at *6 (D. Kan. 2017) (denying motion to compel in train derailment case with respect to a photograph of a cracked rail joint bar because the photograph was taken at a location away from the train derailment site, and was therefore not relevant to the parties' claims and defenses).

Moreover, Plaintiff fails to show how this additional discovery is necessary to defeat summary judgment. *See Hall v. Daigle*, 795 F. App'x 903, 906 (5th Cir. 2019) (holding that district court did not err in denying plaintiff's motion to compel discovery as moot when it granted summary judgment when plaintiff made no effort to show how additional discovery would defeat the defendants' summary judgment motion); *Holmberg v. Vail*, 551 F. App'x 350, 351 (9th Cir. 2014) ("The district court did not abuse its discretion by denying [plaintiff's] motion to compel additional discovery or his request to continue defendants' summary judgment motion until he received additional discovery because [plaintiff] failed to show how the additional discovery was necessary to defeat summary judgment."); *see also* Fed. R. Civ. P. 56(d) (stating that court may defer considering or deny motion for summary judgment if "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition"). Accordingly, the court denies as moot Plaintiff's motion to compel.

Finally, Plaintiff has filed a motion (Doc. 293) requesting an order retroactively approving Plaintiff's prior submission of certain supplemental materials (Docs. 161, 162, 163). This motion is in relation to Plaintiff's previous motions to supplement. (Docs. 142, 143, 144.) These motions were referred to Magistrate Judge West. On October 27, 2022, Magistrate Judge West granted Plaintiff's motions to supplement. (Doc. 273 at 9.) She opined that her ruling granting Plaintiff's

motions to supplement (Docs. 142, 143, 144) would pertain to these supplemental materials, but noted that Docs. 161, 162, and 163 "were not referred to the undersigned Magistrate Judge for disposition." (Doc. 273 at 8 n.1.) This motion does not raise any issues that would preclude summary judgment. Accordingly, the court denies as moot Plaintiff's motion for referral.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's motion for leave to file a reply in support of its motion for partial summary judgment (Doc. 309) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion for partial summary judgment (Doc. 211) is DENIED.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment (Doc. 267) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's *Daubert* motions challenging Defendants' experts Coleman, Larson, and Smith (Docs. 265, 268, 272) are DENIED.

IT IS FURTHER ORDERED that Plaintiff's remaining *Daubert* motions (Docs. 218, 219, 220, 258) are DENIED AS MOOT.

IT IS FURTHER ORDERED that Defendants' *Daubert* motions (Docs. 223, 259, 260, 261, 262, 263, 264) and Defendants' motion to strike (Doc. 300) are DENIED AS MOOT.

IT IS FURTHER ORDERED that Plaintiff's motion in limine (Doc. 221) is DENIED.

IT IS FURTHER ORDERED that Defendants' motion in limine (Doc. 222) is DENIED AS MOOT.

IT IS FURTHER ORDERED that Plaintiff's motion to compel (Doc. 249) is DENIED.

IT IS FURTHER ORDERED that Plaintiff's motion for referral to the assigned magistrate judge (Doc. 293) is DENIED AS MOOT.

IT IS SO ORDERED.  Dated this 7th day of December, 2022.

s/ John W. Broomes
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE