**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

LAZY S RANCH PROPERTIES, LLC, an
Oklahoma limited liability company,

                        Plaintiff,

v.

VALERO TERMINALING AND DISTRIBUTION
COMPANY; VALERO PARTNERS OPERATING
CO. LLC; and VALERO PARTNERS
WYNNEWOOD, LLC,

                        Defendants.

Case No. 19-cv-425-JWB
Judge John W. Broomes

**DEFENDANTS' MOTION TO EXCLUDE HYDROTEST-RELATED EXPERT
OPINIONS OF JOHN BERTON FISHER AND MEMORANDUM IN SUPPORT**

Defendants (collectively, "Valero"), respectfully submit their motion, under Federal Rule
of Evidence 702, to exclude the testimony of Plaintiff's expert John Berton Fisher related to the
tracer gas test performed by Linde Services Inc. on the Pipeline at issue in this case in June 2025.

**INTRODUCTION**

Valero hired Legends Pipeline Services to perform a Hydrotest on the Pipeline in May
2025. To further prove that the Pipeline is not leaking, Valero also engaged Linde to perform its
state-of-the-art SeeperTrace® leak test on the Pipeline. The SeeperTrace® test began in late April
2025, with Linde inoculating the Pipeline test water, injecting its proprietary tracer gas into the
water used in the Hydrotest.[1] After the conclusion of the Hydrotest, Linde returned to "sled" the
Pipeline on June 2, 2025—meaning that Linde personnel walked along the Pipeline to locate leaks
using a battery-powered air-sampling backpack to determine whether any TracerGas could be

---

[1] The tracer gas mixes with the test water. When a pipeline is pressured up during a hydrotest,
water escapes when there is a leak. Tracer gas will escape with the water and diffuse in a gaseous
state up to the ground surface where it can then be detected

detected. Linde then analyzed the samples collected and produced a report explaining that no tracer gas was detected and, thus, the Pipeline is not leaking.

Plaintiff deposed three Linde employees involved in the test. They affirmed the conclusions in the Linde Report and provided additional testimony about Linde's tracer gas technology and process, including testimony about Linde's work identifying leaks in tanks and pipelines for the Department of Defense. (Ex. 1 (C. Toda Dep.) at 170:2-171:19; *id*. at 171:20-172:9 (testifying that Linde has never received complaints about its work from the Department of Defense or the U.S. government generally and that "[i]t's one of the best technologies to use").)

Plaintiff retained Fisher to "critically review the SeeperTrace work conducted by [Linde] and conclusions expressed by Linde regarding this work." (Ex. 2 (Fisher Report) at 5.)[2] This was Fisher's "first case looking at a perfluorocarbon tracer gas." (Ex. 3 (Fisher Dep.) at 33:3-10.) Fisher, who was not present when Linde did the sledding work on the Ranch (*id*. at 33:11-14), did not perform any testing of his own related to the tracer gases and restricted his analysis to reviewing documents that Linde produced and deposition testimony related to the Linde test. (*Id*. at 12:4-11; *id*. at 33:15-34:2.) In fact, despite serving as Lazy S' main expert in this case for air, soil, and water sampling for hydrocarbons, Fisher remarkably admitted he has not been on the Lazy S Ranch to do any testing of any kind for "a few years." (*Id*. at 173:2-6.)

Fisher's Report contains numerous criticisms of the Linde test. Valero disagrees with Fisher's critiques but does not seek to exclude them in their entirety. Rather, this Motion only seeks the exclusion of certain opinions discussed *infra*, including Fisher's unsupported and illogical conclusion that the Linde sled test for tracer gas proves that the Pipeline is leaking. (Ex.

---

[2] Valero understands that Plaintiff sent the Court paper copies of Fisher's Report on February 5, 2026, and thus, Valero has not filed a copy of the Report along with this Motion. If the Court prefers, Valero can file a copy on the docket.

2 at 5.)  These opinions and testimony should be excluded from trial as inadmissible under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

### **FISHER'S OPINIONS**

Fisher's main conclusion is that "[a] careful review of the SeeperTrace® test results obtained in Linde for the Valero Pipeline on the Lazy-S Ranch demonstrate that the pipeline is leaking."  (Ex. 2 at 5.)  In addition to this conclusion, Fisher offers 28 other "conclusions" which are set forth below, nearly all of which are not expert opinions but instead consist of Fisher simply summarizing facts and occurrences, which will not be helpful to the jury:

1. The Valero Pipeline on the Lazy-S Ranch showed areas of tracer chemical release and is, therefore, leaking.

2. Valero's request for a SeeperTrace® survey was made more than three weeks after its hydrostatic testing of its Ardmore to Wynnewood pipeline had been completed.

3. The time between the end of the hydrostatic testing of its Ardmore to Wynnewood pipeline and the time of the SeeperTrace® survey of this [sic] pipeline was long and atypical of the normal timing of such surveys.

4. Even though Linde stressed that it is essential to mark a pipeline undergoing a SeeperTrace survey, Valero did not mark the entire length of the pipeline on the Lazy-S Ranch.

5. Trees, brush and other difficult to penetrate vegetation were present on the pipeline path; Valero did not mow vegetation with a height greater than one (1) foot in height present over the Pipeline on the Lazy-S Ranch as suggested by Linde.

6. The path for sledding within ± three (3) feet of the pipeline is very rocky and topographically challenging.

7. During sledding, winds on the Lazy-S Ranch were strong, gusty and blowing from the SSE at an angle to the pipeline path.

8. No field notes relevant to the June 2, 2025, sledding of the Valero Pipeline have been produced by Linde as of the date of this report.

9. Exposed sampling tubes were transferred from the sampler, Cole Norton, to the field analytical lab by a Valero employee, but no chain of custody record was maintained.

3

10. Linde failed to follow their own guidance by not performing subsequent sledding passes over the Valero Pipeline.

11. The Valero Pipeline is not buried at a uniform depth across the Lazy-S Ranch.

12. The route of the Valero Pipeline traverses multiple geological and soil conditions on the Lazy-S Ranch.

13. The sledding "runs" on the Lazy-S Ranch were not done in conformance with SOP-5010.

14. The pace of sledding that can be derived from the total distance to be traversed and the length of time involved for each sledding run is anomalously fast considering the difficulty of traversing a path with heaped boulders and heavy brush.

15. Analyses of sample tubes are not duplicated.

16. Mr. Lintner relied on the gas chromatograph's computer system to determine if Tracer E was present in a sample.

17. A reliable background sample ("air blank") was not obtained by Linde for their SeeperTrace® work on June 2, 2025.

18. Tracer E was detected in samples collected by Linde during their SeeperTrace® work on the Lazy-S Ranch.

19. Linde's use of standards and controls (blanks and background samples) was inadequate to maintain reliable control over the analytical process involved in SeeperTrace® work.

20. Linde did no work or investigation to determine false negative error rate for SeeperTrace under the specific conditions of survey timing and the geology on the Lazy-S Ranch.

21. Site-specific leak simulation as required to verity [sic] the applicability of SeeperTrace to the Lazy-S Ranch was not done.

22. The false negative error rate for SeeperTrace® has not been published.

23. The SeeperTrace® methodology has not been subject to peer review or published in a scientific journal accompanied by information that would permit an independent third party to replicate the methodology.

24. Chris Toda, the Linde employee who wrote the report that transmitted Linde's SeeperTrace® leak trace results to Valero, did not have firsthand experience with the test, did not consult with anyone who had first-hand experience with the test, relied on a small subset of the documents generated to document the test, and did not review the chromatographic data generated by the test.

4

25. The report prepared by Linde varied from Linde's normal practice of reporting on SeeperTrace® work and incorporated and excluded information specifically requested by a Valero Employee.

26. The document accompanying the report written by Chris Toda that transmitted Linde's SeeperTrace® leak trace results to Valero titled "Results of Alternative U. S. EPA Standard Evaluation Non Volumetric Pipeline Tightness Testing Method,["] did not provide a certification of the SeeperTrace® work done on the Valero Pipeline on the Lazy-5 Ranch by Linde.

27. The tracer chemical used by Linde, Tracer E, is a perfluorocarbon compound whose reported boiling point range suggests it may be perfluoromethylcyclopentane, a compound with a very high vapor pressure whose density is 10 (air=l).

28. Whatever the perfluorocarbon that constitutes Tracer E, its high vapor density rules out buoyancy as a driver of its migration through soil.  Tracer E will migrate through soil because of chemical potential drive (diffusion) and pressure gradients (advection).

(*Id*. at 7-9.)

As explained below, Valero seeks to exclude Fisher Opinion Nos. 1 and 7 because they are not scientifically acceptable and there are disclosure problems with Opinion 7.  Valero also seeks to exclude Opinion Numbers Nos. 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 22, 23, 24, 25, and 26 because they are not expert opinions; rather, they are mere observations and unnecessary summaries of alleged facts Lazy S believes exist in the Linde documents and depositions that the jury does not need to hear from Mr. Fisher.

## LEGAL STANDARD

Federal Rule of Evidence 702 requires a trial court to perform a "gatekeeper function" by assessing "the reasoning and methodology underlying the expert's opinion, and determin[ing] whether it is scientifically valid and applicable to a particular set of facts." *Goebel v. Denver and Rio Grande W.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000).  First, the court must determine whether "the expert [is] qualified by 'knowledge, skill, experience, training, or education' to render an opinion," and, second, if the expert is so qualified, "whether [his] opinions [are] 'reliable' under the principles set forth under *Daubert*."  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965,

5

969 (10th Cir. 2001). "Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1204 (10th Cir. 2002).

"Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination that it has relevant "fit." *Bitler v. AO Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2005). To assess "fit," the court must "look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact." *Id.* "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## ARGUMENT

### I. FISHER IS A REBUTTAL EXPERT AND AS SUCH, CANNOT TESTIFY REGARDING THE LINDE TEST DURING PLAINTIFF'S CASE-IN-CHIEF.

During his deposition, Fisher affirmed that the purpose of his Report is to respond to the Linde report and depositions. (Ex. 3 at 149:5-8.) He is a rebuttal expert who cannot testify regarding any of the opinions in his Report during Plaintiff's case-in-chief unless and until Valero elicits testimony related to the Linde tracer gas testing. *E.g.*, *Vyanet Op. Grp., Inc. v. Maurice*, 2023 WL 1860237, at *1 (D. Colo. Feb. 9, 2023) ("Individuals designated only as rebuttal experts may present limited testimony may not testify as part of a party's case-in-chief, and cannot testify unless and until the testimony they were designated to rebut is given at trial."). Thus, Fisher can

6

only testify to his Linde-related opinions during Plaintiff's rebuttal case if Valero brings up the Linde tracer gas testing in its defense case.

**II.  FISHER'S OWN TESTIMONY ESTABLISHES THAT THERE IS NO BASIS FOR HIS ULTIMATE CONCLUSION IN HIS OPINION NO. 1 THAT THE LINDE TEST DEMONSTRATES THE PIPELINE IS LEAKING AND THUS, HE CANNOT BE PERMITTED TO OFFER THIS SPECULATIVE AND UNSUPPORTED OPINION AT TRIAL.**

Fisher's ultimate conclusion that the Linde test proves the Pipeline is leaking is speculative and unsupported because there is no link between the data he examines and that conclusion.  Most of Fisher's opinions concern Linde's supposed failures to follow its internal policies and its failure to produce certain documents that Fisher believes should have been produced.  (*E.g.*, Ex. 2 at 7, 53 (Opinion No. 4: "Even though Linde stressed that it is essential to mark a pipeline undergoing a SeeperTrace survey, Valero did not mark the entire length of the pipeline on the Lazy-S Ranch."); *id*. at 7, 34 (Opinion No. 8: "No field notes relevant to the June 2, 2025, sledding of the Valero Pipeline have been produced by Linde as of the date of this report."); *id*. at 8, 55 (Opinion No. 10: "Linde failed to follow their own guidance by not performing subsequent sledding passes over the Valero Pipeline."); *id*. at 8, 56 (Opinion No. 13: "The sledding "runs" on the Lazy-S Ranch were not done in conformance with SOP-5010.").)  These kinds of opinions do not and cannot support a conclusion that the test proves the Pipeline is leaking because they do not actually assess the test results.

Fisher does offer some opinions that purport to assess the test results.  (*E.g.*, *id*. at 8, 57 (Opinion No. 17: "A reliable background sample ("air blank") was not obtained by Linde for their SeeperTrace® work on June 2, 2025."); *id*. at 8, 57 (Opinion No. 18: "Tracer E was detected in samples collected by Linde during their SeeperTrace® work on the Lazy-S Ranch.").)  But these opinions also fail to establish that the test proves the Pipeline is leaking.  At most, these opinions provide a basis for Fisher to conclude and then offer an opinion that the test produced unreliable

data.  And Fisher does in fact express this opinion.  He testified that the test data "doesn't make any sense." (Ex. 3 at 136:12-13.)  He concludes that, in his view, the entire test was performed in an unreliable and "very sloppy" manner:

> It's – it's – it's hard to follow because almost everything that was done here is just about guaranteed to minimize or eliminate an analytical detection of Tracer E.  It's run in an extended time from the hydrostatic test, run after the extended time.  It's run under conditions that are not those specified by Linde for the test.  With the marking of the line and then removal of obstacles.  It's run with a super high air blank, which is guarantees that you're never going to detect anything.  I would say that what they did is a very sloppy job.

(*Id*. at 137:18-138:3; *see also id*. at 136:24-137:2 (the test "could be run in a way that's more reliable than the way Linde ran it" in this case).)

Remarkably, Fisher also believes that it is possible the sledding work was not performed at all:

> I mean, given – at least my observation – within the convex hall of my observations, the timing issues on the chromatographs that seem to be run before we start and end well before the job is finished, this 9:30 to 12:30.  The – and the – the lack of attention to analytical detail that's shown by the – the high air blank suggests that, you know, **it may be that Linde never actually ran these in reality at all.**

(*Id*. at 167:21-168:4; *see also id*. at 168:21-169:1 ("Who we never deposed was the fella who sledded the line.  And what we don't have are any notes from the sledding of the line.  What we don't have are the actual locations where we sledded the line from Point A to Point B.  So I don't know.  I'm just saying that that's a possibility.").)

Fisher did not perform any testing to validate any of the conclusions in his Report.  (*Id*. at 12:4-11 (testifying that he was asked to review Linde documents and depositions of Linde personnel and Valero employee Mario Puentes to write his Report); *id*. at 33:11-34:2 (testifying that he was not present at the Ranch when Linde performed the sledding of the line and did not do any of his own independent testing related to Linde trace gases).)  His conclusion that the Linde

8

test proves the Pipeline is leaking is based **solely** on his review of Linde's data, which he characterizes as unreliable and perhaps completely made up. While Valero does not agree that the data is invalid, Fisher's opinion to the contrary prohibits him from both criticizing the data as so flawed that it "doesn't make any sense" while simultaneously relying on that data to support a conclusion that the Pipeline is leaking. That conclusion "simply does not follow from the data," and thus there is "an impermissible analytical gap … between premises and conclusion." *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005). *See also Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Ho v. Michelin N. Am., Inc.*, 520 F. App'x 658, 666 (10th Cir. 2013) (affirming exclusion of expert opinion when there was no link to his underlying data); *Combs v. Shelter Mut. Ins. Co.*, 2007 WL 4748227, at *3 (E.D. Okla. Feb. 16, 2007) (excluding expert opinion where the "inferences and assertions…are not supported by appropriate validation"). The Court has already excluded such opinions in this case, *see* ECF No. 427 at 18 (excluding an opinion offered by Plaintiff's expert Kenneth Ede because it was "purely conjecture" and unsupported by any data), and the same should be done here.

Accordingly, Fisher should be prohibited from testifying that the Linde test proves the Pipeline is leaking because such a conclusion is supported only by data that Fisher himself repeatedly characterizes as at best, unreliable and at worst, fabricated.

## III.    FISHER'S WIND DATA OPINION NO. 7 SHOULD BE EXCLUDED BECAUSE IT RELIES ON UNDISCLOSED DATA.

Fisher's Opinion No. 7 relates to wind conditions at the Lazy S Ranch on the day of the sledding: "During sledding, winds on the Lazy-S Ranch were strong, gusty and blowing from the

SSE at an angle to the pipeline path." (Ex. 2 at 33-34.)  This opinion relies on wind speed data purportedly collected on the day that sledding occurred.  Fisher compiled this data, which he represents originated from three sources—"Wind Farm," "Ardmore Mesonet," and "Newport Mesonet"—into several charts.  (*See* Ex. 4 (Fisher Report Exhibit 5).)[3]  Fisher agreed that apparently the Wind Farm data is not available online.  (Ex. 2 at 72:12-16.)  According to a footnote in his Report, Fisher obtained this data from an individual named Amy Riley.  (Ex. 2 at 33 fn.102.)  During his deposition, Fisher testified that he obtained Ms. Riley's contact information from Charles Roos (a representative of Plaintiff) and she "sent [Fisher] an Excel spreadsheet with the data."  (Ex. 3 at 74:2-19.)

Fisher did not disclose the spreadsheet or the underlying data it contains.  Ms. Riley was never disclosed as a witness in this case.  The data upon which Fisher's Opinion No. 7 has not been produced, is not authenticated, and is unreliable.  Thus, Fisher should be prohibited from relying on this data in support of any of his opinions at trial.

**IV.  FISHER'S OPINION NOS. 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 22, 23, 24, 25, AND 26 ARE NOT ADMISSIBLE EXPERT OPINIONS—THEY ARE OBSERVATIONS THAT SHOULD HAVE BEEN ADDRESSED BY LAZY S IN THE THREE DEPOSITIONS OF LINDE PERSONNEL.**

In addition to moving to exclude Fisher's Opinion Nos. 1 and 7 in the foregoing sections, Valero requests that the Court prohibit him from testifying in Lazy S' rebuttal case about Opinion Nos. 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 22, 23, 24, 25, and 26 (the "Observation Opinions") because they are not expert opinions.  Instead, they are mere observations and unnecessary summaries of alleged facts Lazy S believes exist in the Linde documents and depositions.  A plain reading of the Observation Opinions demonstrates that they did not require the application of any

---

[3] *See* footnote 2.

scientific or mathematical principles, they did not involve expert analysis, and they are actually just cross examination questions that Lazy S' counsel could have asked—and in some cases, did ask—the three Linde witnesses in their depositions in November 2025. The proper way for Lazy S to elicit that testimony is from the Linde depositions at trial, not through Fisher simply observing facts and trying to summarize facts for the jury; the jury can do that for itself and does not need expert testimony to assist it. *E.g.*, *Wells v. Allergan, Inc.*, 2013 WL 7208221, at *2 (W.D. Okla. Feb. 4, 2013) ("An expert must do more than simply construct[] a factual narrative based upon record evidence or address lay matters which a jury is capable of understanding and deciding without the expert's help"); *see also Jones v. Mountainside Apartments, LP*, 2022 WL 2158987, at *3 (D. Wyo. May 23, 2022) (striking expert report which "consists of inadmissible factual narrative" because "[s]imply reciting the facts and information contained within [record] evidence would not be helpful to a jury"); *Turnkey Sols. Corp. v. Hewlett Packard Enter. Co.*, 2018 WL 571877, at *3 (D. Colo. Jan. 26, 2018) ("inappropriate[]" for an expert to "regurgitat[e] facts at trial, rather than using relevant facts as context for his expert opinions").

Therefore, Valero respectfully requests that the Court exclude the Fisher Observation Opinions.

## CONCLUSION

For all these reasons, Defendants request that the Court grant this Motion and prohibit Plaintiff's expert, John Berton Fisher, from offering the above-discussed opinions at trial.

Dated: February 27, 2026                    By: /s/ *Ben A. Barnes*

James F. Bennett, MO Bar # 46826
Megan S. Heinsz, MO Bar # 56377
Matthew E. Johnson, CO Bar # 40984

11

Philip A. Cantwell, MO Bar # 65505
Arin H. Smith, MO Bar # 72636
Ben A. Barnes, TX Bar #24092085
DOWD BENNETT LLP
7676 Forsyth Blvd., Suite 1900
St. Louis, MO 63105
(314) 889-7300 Telephone
(314) 863-2111 Facsimile
jbennett@dowdbennett.com
mheinsz@dowdbennett.com
mjohnson@dowdbennet.com
pcantwell@dowdbennett.com
asmith@dowdbennett.com
bbarnes@dowdbennett.com

Stephen L. Jantzen, OBA # 16247
Phillip G. Whaley, OBA # 13371
Grant M. Lucky, OBA # 17398
RYAN WHALEY PLLC
400 N. Walnut Ave.
Oklahoma City, OK 73104
(405) 239-6040 Telephone
(405) 239-6766 Facsimile
sjantzen@ryanwhaley.com
pwhaley@ryanwhaley.com
glucky@ryanwhaley.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF CONFERRAL

Defendants understand that Plaintiff opposes this Motion. Conferral regarding this Motion took place via email on February 26, 2026, as Plaintiff's counsel is located at 1921 South Boston Ave., Tulsa, Oklahoma and in St. Louis, while Defendants' counsel is located in St. Louis and at 400 N. Walnut Ave., Oklahoma City, Oklahoma – more than thirty (30) miles from each other.

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2026, a true and accurate copy of the foregoing was electronically transmitted to the Clerk of Court using the ECF System for filing and transmitting to those registered to receive notices of this case via the ECF System:

By: */s/ Jessica Green*