1

SS

EXHIBIT

3

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

LAZY S RANCH PROPERTIES, LLC,  )

                               )

          Plaintiff,           )

                               )

vs.                            ) No. 19-cv-425-JWB

                               )

VALERO TERMINALING AND         )

DISTRIBUTION COMPANY; VALERO   )

PARTNERS OPERATING COMPANY     )

LLC; and VALERO PARTNERS       )

WYNNEWOOD, LLC,                )

                               )

          Defendants.          )

* * * * * *

VIDEOTAPED DEPOSITION OF JOHN BERTON FISHER, Ph.D

TAKEN ON BEHALF OF THE DEFENDANTS

2

IN TULSA, OKLAHOMA


ON FEBRUARY 24, 2026


* * * * * *



******ROUGH DRAFT******







REPORTED BY:  KEVIN LEE IDLEMAN, CSR #01652

fact that you learned there was going to be a test, when

12

did you determine or was it determined that you were going to issue some sort of report related to that test?

A    Well, I can't -- I don't determine when I issue reports.  So I can't answer that question.  I was asked to review the Linde documents that were produced in discovery concerning their tracer study.  And then asked to attend the deposition of Mr. Cimijotti, Mr. -- gosh.  Mr. Toda.  I don't know why I can't remember this fella's name.  He was sort of a critical guy.  Kel -- Kel Lintner.  As to that, review their depositions, and review the deposition of Mario Puentes.

Q    Those depositions of the three Linde folks, you were present in Birmingham, Alabama for those depositions?

A    Yes.

Q    And then did you attend in person or on Zoom, the Mario Puentes deposition?

A    I did not.  I read his deposition.

Q    All right.  And thinking about, as I recall, the hydrotest happened in early May.  It would be, you know, May 2 through 5 or something like that.  Do you

Q    In your work as an expert witness in various cases, have you ever come across any of your environmental cases or oil and gas cases where a tracer gas like the one described in this case was used in

33

those cases in any way?

A    No.

Q    Okay.  This is the first time you've issued opinions about a tracer gas that you can recall?

A    Well, the use of -- it's really the analysis of a fugitive substance in the environment.  So it's more general than a tracer gas.  But it's -- this would be the first case looking at a perfluorcarbon tracer gas.  Introduction, measurement and -- collection and measurement modalities and procedures.

Q    I think I might have asked this, but I want to be sure.  You weren't present on June 2nd when they did the sledding?

A    No.

Q    Did you do any of your own, I think the answer is no because you said you haven't been to the ranch lately, but did you do any of your own independent testing of any kind related to Linde tracer gases that were use in this process?

A    With respect to the gases, per se?  No.

Q    Okay.  So your analysis was focused on the documents Linde produced including the chromatograms?

A    That's correct.

Q    Okay.  So, you weren't, like, in the lab trying to recreate anything with the tracer gas or

34

anything like that?

A    No.

MR. PAGE:  Object to the form.  Ambiguous.

Q    (By Mr. Johnson)  What about in terms of other cases where you refer to as a fugitive substance; is that right?

A    Uh-huh.

Q    Have you ever had any cases where anybody is trying to test above the ground like this the way they do with their sledding process for any sort of fugitive chemical like the tracer gas?

A    Sure.  Sniffing for hydrocarbons.

Q    And how does that work?  Explain that. Explain that process to me.

A    The process, there is a -- it's done in exploration geology in multiple ways.  One is by direct

forgotten, but it's owned by a foreign company.  But there's a person -- pardon?

Q    So how -- go ahead.

A    There's a person there who was happy to provide me with the wind information.

Q    How did you -- you just called them up and

74

said, hey, do you have wind info?

A    No.  Mr. Roos identified the person.  Then I called them up.  He got some data and I said that's not detailed enough.  He gave me this person's phone number. I called her and then she provided me the full data set at ten-minute intervals.

Q    Do you know which Mr. Roos you're referring to?

A    Charles Roos.

Q    Okay.  And he provided the name of a person at the wind farm.  Do you know what that person's name was?

A    It should be in here but I can't remember if I've included it or not.  But I will.  I can provide that if -- if it's not in this report.

Q    How did this woman at the wind farm convey

the information to you?

A    She sent me an Excel spreadsheet with the data.

Q    And what was it specifically that you asked for from her?

A    I asked for wind data at whatever their sampling interval was for that -- for the day at which the sledding was done.

Q    Do you recall which day we talked about?

75

A    May 2nd.

Q    Okay.

MR. PAGE:  Excuse me?

THE WITNESS:  May 2nd of 2025.  2025.

Q    (By Mr. Johnson)  Do you know if the -- the wind data that she provided is from the top of where the blades are or the poles are that hold up the windmills or from the surface?

A    It's going to be -- it's not from the windmills themselves.  It's from a standard anemometer. Probably the two meter height.  Or it's either a two meter or ten meter height.  But that's a standard reporting.  When you get a wind velocity, that's the standard place you get a wind velocity reported from,

Q      Yeah.  You don't find them in any of the actually tested chromatograms?

A      No.  You do find it in the test.

Q      Well, not at the same --

A      Well, no.  The blank's screwed up.  And at the end of the runs, the last two runs that I have reports for, show me there's no response at that level, which tells me the real air blank is -- is that.

Q      Okay.  So let's think about, like, intellectual honesty here.  So if -- if what you're saying is that the air blank has problems --

136

MR. PAGE:  I like honesty is my best policy.

Q      (By Mr. Johnson)  If the air blank has a problem, and what we're seeing in these areas for the four or five -- four that came back as supposedly having smaller areas of Tracer E, do you think, as a decades long chemist, that the results are reliable?

A      I would say this, I would say that Linde didn't -- Linde's technician should never have let that project go with a single air blank at that level.  But he did.  If that's the correct air blank, which we're forced to assume because that's what he represents it

as.  Doesn't make any -- the data doesn't make any sense.  If we anticipate finding some universal value of air blank, and I find samples with trivial amounts so small that they don't show up as detects, and we run them at the same amount of collection time, I can only conclude that the true air blank is those.  This is a bad blank.  I got a bad blank.  They run the system.  Find Tracer E present at low and somewhat variable levels and not trending variable levels.  Not trending downward, but bouncing around.  And the last two samples show that there is no tracer.  It doesn't detect Tracer E, then that's the real blank.

Q    Do you think that if this type of test with the tracer gas and the sledding could be run in a way

137

that's more reliable than the way Linde ran it?

A    Yeah.

Q    And it's starts with the air blank?

A    Well, in part it starts with the air blank. It also starts with marking the line completely. Cutting -- no.  It all works together.  We've got to mark the line.  We need to cut all the obstacles down to one foot, whatever Linde specifies.  And we need to divide some ability to try to manage that sled over this

really rough ground, which is not a common circumstance.

Q    Okay.  So what's -- back to my question a few minutes ago.  What is Linde's -- I mean, they were pretty confident in their depos, you were there.  That there was no -- there were not sufficient amounts of Tracer E detected to result in a leak.  What do you understand their thought process or analysis to be, if you have one.

A    It's -- it's -- it's hard to follow because almost everything that was done here is just about guaranteed to minimize or eliminate an analytical detection of Tracer E.  It's run in an extended time from the hydrostatic test, run after the extended time.  It's run under conditions that are not those specified by Linde for the test.  With the marking of the line and then removal of obstacles.  It's run with a super high

138

air blank, which is guarantees that you're never going to detect anything.  I would say that what they did is a very sloppy job.

Q    Why do you say that the -- the high air blank guarantees you won't detect anything?

A    If that's zero, then all these other vallues

sure prior to.  I was looking at the depositions from Linde.  He reached the same conclusion as did their report.

Q    So you're -- you're not sure if you actually saw this before you issued a report, is your point?

A    No.  It would make no difference.

Q    Okay.  And then in terms of describing what you are responding to, what you're telling me is that you're issuing opinions in response to the work that was done by Linde that was commissioned by Valero; is that right?

A    Correct.

Q    And as stated in here on Page 20, that's exactly what I'm responding to.  Because Mr. Garrity uses Linde's report and reports the conclusion as a quote from their report.  So I'm responding to Linde's report, not to this report.

Q    Okay.  You're responding to the work Linde did and the report they issued, which is marked as what?

149

Exhibit 3 or 4?

A    No.

Q    Maybe 6?

A    Six.

Q    So you're responding to the work Linde did in their report, Exhibit 6, including some of the points made in the Linde depositions; right?

A    Correct.

Q    Okay.  All right.  Let's go back to your report.  We've got into the chemistry when we were talking about Page 42 at the bottom in bold.

A    Yes.

Q    And I think we covered that one.  So I want to go to the top of 43.  And maybe we're going to be able to short circuit some of this.  You wrote, a reliable backgroun sample was not obtained by Linde for their seeper trace work on June 2, 2025.  That's specifically about the air sample that we just talked about; right?

A    That's correct.

Q    There's not any other background sample that you're referring to?

A    That's the problem.  There are no other background samples that were specifically collected to be background.

150

Q    Right.  But there was one.  That we talked

Q    Can you confirm that for me?  Maybe you just did.

A    Well, I think that's true.  I will confirm it.  I think there's one we haven't discussed at the bottom of Page 59.

Q    Oh, yeah.  That's the top of 50, I think.

A    Top of 50?

Q    No.  Top of 52.  I didn't ask you about it though.

A    Okay.

Q    So you're right.  But I mean, that's the same as the top of 52; right?

A    I'll just confirm that.  Yeah.  That's correct.

167

MR. PAGE:  So, I don't know what you're talking about.  You confirmed something on one page that was written on the bottom of this other page, and he's confirmed but no one's actually said what is being confirmed.

THE WITNESS:  And I will say it.  It says the seeper trace methodology has not been subject to pier review or published in a scientific journal accompanied by information that would permit an independent third

party to replicate the methodology.

MR. PAGE:  And I know it's your question, but I wanted to make sure I could hear it.

Q    (By Mr. Johnson)  And that is the same topic that's discussed at the top of 50 also?

A    That is correct.

MR. PAGE:  Thank you.

Q    (By Mr. Johnson)  Beyond that, are there any other conclusions that you think are different or that we haven't discussed today in that conclusion section that goes through Page 61?

A    Yeah.  There may be.  I mean, given -- at least my observation -- within the convex hall of my observations, the timing issues on the chromatographs that seem to be run before we start and end well before the job is finished, this 9:30 to 12:30.  The -- and

168

the -- the lack of attention to analytical detail that's shown by the -- the high air blank suggests that, you know, it may be that Linde never actually ran these in reality at all.

Q    Wow.  So all these people lied under oath about doing it?

A    Well, Mr. Toda didn't.  He worked on the --
the -- the report only based upon notes.

Q    Okay.  And the inoculation guy?

A    Mr. Cimijotti did the inoculation.  There are
a set of notes.  What we fail to have notes from is the
sledding.

Q    Hold on.  So who -- who are you saying might
be lying?  Are you ruling out Cimijotti?

A    I'm ruling out Cimijotti.

Q    Are you ruling out Chris Toda?

A    I don't think Toda would know.  He just had
information.

Q    So --

A    Mr. Lintner may have received back samples.
Who we never desposed was the fella who sledded the
line.  And what we don't have are any notes from the
sledding of the line.  What we don't have are the actual
locations where we sledded the line from Point A to
Point B.  So I don't know.  I'm just saying that that's

169

a possibility.

Q    Okay.  I understand that.  I thought you were
saying something very different.  I'm trying to ask you,
I think 52 to 61 is a repeat of your earlier comments in

this location?

A    No.

Q    Have you done any water sampling location --
or at this location in the event water --

173

A    No.  There's no water in that location.

Q    When was the last time you can recall doing
any air or water or soil sampling at the ranch?

A    I don't remember.

Q    It's been years; right?

A    Been A few years.  Yeah.

Q    Few years.  All right.  What's the point of
Exhibit 8B?

A    That's a sink hole that's 60 feet west of the
Valero pipeline.  It's a collapsed feature in which
surface material is falling into the subsurface because
it's been undermined by karst development.

Q    Have you done any testing at this location
that you can recall?

A    Only to look at the -- the debris sistivity
testing at this location and the last one.  But no
sampling at this location.

Q    No sampling.  All right.  The purpose of
Exhibit 9 on Page 77, tell me about that?

I, KEVIN LEE IDLEMAN, CSR for the State of Oklahoma, certify that JOHN BERTON FISHER, Ph.D was by me sworn to testify the truth; that the videotaped deposition was taken by me in stenotype and thereafter transcribed and is a true and correct transcript of the testimony of the witness; that the videotaped deposition was taken on FEBRUARY 24, 2026, at 10:04 a.m., at 401 S. Boston Avenue, Suite 310, City of Tulsa, State of Oklahoma; that I am not an attorney for or a relative of either party, or otherwise interested in this action.

Witness my hand and seal of office on this the 25th day of February, 2026.


_____
KEVIN LEE IDLEMAN, CSR
Oklahoma Certified Shorthand Reporter
Certificate No. 1652
Expiration date:  December 31, 2026